1   MORGAN, LEWIS & BOCKIUS LLP
    Eric Meckley, Bar No. 168181
2   eric.meckley@morganlewis.com
    Brian D. Berry, Bar No. 229893
3   brian.berry@morganlewis.com
    Kassia Stephenson, Bar No. 336175
4   kassia.stephenson@morganlewis.com
    One Market, Spear Street Tower
5   San Francisco, CA  94105-1596
    Tel:    +1.415.442.1000
6   Fax:    +1.415.442.1001

7   MORGAN, LEWIS & BOCKIUS LLP
    Ashlee N. Cherry, Bar No. 312731
8   ashlee.cherry@morganlewis.com
    1400 Page Mill Road
9   Palo Alto, CA  94304
    Tel:    +1.650.843.4000
10  Fax:    +1.650.843.4001

11  Attorneys for Defendant
    X CORP. AS SUCCESSOR IN INTEREST TO
12  TWITTER, INC.

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16

17

18  DMITRY BORODAENKO and HANA          Case No. 3:22-cv-07226-AMO
    THIER, on behalf of themselves and all others
19  similarly situated,                 Assigned to: Hon. Araceli Martinez-Olguin

20              Plaintiffs,             **REQUEST FOR JUDICIAL NOTICE IN
                                        SUPPORT OF DEFENDANT'S
21        vs.                           OPPOSITION TO PLAINTIFFS'
                                        ADMINISTRATIVE MOTION TO
22  TWITTER, INC. and X CORP.,          RELATE CASES**

23              Defendants.

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DEFENDANT'S REQUEST
FOR JUDICIAL NOTICE
CASE NO. 3:22-cv-07226-AMO

1

## REQUEST FOR JUDICIAL NOTICE

2

In accordance with Federal Rule of Evidence 201, Defendant X Corp. as successor in

3 interest to Defendant Twitter, Inc. ("Twitter" or "Defendant") respectfully requests that this Court

4 take judicial notice of Exhibits 1 through 5 attached to this Request for Judicial Notice in

5 connection with Twitter's Opposition to Plaintiff's Administrative Motion to Relate Cases.

6

Rule 201 allows a court to take judicial notice of facts that are "not subject to reasonable

7 dispute" because they are either (1) "generally known within the trial court's territorial

8 jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy

9 cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Khoja v. Orexigen*

10 *Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("A court may take judicial notice of

11 matters of public record without converting a motion to dismiss into a motion for summary

12 judgment." (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001))).  The Court

13 "must take judicial notice if a party request it and the court is supplied with the necessary

14 information."  Fed. R. Evid. 201(c)(2).

15

This Court can take judicial notice of Exhibit 1 through 4 because court orders and filings

16 are the type of documents that are properly noticed under Rule 201.  *See Reyn's Pasta Bella, LLC*

17 *v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (taking judicial notice "of several other

18 pleadings, memoranda, expert reports, etc." from related litigation because they are "matters of

19 public record"); *see also Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007) (recognizing

20 district court "may take notice of proceedings in other courts, both within and without the federal

21 judicial system, if those proceedings have a direct relation to matters at issue"); *Neilson v. Union*

22 *Bank of Cal.*, 290 F. Supp. 2d 1101, 1112-14 (C.D. Cal. 2003) (granting judicial notice of court

23 orders and civil minutes, including the "existence and legal effect of the documents").

24

Accordingly, Twitter hereby requests that this Court take judicial notice of the following

25 documents:

26

1.      **Exhibit 1** is a true and correct copy of the Complaint (ECF No. 1) filed on August

27 8, 2023, in *Weinberg et al. v. Twitter, Inc.*, Case No. 3:23-cv-04016, filed in the United States

28 District Court for the Nothern District of California.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

1

DEFENDANT'S REQUEST
FOR JUDICIAL NOTICE
CASE NO. 3:22-cv-07226-AMO

1

2. **Exhibit 2** is a true and correct copy of the Amended Class and Collective Action

2 Complaint (ECF No. 41) filed on May 26, 2023, in *Strifling, et al. v. Twitter, Inc.*, Case No. 22-

3 cv-07739-JST, filed in the United States District Court for the Nothern District of California.

4

3. **Exhibit 3** is a true and correct copy of the Order Granting Defendant's Motion to

5 Dismiss the Complaint (ECF No. 38) filed on May 8, 2023, in *Strifling, et al. v. Twitter, Inc.*,

6 Case No. 22-cv-07739-JST, filed in the United States District Court for the Nothern District of

7 California.

8

4. **Exhibit 4** is a true and correct copy of Twitter's  Notice of Motion and Motion to

9 Strike Portions of the First Amended Complaint (ECF No. 46) filed on June 16, 2023, in *Strifling,*

10 *et al. v. Twitter, Inc.*, Case No. 22-cv-07739-JST, filed in the United States District Court for the

11 Nothern District of California.

12

5. **Exhibit 5** is a true and correct copy of Twitter's Notice of Motion and Motion to

13 Dismiss the Complaint (ECF No. 19) filed on May 12, 2023, in *Zeman v. Twitter, Inc.*, Case No.

14 3:23-cv-01786-SI, filed in the United States District Court for the Nothern District of California.

15

16 Dated: August 15, 2023                              MORGAN, LEWIS & BOCKIUS LLP

17

18                                                            By   */s/ Eric Meckley*
                                                                 Eric Meckley
19                                                               Brian D. Berry
                                                                 Ashlee N. Cherry
20                                                               Kassia Stephenson

21                                                               Attorneys for Defendant
                                                                 X CORP. AS SUCCESSOR IN
22                                                               INTEREST TO TWITTER, INC.

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

2

DEFENDANT'S REQUEST FOR
JUDICIAL NOTICE
CASE NO. 3:22-cv-07226-AMO

# EXHIBIT 1

SHANNON LISS-RIORDAN (SBN 310719)
(sliss@llrlaw.com)
BRADLEY MANEWITH (*pro hac vice* forthcoming)
(bmanewith@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:     (617) 994-5800
Facsimile:     (617) 994-5801

*Attorneys for Plaintiffs Nhu Weinberg,*
*Samantha Gongora, Julia Steele,*
*Omolade Ogunsanya, Nanci Sills,*
*Krista Bessinger, and Ikuhiro Ihara,*
*on behalf of themselves and others*
*similarly situated*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| NHU WEINBERG, SAMANTHA GONGORA, JULIA STEELE, OMOLADE OGUNSANYA, NANCI SILLS, KRISTA BESSINGER, IKUHIRO IHARA, and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TWITTER, INC., and  X CORP., <br><br> Defendants | **CLASS ACTION COMPLAINT AND JURY DEMAND** <br><br> 1. VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. §2601, *et seq.* <br> 2. SEX DISCRIMINATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.* <br> 3. RACE DISCRIMINATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.* <br> 4. DISCRIMINATION IN VIOLATION OF THE ADEA, 29 U.S.C. § 621, *et seq.* |

I.     **INTRODUCTION**

1.     This case is brought by Plaintiffs Nhu Weinberg, Samantha Gongora, Julia Steele, Omolade Ogunsanya, Nanci Sills, Krista Bessinger, and Ikuhiro Ihara, on behalf of themselves and others similarly situated, against Defendants Twitter, Inc. and X Corp. (collectively, "Twitter"), for discrimination and violations of the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, related to Plaintiffs' separations from employment with Twitter during the chaotic days following multi-billionaire Elon Musk's purchase of the company.

2.     Plaintiff Weinberg, who had taken family leave in recent years, and was separated from Twitter shortly after returning from a medical leave, brings claims on behalf of herself and other similarly situated employees who have taken or applied to take a family or medical leave, for violations of the FMLA, challenging the company's termination, or constructive termination, of employees who had taken, or applied to take, a medical or family leave of absence.

3.     Plaintiffs Weinberg, Gongora, Steele, Sills, and Bessinger, who are female, bring claims of discrimination under Title VII, 42 U.S.C. § 2000e, *et seq.*, challenging their terminations following Elon Musk's acquisition of the company as the product of unlawful sex discrimination against female employees.

4.     Plaintiff Ogunsanya, who is Black, brings a claim of discrimination under Title VII, 42 U.S.C. § 2000e, *et seq.*, challenging his termination following Elon Musk's acquisition of the company as the product of unlawful race-based discrimination against Black employees.

5.     Plaintiffs Bessinger and Ihara, who are age fifty (50) or older, bring claims of discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*, challenging their terminations following Elon Musk's acquisition of the company as the product of unlawful age discrimination against employees age fifty (50) or older.

6.      As described in further detail below, shortly after Elon Musk completed his purchase of Twitter, he immediately began laying off well more than half of its workforce.

7.      Twitter's mass termination has impacted employees in a number of protected categories to a much greater degree than other employees.  These categories include female, Black, and older employees, as well as employees who had recently taken or were preparing to take family or medical leave.

8.      Plaintiffs thus file this complaint alleging sex, race, and age discrimination claims, as well as class action claims for violations of the FMLA.[1]

## II.      **PARTIES**

9.      Plaintiff Nhu Weinberg is an adult resident of Piedmont, California, who worked for Twitter from October 15, 2012, until November 4, 2022.  She was employed by Twitter as a Staff Software Engineer. Throughout her employment with Twitter, Weinberg's performance met the Company's expectations.

10.      Plaintiff Samantha Gongora is an adult resident of Boulder, Colorado, who worked for Twitter from February 1, 2012, until November 4, 2022.  She was employed by Twitter as a Software Engineer II. Throughout her employment with Twitter, Gongora's performance met the Company's expectations.

11.      Plaintiff Julia Steele is an adult resident of Dallas, Texas, who worked for Twitter from September 2018 until November 4, 2022.  She was employed by Twitter as the Head of

---

[1]      Similar class discrimination claims have already been filed on behalf of female employees in Strifling et al v. Twitter, Inc., C.A. No. 22-cv-7739 (N.D. Cal.), and older employees in Zeman v. Twitter, Inc., C.A. No. 23-cv-01786 (N.D. Cal.).  Another class discrimination case, Borodaenko et al v. Twitter, Inc., No. 22-cv-7226 (N.D. Cal.), was also filed on behalf of disabled employees and employees raising FMLA claims.  However, the lead plaintiff in the Borodaenko case who brought an FMLA claim was bound by an arbitration agreement and thus is pursuing his claim in arbitration.  The class FMLA claim raised here thus effectively replaces that class claim from the Borodaenko case.

CLASS ACTION COMPLAINT AND JURY DEMAND

Global Internal Communications. Throughout her employment with Twitter, Steele's performance met the Company's expectations.

12.     Plaintiff Omolade Ogunsanya is an adult resident of San Francisco, California, who worked for Twitter from September 14, 2020, until November 4, 2022. He was employed by Twitter as the Curation Desk Lead and also served as the Global Co-Chair of Blackbirds, an employee resource group for African American employees. Throughout his employment with Twitter, Ogunsanya's performance met the Company's expectations.

13.     Plaintiff Nanci Sills is an adult resident of Palmetto Bay, Florida, who worked for Twitter from September 6, 2013, until November 4, 2022.  She was employed by Twitter as the Director of Market Research. Throughout her employment with Twitter, Sills's performance met the Company's expectations.

14.     Plaintiff Krista Bessinger is an adult resident of Piedmont, California, who worked for Twitter from October 28, 2013, until November 4, 2022.  She was employed by Twitter as the Vice President of Investor Relations. Throughout her employment with Twitter, Bessinger's performance met the Company's expectations.

15.     Plaintiff Ikuhiro Ihara is an adult resident of New York, New York, who worked for Twitter from October 2, 2012, until November 23, 2022.  He was employed by Twitter as a Staff Machine Learning Engineer. Throughout his employment with Twitter, Ihara's performance met the Company's expectations.

16.     Defendant Twitter, Inc. is a Delaware corporation, headquartered in San Francisco, California.

17.     Defendant X Corp. is a Nevada corporation, headquartered in San Francisco, California.

18.     In or about March 2023, Twitter merged with X Corp., and as a result Twitter and X Corp. are a single entity. X Corp. has successor liability for Twitter's unlawful acts.  Twitter and X Corp. are referred to herein as "Twitter".

## III.   JURISDICTION

19.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1331, as it is a civil action arising under the Constitution, laws, or treaties of the United States.

20.     This Court has personal jurisdiction over Twitter, as it is headquartered in this District and conducts substantial business operations in this District.

## IV.   STATEMENT OF FACTS

21.     Twitter is a social media company that used to employ thousands of people across the United States.

22.     In April 2022, it was announced that multi-billionaire Elon Musk would be purchasing the company.

23.     Following Elon Musk's purchase of Twitter in late October 2022, Musk immediately began a mass layoff that affected well more than half of Twitter's workforce.  See Kate Conger, Ryan Mac, and Mike Isaac, Confusion and Frustration Reign as Elon Musk Cuts Half of Twitter's Staff, NEW YORK TIMES (November 4, 2022), https://www.nytimes.com/2022/11/04/technology/elon-musk-twitter-layoffs.html.

24.     The decisions regarding which employees would be laid off were made under extremely hurried circumstances, with little if any regard given to employees' job performance, qualifications, experience, and abilities.  Indeed, decisions regarding laying off thousands of employees were made in a period of just days after Musk's acquisition of the company.

25.     Most laid off employees (including all Plaintiffs other than Ihara) were notified of their layoff on November 4, 2022.  Other employees were notified of their layoffs in the following weeks, including Plaintiff Ihara, who was notified on November 23, 2022.

CLASS ACTION COMPLAINT AND JURY DEMAND

26.     Reportedly, the layoff decisions were made quickly by a small group of managers, under close supervision by Musk.  Some of these managers were brought in from other companies owned by Musk (such as Tesla), who did not have much, if any, knowledge about Twitter's operations.  See Lora Kolodny, Elon Musk has pulled more than 50 Tesla employees into his Twitter takeover, CNBC (November 1, 2022), Elon Musk has pulled more than 50 Tesla employees into Twitter (cnbc.com).

27.     These layoffs resulted in a significantly greater proportion of women being laid off than men; a greater proportion of older employees being laid off than younger employees; and Black employees being laid off than employees of other races.  In addition, employees who had taken, or were preparing to take, family or medical leave were more likely to be laid off than other employees.

### A.     FMLA Violations

28.     Plaintiff Nhu Weinberg worked as a Staff Software Engineer.  She had taken family or medical leave in the years leading up to her layoff to care for her child, who is disabled, as well as to care for her own medical conditions.  She also took medical leave just prior to Musk's purchase of the company.

29.     Weinberg was informed of her layoff on November 4, 2022, less than a month after returning from 10 weeks of FMLA leave.

30.     The layoffs at Twitter following Musk's acquisition of the company had a disproportionately high impact on employees who were taking, or preparing to take, family or medical leave.   Approximately 60% of employees who were on leave at the time of the November 4, 2022, layoffs were notified that day that they were being laid off (as compared to approximately 51% of employees overall).  And most employees who were on leave were no longer employed by the company following Musk's ultimatum a couple of weeks later, in which

CLASS ACTION COMPLAINT AND JURY DEMAND

he required that employees agree by November 17, 2022, to being "extremely hardcore" and "working long hours at high intensity".

**B.      Sex Discrimination**

31.      Widely circulated pictures of Twitter employees before and after the November 4, 2022, layoff raised observations about the stark contrast in the number of women who appeared to be employed at the company before and after Musk's acquisition.  Rachna Manojkumar Dhanrajani, Curious case of Twitter's missing women: Before and after pictures shock the internet, Business Today  (November 21, 2022), Curious case of Twitter's missing women: Before and after pictures of Twitter office shock the internet - BusinessToday; Kanishka Sarkar, Where have all the women gone from Elon Musk's Twitter? 'Before & after' office photos shock internet, CNBC (November 21, 2022),  Where Have All The Women Gone From Elon Musk'S Twitter? 'Before & After' Office Photos Shock Internet (cnbctv18.com).

32.      The data from these layoffs bear out these observations.

33.      According to a spreadsheet showing which Twitter employees in the United States were retained and which were laid off on November 4, 2022, approximately 2,621 out of 5,134 employees were notified that day they were being laid off.

34.      Prior to the layoffs that day, Twitter employed approximately 2,234 female employees and 2,900 male employees in the United States.  Of those employees, approximately 1,271 females and 1,350 males were notified that day they were being laid off.

35.      Thus, 57% of female employees were laid off on November 4, 2022, while 47% of male employees were laid off.

36.      Not only is this a large percentage difference, but it is also extremely statistically significant.

37.     According to Dr. Mark Killingsworth, a professor in the Department of Economics at Rutgers University,[2] a chi square statistical analysis reveals that this distribution in layoffs by sex is 7.3491 standard deviations away from a normal distribution.  In other words, the odds that this disparity between women and men being laid off is due only to chance is .00000000000001 (or, put another way, 9.977 out of 100 trillion).

38.     Further, the disparity between women and men being laid off cannot be explained based upon a justification that Musk intended to retain more employees in engineering-related roles.

39.     According to the spreadsheet, prior to the layoffs that day, Twitter employed approximately 863 female and 1,834 male employees in engineering-related roles in the United States.  Of those employees, approximately 507 females and 826 males were notified that day they were being laid off.  Thus, 59% of females in engineering-related roles were laid off on November 4, 2022, while 45% of male employees in engineering-related were laid off.

40.     This disparity is also extremely statistically significant.  According to Dr. Killingsworth, a chi square test reveals that this distribution in layoffs by sex is 7.6380 standard

---

[2]     A federal court has described Dr. Killingsworth's qualifications as follows:

Dr. Killingsworth is a labor economist with more than 40 years of experience and has a substantial record as an expert witness in federal and state litigation. He is the author of *Labor Supply* and *The Economics of Comparable Worth*, and has also authored numerous publications in the areas of comparable worth, pay equity, employment discrimination, and wage differentials. Also, Dr. Killingsworth has testified in front of United States Congressional Committees and the General Assembly of Pennsylvania. In addition, he has been a consultant to United States District Judge Robert L. Carter, the Canadian Department of Justice, and the United States Departments of Justice and Labor. Dr. Killingsworth graduated from the University of Michigan and received M.Phil. and D.Phil. degrees from the University of Oxford, where he was a Rhodes Scholar.

Artunduaga v. Uni. Of Chicago Med. Ctr., 2016 WL 7384432, at *2-3 (N.D. Ill. Dec. 21, 2016) (citing cases).

8
CLASS ACTION COMPLAINT AND JURY DEMAND

deviations away from a normal distribution. The odds that this disparity between women and men in engineering-related roles being laid off is due only to chance is .00000000000001 (or, put another way, 1.103 out of 100 trillion).

41. There is also a great disparity in the layoff rates between women and men in non-engineering roles. Prior to the layoffs that day, Twitter employed approximately 1,371 female and 1,066 male employees in non-engineering-related roles in the United States. Of those employees, approximately 764 females and 524 males were notified that day they were being laid off. Thus, 56% of females in non-engineering-related roles were laid off on November 4, 2022, while 49% of male employees in non-engineering-related were laid off. A chi square test performed by Dr. Killingsworth revealed that this distribution in layoffs by sex is 4.0309 standard deviations away from a normal distribution. The odds that this disparity between women and men in non-engineering-related roles being laid off is due only to chance is .00001 (or, put another way, 2.778 out of 100 thousand).

42. These results are summarized in the following chart:

| | | Laid off | Not laid off | Total | % laid off | Standard deviations from normal | Probability of this distribution being based on chance |
|---|---|---|---|---|---|---|---|
| ALL EMPLOYEES | Female | 1271 | 963 | 2234 | 0.57 | 7.3491 | $9.977 \times 10^{-14}$ |
| | Male | 1350 | 1550 | 2900 | 0.47 | | (9.977 chances out of 100 trillion) |
| | | | | | | | |
| | TOTAL | 2621 | 2513 | 5134 | | | |
| EMPLOYEES IN ENGINEERING-RELATED POSITIONS | Female | 630 | 373 | 1003 | 0.63 | 7.638 | $1.103 \times 10^{-14}$ |
| | Male | 1037 | 1113 | 2150 | 0.48 | | (1.103 chances out of 100 trillion) |
| EMPLOYEES IN NON-ENGINEERING-RELATED POSITIONS | Female | 545 | 517 | 1062 | 0.51 | 4.0309 | $2.778 \times 10^{-5}$ |
| | Male | 312 | 436 | 748 | 0.42 | | (2.778 chances out of 100 thousand) |

43. Thus, it is clear that women were far more likely than men to be laid off from Twitter, and those differences are highly statistically significant.

44. The fact that more women than men were laid off is not surprising given Musk's history of making sexist, demeaning, and hostile comments against women. Such comments show his discriminatory animus against women. As Twitter's new owner and CEO, who

9
CLASS ACTION COMPLAINT AND JURY DEMAND

oversaw and closely managed the employees who were making layoff decisions and implementing his policies, Musk's discriminatory animus is imputed to Twitter.

45. Examples of Musk's discriminatory and demeaning comments about women include his posting of tweets on Twitter in which he joked about naming a school using the acronym "TITS" and making other jokes about women's breasts.  See Chandra Steele, Elon Musk is a Misogynist and It Matters, PCMag (December 13, 2021), Elon Musk Is a Misogynist and It Matters | PCMag (quoting Musk's tweet: "Am thinking of starting new university: Texas Institute of Technology & Science"); Jon Christian, Elon Musk Deletes Sexist Tweets, The Byte (October 31, 2021), Elon Musk Deletes Sexist Tweets (futurism.com); Stock Joker on Twitter: "@ZJAyres @PhilKoopman Now deleted, but only D cups need apply https://t.co/40NBcDTonb" / Twitter); Ananya Bhattacharya, In one tweet, Elon Musk captures the everyday sexism faced by women in STEM, Quarz (November 1, 2021), Elon Musk's tweet captures everyday sexism faced by women in STEM (qz.com).

46. Shortly before acquiring Twitter, Musk, who has been vocal about promoting women having a lot of babies (presumably disseminating the message that is more important than keeping Thier jobs), tweeted: "Being a Mom is just as important as any career."  Twitter (August 17, 2022), https://twitter.com/elonmusk/status/1559823434028400640.  Within weeks of announcing the layoffs, Musk tweeted "Testosterone rocks ngl".  Twitter (December 4, 2022), https://twitter.com/elonmusk/status/1599345615443746817

47. More recently, Musk had the "w" on the sign of the corporate headquarters painted white so that the company's name appeared to be "Titter." See Twitter (April 9, 2023), https://twitter.com/elonmusk/status/1645266104351178752?cxt=HHwWgIC-7cGzlNUtAAAA.

## C.     Race Discrimination

48.     Black employees were also statistically more likely to be chosen for layoff on November 4, 2022, than other employees.

49.     This is not surprising given Musk's history of support for racist groups and hate speech directed at Black people, which demonstrate his discriminatory animus against Black individuals.  As Twitter's new owner and CEO, who oversaw and closely managed the employees who were making layoff decisions and implementing his policies, Musk's discriminatory animus is imputed to Twitter.

50.     For example, Musk defended Scott Adams, the creator of the comic strip "Dilbert," after Adams called Black Americans a "hate group" and suggested that white people should "get the hell away" from them. Jordan Valinsky, Elon Musk Tweets Support for Dilbert Creator after Racist Tirade, CNN (February 27, 2023),

https://www.cnn.com/2023/02/27/business/elon-musk-scott-adams-defense/index.html.

51.     As another example, since acquiring Twitter, Musk has reinstated previously banned racists to the platform, including neo-Nazis and white supremacists. Charisma Madarang, Elon Musk's 'Racist Rhetoric' Weighed by Advertisers before Meeting with Twitter CEO, ROLLING STONE (April 6, 2023), https://www.rollingstone.com/culture/culture-news/elon-musk-racist-rhetoric-twitter-advertisers-1234710991/.

### D.    Age Discrimination

52.    Older employees (age fifty (50)) and older were also statistically more likely to be laid off from Twitter than younger employees following Musk's acquisition of the company.

53.    According to data that Twitter provided employees pursuant to the Older Workers Benefit Protection Act (OWBPA), which shows which Twitter employees in the United States were retained and which were laid off, approximately 2,686 out of 4,964 employees were notified of their layoff on November 4, 2022.

54.    Prior to the layoffs that day, Twitter employed approximately 248 employees age fifty (50) or over and 4,716 employees under the age of fifty (50) in the United States.  Of those employees, approximately 149 employees age fifty (50) or over and 2,537 employees under the age of fifty (50) were notified that day they were being laid off.

55.    Thus, 60% of employees age fifty (50) or over were laid off on November 4, 2022, while 54% of employees under the age of fifty (50) were laid off.

56.    This difference in layoff rates between employees age fifty (50) or over and under the age of fifty (50) is statistically significant.  According to Dr. Killingsworth, a chi square statistical analysis reveals that this distribution in layoffs by age is close to 2 (1.936) standard deviations away from a normal distribution.  In other words, the odds that this disparity between employees age fifty (50) or over and under age fifty (50) being laid off is due only to chance is .0529.  This level of disparity is considered significant for legal discrimination purposes.

57.    Twitter's discrimination against employees over the age of fifty (50) was willful.

58.    The fact that older employees were laid off in greater proportion than younger employees is not surprising given Musk's history of making ageist comments. Such comments show his discriminatory animus against older individuals.  As Twitter's new owner and CEO, who oversaw and closely managed the employees who were making layoff decisions and implementing his policies, Musk's discriminatory animus is imputed to Twitter.

59. For example, in a 2022 interview with the CEO of the publishing company Axel Springer, Musk commented:

> I don't think we should try to have people live for a really long time. That it would cause asphyxiation of society because the truth is, most people don't change their mind, …they just die. So, if they don't die, we will be stuck with old ideas and society wouldn't advance . . . [a]nd it is just impossible to stay in touch with the people if you are many generations older than them.

https://www.foxbusiness.com/lifestyle/lonely-elon-musk-humans-shouldnt-live-longer-asphyxiate-society.

## V.   EXHAUSTION OF ADMINSTRATIVE REMEDIES

60. Plaintiffs have all filed administrative charges of discrimination with the Equal Employment Opportunity Commission and have received Right to Sue letters to pursue these claims in court.

## COUNT I

### Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*

Plaintiff Weinberg and other employees who have taken or were prepared to take a family or medical leave have been entitled to the protections of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* Under the FMLA, employees are entitled to take up to twelve weeks of unpaid leave during a twelve-month period in order to care for themselves or a spouse or child with a serious health condition, or to care for a newborn child. The FMLA prohibits employers "from interfering with, restraining, or denying the exercise of their employees' rights under the statute," and from discharging or in any other manner discriminating against "any individual for opposing any practice made unlawful by [the statute]." 29 U.S.C. § 2615.

As set forth above, Twitter's layoffs following Musk's acquisition of the company have disproportionately impacted employees like Weinberg who have taken or who were preparing to take family or medical leave. Twitter has thus violated the FMLA with respect to these employees.

### COUNT II

**Sex Discrimination in Violation of Title VII,**
**42 U.S.C. § 2000e, *et seq.***

Plaintiffs Weinberg, Gongora, Steele, Sills, and Bessinger have been entitled to the protections of Title VII, 42 U.S.C. § 2000e, *et seq.*, which prohibits discrimination on the basis of sex. Twitter's conduct in conducting layoffs that affected a higher proportion of women than men constitutes unlawful discrimination against Plaintiffs on the basis of sex in violation of Title VII.

### COUNT III

**Race Discrimination in Violation of Title VII,**
**42 U.S.C. § 2000e, *et seq.***

Plaintiff Ogunsanya has been entitled to the protections of Title VII, 42 U.S.C. § 2000e, *et seq.*, which prohibits discrimination on the basis of race. Twitter's conduct in conducting layoffs that affected a higher proportion of Black employees than other employees constitutes unlawful discrimination against Plaintiff on the basis of race in violation of Title VII.

### COUNT IV

**Age Discrimination in Employment Act,**
**29 U.S.C. § 621, *et seq.***

Plaintiffs Bessinger and Ihara are entitled to the protections of the ADEA, 29 U.S.C. §621, which prohibits discrimination on the basis of age. Twitter's conduct in conducting layoffs that affected a higher proportion of older employees (age fifty (50) and over) constitutes unlawful discrimination against Plaintiffs Bessinger and Ihara on the basis of age in violation of the ADEA.

## JURY DEMAND

Plaintiffs request a trial by jury on the claims asserted here.

WHEREFORE, Plaintiffs request that this Court enter the following relief:

61.     Certify this case as a class action on behalf of employees, who were laid off by Twitter following Musk's acquisition of the company who had recently taken, or were preparing to take, a family or medical leave, under the FMLA;

62.     Declare and find that Twitter is liable to Plaintiff Weinberg and other similarly situated employees, who have taken or were preparing to take a family or medical leave, under the FMLA;

63.     Declare and find that Twitter is liable to Plaintiffs Weinberg, Gongora, Steele, Sills, and Bessinger for sex discrimination under Title VII, 42 U.S.C. § 2000e, *et seq.*;

64.     Declare and find that Twitter is liable to Plaintiff Ogunsanya for race discrimination under Title VII, 42 U.S.C. § 2000e, *et seq.*;

65.     Declare and find that Twitter is liable to Plaintiffs Bessinger and Ihara for age discrimination under the ADEA, 29 U.S.C. § 621, *et seq.*;

66.     Reinstate female, Black, and older employees who wish to return to their jobs, as well as employees who were terminated in violation of the FMLA;

67.     Award compensatory and any other appropriate damages under the FMLA, Title VII, and ADEA;

68.     Award emotional distress and punitive damages under Title VII;

69.     Award liquidated damages under the ADEA;

70.     Award pre- and post-judgment interest;

71.     Award reasonable attorneys' fees, costs, and expenses; and

72.     Award any other relief to which Plaintiffs and other similarly situated employees may be entitled.

Respectfully submitted,

NHU WEINBERG, SAMANTHA GONGORA, JULIA STEELE, OMOLADE OGUNSANYA, NANCI SILLS, KRISTA BESSINGER, IKUHIRO IHARA, and others similarly situated,

By their attorneys,

 /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, SBN 310719
Bradley Manewith (*pro hac vice* forthcoming)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com; bmanewith@llrlaw.com

Dated:        August 8, 2023

16
CLASS ACTION COMPLAINT AND JURY DEMAND

# EXHIBIT 2

SHANNON LISS-RIORDAN (SBN 310719)
(sliss@llrlaw.com)
THOMAS FOWLER (*pro hac vice* forthcoming)
(tfowler@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:     (617) 994-5800
Facsimile:      (617) 994-5801

*Attorneys for Plaintiffs Carolina Bernal Strifling,*
*Willow Wren Turkal, and Sydney Frederick-Osborne,*
*on behalf of themselves and all others similarly situated*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CAROLINA BERNAL STRIFLING, WILLOW WREN TURKAL, and SYDNEY FREDERICK-OSBORNE on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TWITTER, INC., and  X CORP.,<br><br>Defendants | Case No. 22-cv-07739-JST<br><br>**AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT AND JURY DEMAND**<br><br>1. DISCRIMINATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*<br>2. DISCRIMINATION IN VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, Gov. Code § 12900, *et seq.*<br>3. DISCRIMINATION IN VIOLATION OF THE ADEA, 29 U.S.C. § 621, *et seq.*<br>4. DISCRIMINATION IN VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, Gov. Code § 12900, *et seq.* |

## I.    **INTRODUCTION**

1.    Plaintiffs Carolina Bernal Strifling, Willow Wren Turkal, and Sydney Frederick-Osborne file this Class and Collective Action Complaint against Twitter, Inc. and X Corp. (collectively "Twitter"), on their own behalf and on behalf of other female Twitter employees across the country who have been discharged or constructively discharged from their jobs during the chaotic months since multi-billionaire Elon Musk purchased the company.

2.    Plaintiffs bring claims of discrimination under Title VII, 42 U.S.C. § 2000e, *et seq.*, and (for employees who worked out of California) the California Fair Employment and Housing Act ("FEHA"), Gov. Code § 12900, *et seq.*, challenging the company's termination, or constructive termination, of female employees since Elon Musk's acquisition of the company.

3.    Plaintiff Frederick-Osborne also files this Class and Collective Action Complaint against Twitter on her own behalf and on behalf of other Twitter employees age fifty (50) or older across the country who have been discharged or constructively discharged from their jobs during the chaotic months since multi-billionaire Elon Musk purchased the company.

4.    Plaintiff Frederick-Osborne brings claims of discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA"), and (for employees who worked out of California) the California Fair Employment and Housing Act ("FEHA"), Gov. Code § 12900, *et seq.*, challenging the company's termination or constructive termination of employees age fifty (50) or older since Elon Musk's acquisition of the company.

5.    As described further below, shortly after Elon Musk completed his purchase of Twitter, he immediately began laying off more than half of its workforce.

6.    The mass termination of employees at Twitter has impacted female employees to a much greater extent than male employees – and to a highly statistically significant degree. Moreover, Elon Musk has made a number of publicly discriminatory remarks about females, further confirming that the mass termination's greater impact on female employees resulted from

2
AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

discrimination.  Musk also quickly implemented new policies at Twitter that were intended to, and the effect of, forcing more women to leave the company.

7.     Likewise, the mass termination of employees at Twitter has impacted employees age fifty (50) or older to a greater extent than employees under the age of fifty (50) – and to a statistically significant degree.  Moreover, Elon Musk has made publicly discriminatory remarks about older people, so it is not surprising that the managers working under his direction laid off a higher proportion of older employees.  Musk also quickly implemented new unreasonable work demands and policies at Twitter, which were intended to, and had the effect of, forcing out older employees.

8.     Plaintiffs file this action on their own behalf and on behalf of similarly situated individuals, bringing claims of sex and age discrimination.

## II.   **PARTIES**

9.     Plaintiff Carolina Bernal Strifling is an adult resident of Miami, Florida, where she worked for Twitter from June 2015 until November 2022.  Ms. Strifling was employed by Twitter as a Senior Client Partner Lead. Throughout her employment with Twitter, Ms. Strifling's performance met the Company's expectations.

10.    Plaintiff Willow Wren Turkal is an adult resident of San Jose, California, where she worked for Twitter from June 2021 until November 2022.  Ms. Turkal was employed by Twitter as a Staff Site Reliability Engineer. Throughout her employment with Twitter, Ms. Turkal's performance met the Company's expectations.

11.    Plaintiff Sydney Frederick-Osborne is an adult resident of San Francisco, California, where she worked for Twitter from June 2022 until November 2022.  Ms. Frederick-Osborne was employed by Twitter as a Staff Software Engineer. Throughout her employment with Twitter, Ms. Frederick-Osborne's performance met the Company's expectations.

12.     Plaintiffs bring this lawsuit as a Rule 23 class action on behalf of all similarly situated female Twitter employees across the United States whose jobs have been affected by the company's layoffs, terminations, and constructive discharges based on the heightened and unreasonable demands placed on the company's workforce since Elon Musk acquired the company.

13.     Plaintiff Frederick-Osborne also brings this lawsuit as a collective action under the ADEA on behalf of all Twitter employees across the United States age fifty (50) or older who have lost their jobs since Elon Musk acquired the company, and as a Rule 23 class action for those employees who worked in California.

14.     Defendant Twitter, Inc. is a Delaware corporation, headquartered in San Francisco, California.

15.     Defendant X Corp. is a Nevada corporation, headquartered in San Francisco, California.

16.     In or about March 2023, Twitter merged with X Corp., and as a result Twitter and X Corp. are a single entity. X Corp. has successor liability for Twitter's unlawful acts.  Twitter and X Corp. are referred to herein as "Twitter".

## III.   <u>JURISDICTION</u>

17.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

18.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims, because those claims derive from a common nucleus of operative facts with Plaintiffs' federal claims.

19.     This Court has personal jurisdiction over Twitter, as it is headquartered in this District and conducts substantial business operations in this District.

AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

## IV.    **STATEMENT OF FACTS**

20.    Twitter is a social media company that used to employ thousands of people across the United States.

21.    In April 2022, it was announced that multi-billionaire Elon Musk would be purchasing the company.

22.    Following Elon Musk's purchase of Twitter in late October 2022, Musk immediately began a mass layoff that affected well more than half of Twitter's workforce.  See Kate Conger, Ryan Mac, and Mike Isaac, Confusion and Frustration Reign as Elon Musk Cuts Half of Twitter's Staff, NEW YORK TIMES (November 4, 2022), https://www.nytimes.com/2022/11/04/technology/elon-musk-twitter-layoffs.html; Kate Conger, Ryan Mac, and Mike Isaac, In Latest Round of Job Cuts, Twitter is said to Layoff at Least 200 Employees, NEW YORK TIMES (February 26, 2023), https://www.nytimes.com/2023/02/26/technology/twitter-layoffs.html; Ryan Morrison, Twitter 'lays off 10% of its global workforce' in Elon Musk's latest job cuts, TECHMONITOR (February 27, 2023, updated March 9, 2023) ("The Company's headcount is down 75%."), https://techmonitor.ai/policy/digital-economy/twitter-job-cuts-elon-musk.

23.    The decisions regarding which employees would be laid off were made under extremely hurried circumstances, with little if any regard given to employees' job performance, qualifications, experience, and abilities.  Indeed, decisions regarding laying off thousands of employees were made in a period of just days after Musk's acquisition of the company.

24.    Most laid off employees were notified on November 4, 2022 (although many of these employees were aware they had been laid off the night before, when their access to Twitter's systems was cut off).

25.    Reportedly, the layoff decisions were made quickly by a small group of managers, under close supervision by Musk.  Some of these managers were brought in from other

companies owned by Musk (such as Tesla), who did not have much, if any, knowledge about Twitter's operations.  See Lora Kolodny, <u>Elon Musk has pulled more than 50 Tesla employees into his Twitter takeover</u>, CNBC (November 1, 2022), <u>Elon Musk has pulled more than 50 Tesla employees into Twitter (cnbc.com)</u>.

26.  Widely circulated pictures of Twitter employees before and after the layoff raised observations about the stark contrast in the number of women who appeared to be employed at the company before and after Musk's acquisition.  Rachna Manojkumar Dhanrajani, <u>Curious case of Twitter's missing women: Before and after pictures shock the internet</u>, Business Today (November 21, 2022), <u>Curious case of Twitter's missing women: Before and after pictures of Twitter office shock the internet - BusinessToday</u>; Kanishka Sarkar, <u>Where have all the women gone from Elon Musk's Twitter? 'Before & after' office photos shock internet</u>, CNBC (November 21, 2022), <u>Where Have All The Women Gone From Elon Musk'S Twitter? 'Before & After' Office Photos Shock Internet (cnbctv18.com)</u>.

27.  The data from these layoffs bear out these observations.

28.  According to a spreadsheet showing which Twitter employees in the United States were retained and which were laid off on November 4, 2022, approximately 2,621 out of 5,134 employees were notified that day they were being laid off.[1]

29.  Prior to the layoffs that day, Twitter employed approximately 2,234 female employees and 2,900 male employees in the United States.  Of those employees, approximately 1,271 females and 1,350 males were notified that day they were being laid off.

---

[1]  The figures throughout this complaint are described as "approximate" because employees for whom their gender was not immediately clear were not included in these calculations.

30.     Thus, 57% of female employees were laid off on November 4, 2022, while 47% of male employees were laid off.

31.     Not only is this a large percentage difference, but it is also extremely statistically significant.

32.     According to Dr. Mark Killingsworth, a professor in the Department of Economics at Rutgers University,[2] a chi square statistical analysis reveals that this distribution in layoffs by sex is 7.3491 standard deviations away from a normal distribution.  In other words, the odds that this disparity between women and men being laid off is due only to chance is .00000000000001 (or, put another way, 9.977 out of 100 trillion).

33.     Further, the disparity between women and men being laid off cannot be explained based upon a justification that Musk intended to retain more employees in engineering-related roles.

34.     According to the spreadsheet, prior to the layoffs that day, Twitter employed approximately 863 female and 1,834 male employees in engineering-related roles in the United States.  Of those employees, approximately 507 females and 826 males were notified that day

_____

[2]     A federal court has described Dr. Killingsworth's qualifications as follows:

Dr. Killingsworth is a labor economist with more than 40 years of experience and has a substantial record as an expert witness in federal and state litigation. He is the author of *Labor Supply* and *The Economics of Comparable Worth*, and has also authored numerous publications in the areas of comparable worth, pay equity, employment discrimination, and wage differentials. Also, Dr. Killingsworth has testified in front of United States Congressional Committees and the General Assembly of Pennsylvania. In addition, he has been a consultant to United States District Judge Robert L. Carter, the Canadian Department of Justice, and the United States Departments of Justice and Labor. Dr. Killingsworth graduated from the University of Michigan and received M.Phil. and D.Phil. degrees from the University of Oxford, where he was a Rhodes Scholar.

Artunduaga v. Uni. Of Chicago Med. Ctr., 2016 WL 7384432, at *2-3 (N.D. Ill. Dec. 21, 2016) (citing cases).

AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

they were being laid off.  Thus, 59% of females in engineering-related roles were laid off on November 4, 2022, while 45% of male employees in engineering-related were laid off.

35.     This disparity is also extremely statistically significant.  According to Dr. Killingsworth, a chi square test reveals that this distribution in layoffs by sex is 7.6380 standard deviations away from a normal distribution.  The odds that this disparity between women and men in engineering-related roles being laid off is due only to chance is .00000000000001 (or, put another way, 1.103 out of 100 trillion).

36.     There is also a great disparity in the layoff rates between women and men in non-engineering roles.  Prior to the layoffs that day, Twitter employed approximately 1,371 female and 1,066 male employees in non-engineering-related roles in the United States.  Of those employees, approximately 764 females and 524 males were notified that day they were being laid off.  Thus, 56% of females in non-engineering-related roles were laid off on November 4, 2022, while 49% of male employees in non-engineering-related were laid off.  A chi square test performed by Dr. Killingsworth revealed that this distribution in layoffs by sex is 4.0309 standard deviations away from a normal distribution.  The odds that this disparity between women and men in non-engineering-related roles being laid off is due only to chance is .00001 (or, put another way, 2.778 out of 100 thousand).

37.     These results are summarized in the following chart:

| | | | Laid off | Not laid off | Total | % laid off | Standard deviations from normal | Probability of this distribution being based on chance |
|---|---|---|---|---|---|---|---|---|
| ALL EMPLOYEES | | Female | 1271 | 963 | 2234 | 0.57 | 7.3491 | $9.977 \times 10^{-14}$ |
| | | Male | 1350 | 1550 | 2900 | 0.47 | | (9.977 chances out of 100 trillion) |
| | | | | | | | | |
| | | TOTAL | 2621 | 2513 | 5134 | | | |
| EMPLOYEES IN ENGINEERING-RELATED POSITIONS | | Female | 630 | 373 | 1003 | 0.63 | 7.638 | $1.103 \times 10^{-14}$ |
| | | Male | 1037 | 1113 | 2150 | 0.48 | | (1.103 chances out of 100 trillion) |
| EMPLOYEES IN NON-ENGINEERING-RELATED POSITIONS | | Female | 545 | 517 | 1062 | 0.51 | 4.0309 | $2.778 \times 10^{-5}$ |
| | | Male | 312 | 436 | 748 | 0.42 | | (2.778 chances out of 100 thousand) |

8

AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

38.     Thus, it is clear that women were far more likely than men to be laid off from Twitter, and those differences are highly statistically significant.

39.     Older employees (those age 50 and over) were also statistically more likely to be chosen for layoff on November 4, 2022, than younger employees.

40.     In addition to laying off a higher proportion of women than men, and a higher proportion of employees age fifty (50) and older, in the initial layoffs at Twitter in early November, Elon Musk also implemented a number of policies at the company that have had a disproportionate impact on women and that also sent the message that older employees were no longer welcomed at Twitter.

41.     These policies included expectations that employees would work an unreasonable number of hours and that employees would be required to work out of physical offices (despite the fact that Twitter had freely allowed remote work throughout the pandemic and even before that).

42.     Following Musk's acquisition of the company, employees were reported to work 12 hour shifts, 7 days a week.  Some employees were told: "The expectation is literally to work 24/7 to get this out."  Some employees slept in Twitter offices while being required to work around the clock.  Grace Dean, BUSINESS INSIDER, Twitter staff have been told to work 84-hour weeks and managers slept at the office over the weekend as they scramble to meet Elon Musk's Tight deadlines, reports say, (Nov. 1, 2022), https://www.businessinsider.com/elon-musk-twitter-staff-layoffs-long-hours-shifts-work-jobs-2022-11.

43.     These demands occurred while the company was in the process of mass layoffs, thus signaling to employees that these extraordinary efforts were required in order to keep their jobs.

44.     Elon Musk would certainly have known that these policy changes and expectations would have a disproportionate impact on women, as well force older employees out of the company.

45.     On November 16, 2022, Musk sent the following email to remaining Twitter employees:

> Going forward, to build a breakthrough Twitter 2.0 and succeed in an increasingly competitive world, we will need to be extremely hardcore.  This will mean working long hours at high intensity.  Only exceptional performance will constitute a passing grade.
>
> Twitter will also be much more engineering-driven.  Design and product management will still be very important and report to me, but those writing great code will constitute the majority of our team and have the greatest sway.  At its heart, Twitter is a software and servers company, so I think this makes sense.
>
> If you are sure that you want to be part of the new Twitter, please click yes on the link below:
>
> [LINK]
>
> Anyone who has not done so by 5pm ET tomorrow (Thursday) will receive three months of severance.
>
> Whatever decision you make, thank you for your efforts to make Twitter successful.
>
> Elon

46.     The ultimatum was intended to, and did, result in further layoffs.  The ultimatum resulted in more women, including Ms. Frederick-Osborne, leaving the company than men.  Indeed, approximately 36% of remaining women left the company as a result of this ultimatum, while approximately 28% of men did.

47.     The undertone of the policies and message from Twitter was also that it was prioritizing younger employees and was not welcoming to older employees.

48.     Following Musk's ultimatum, Ms. Frederick-Osborne, who was in her late 50s at the time, felt she was no longer welcome at Twitter, given her sex and age.  She felt that Musk's

policies and messages seemed directed at maintaining a workforce that was largely young and male.  As such, she did not click yes on the ultimatum link that Musk sent employees on November 16, 2022.

49.     The next day, Ms. Frederick-Osborne was laid off.

50.     The fact that more women than men were laid off and forced out of the company through constructive discharge since Musk's acquisition is not surprising given Musk's history of making sexist, demeaning, and hostile comments against women. Such comments show his discriminatory animus against women, and it is understandable that women would feel less welcome in the workplace under his leadership.  As Twitter's new owner and CEO, who oversaw and closely managed the employees who were making layoff decisions and implementing his policies, Musk's discriminatory animus is imputed to Twitter.

51.     Examples of Musk's discriminatory and demeaning comments about women include his posting of tweets on Twitter in which he joked about naming a school using the acronym "TITS" and making other jokes about women's breasts.  See Chandra Steele, Elon Musk is a Misogynist and It Matters, PCMag (December 13, 2021), Elon Musk Is a Misogynist and It Matters | PCMag (quoting Musk's tweet: "Am thinking of starting new university: Texas Institute of Technology & Science"); Jon Christian, Elon Musk Deletes Sexist Tweets, The Byte (October 31, 2021), Elon Musk Deletes Sexist Tweets (futurism.com); Stock Joker on Twitter: "@ZJAyres @PhilKoopman Now deleted, but only D cups need apply https://t.co/40NBcDTonb" / Twitter); Ananya Bhattacharya, In one tweet, Elon Musk captures the everyday sexism faced by women in STEM, Quarz (November 1, 2021), Elon Musk's tweet captures everyday sexism faced by women in STEM (qz.com).

52.     Shortly before acquiring Twitter, Musk, who has been vocal about promoting women having a lot of babies (presumably disseminating the message that is more important than keeping Their jobs), tweeted: "Being a Mom is just as important as any career."  Twitter

(August 17, 2022), https://twitter.com/elonmusk/status/1559823434028400640.  Within weeks

of announcing the layoffs, Musk tweeted "Testosterone rocks ngl".  Twitter (December 4, 2022),

https://twitter.com/elonmusk/status/1599345615443746817

53.     More recently, Musk had the "w" on the sign of the corporate headquarters

painted white so that the company's name appeared to be "Titter." See Twitter (April 9, 2023),

https://twitter.com/elonmusk/status/1645266104351178752?cxt=HHwWgIC-7cGzlNUtAAAA.

54.     Similarly, the fact that older employees were laid off in greater proportion than

younger employees, and many older employees were forced out of the company since Musk's

acquisition, is not surprising given Musk's history of making ageist comments. Such comments

show his discriminatory animus against older individuals, and it is understandable that older

employees would feel less welcome in the workplace under his leadership.  As Twitter's new

owner and CEO, who oversaw and closely managed the employees who were making layoff

decisions and implementing his policies, Musk's discriminatory animus is imputed to Twitter.

55.     For example, in a 2022 interview with the CEO of the publishing company Axel

Springer, Musk commented:

> I don't think we should try to have people live for a really long time. That
> it would cause asphyxiation of society because the truth is, most people
> don't change their mind, …they just die. So, if they don't die, we will be
> stuck with old ideas and society wouldn't advance . . . [a]nd it is just
> impossible to stay in touch with the people if you are many generations
> older than them.

https://www.foxbusiness.com/lifestyle/lonely-elon-musk-humans-shouldnt-live-longer-
asphyxiate-society.

## V.    EXHAUSTION OF ADMINSTRATIVE REMEDIES

56.    Plaintiff Strifling has filed an administrative charge of sex discrimination under Title VII with the Equal Employment Opportunity Commission.  She has received a Right to Sue letter to pursue this claim in court.

57.    Plaintiff Turkal has filed an administrative charge of sex discrimination under Title VII with the Equal Employment Opportunity Commission and under the California Fair Employment and Housing Act with the California Civil Rights Department.  She has received a Right to Sue letter to pursue this claim in court.

58.    Plaintiff Frederick-Osborne has filed an administrative charge of sex discrimination under Title VII and age discrimination under the ADEA with the Equal Employment Opportunity Commission and under the California Fair Employment and Housing Act with the California Civil Rights Department.  She has received a Right to Sue letter to pursue these claims in court.

## COUNT I

### Title VII,
### 42 U.S.C. § 2000e, *et seq.*

Plaintiffs and other female employees have been entitled to the protections of Title VII, 42 U.S.C. § 2000e, *et seq.*, which prohibits discrimination on the basis of sex. Twitter's conduct in conducting mass layoffs that affected a higher proportion of women than men, as well as other policies that led to more women leaving the company after Musk's acquisition of Twitter, constitutes unlawful discrimination against Plaintiffs and other similarly situated female Twitter employees on the basis of sex in violation of Title VII.

## COUNT II

### California Fair Employment and Housing Act,
### Gov. Code § 12900, *et seq.*
### (Sex Discrimination)

Plaintiffs and other female employees have been entitled to the protections of the California Fair Employment and Housing Act ("FEHA"), Gov. Code § 12900, *et seq.* Twitter's conduct in conducting mass layoffs that affected a higher proportion of women than men, as well as other policies that led to more women leaving the company after Musk's acquisition of Twitter, constitutes unlawful discrimination against Plaintiffs and other similarly situated female Twitter employees who worked in California on the basis of sex in violation of the FEHA.

## COUNT III

### Age Discrimination in Employment Act,
### 29 U.S.C. § 621

Plaintiff Frederick-Osborne and other older employees are entitled to the protections of the ADEA, 29 U.S.C. § 621, which prohibits discrimination on the basis of age. Twitter's conduct in conducting mass layoffs that affected a higher proportion of older employees (age fifty (50) and over), as well as other policies that led to more older employees leaving the company after Musk's acquisition of Twitter, constitutes unlawful discrimination against Plaintiff and other similarly situated Twitter employees on the basis of age in violation of the ADEA.

## COUNT IV

### California Fair Employment and Housing Act,
### Gov. Code § 12900, *et seq.*
### (Age Discrimination)

Plaintiff Frederick-Osborne and other employees age fifty (50) and older have been entitled to the protections of the California Fair Employment and Housing Act ("FEHA"), Gov. Code § 12900, *et seq.* Twitter's conduct in conducting mass layoffs that affected a higher

proportion of older employees (age fifty (50) and over), as well as other policies that led to more older employees leaving the company after Musk's acquisition of Twitter, constitutes unlawful discrimination against Plaintiff Frederick-Osborne and other similarly situated Twitter employees who worked in California on the basis of age in violation of the FEHA.

## **JURY DEMAND**

Plaintiffs request a trial by jury on the claims asserted here.

WHEREFORE, Plaintiffs request that this Court enter the following relief:

a. Declare and find that Defendants are liable to Plaintiffs and other similarly situated female employees under Title VII, 42 U.S.C. § 2000e, *et seq.*, and, with respect to employees who have worked out of California, the Fair Employment and Housing Act, Gov. Code § 12900, *et seq.*;

b. Declare and find that Defendants are liable to Plaintiff Frederick-Osborne and other similarly situated older employees whose rights are protected under the ADEA, 29 U.S.C. § 621, and, with respect to employees who have worked out of California, the Fair Employment and Housing Act, Gov. Code § 12900, *et seq.*;

c. Certify this case as a class action under Title VII and the Fair Employment and Housing Act;

d. Certify this case as a collective action under the ADEA;

e. Reinstate female and older employees who wish to return to their jobs;

f. Award compensatory and any other appropriate damages, including emotional distress and punitive damages under Title VII and the Fair Employment and Housing Act;

g. Award liquidated damages under the ADEA;

h. Award pre- and post-judgment interest;

i. Award reasonable attorneys' fees, costs, and expenses; and

j. Award any other relief to which Plaintiffs and other similarly situated employees may be entitled.

Respectfully submitted,

CAROLINA BERNAL STRIFLING, WILLOW WREN TURKAL, and SYDNEY FREDERICK-OSBORNE, on behalf of themselves and all others similarly situated,

By their attorneys,

 /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, SBN 310719
Thomas Fowler (*pro hac vice* forthcoming)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com; tfowler@llrlaw.com

Dated:        May 26, 2023

## CERTIFICATE OF SERVICE

I, Shannon Liss-Riordan, hereby certify that a true and accurate copy of this document was served on Defendants' counsel via the CM/ECF system on May 26, 2023.

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan

16
AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

# EXHIBIT 3

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLINA BERNAL STRIFLING, et al., | Case No. 22-cv-07739-JST |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO DISMISS** |
| TWITTER INC., | Re: ECF No. 20 |
| Defendant. | |

Before the Court is Twitter, Inc.'s ("Twitter") motion to dismiss.  ECF No. 20.  The Court will grant the motion.

## I.     BACKGROUND

For the purpose of ruling on the instant motion, the Court accepts all the following facts as true.  Plaintiff Carolina Bernal Strifling is a resident of Miami, Florida and was employed by Twitter from June 2015 to November 2022.  ECF No. 1 ¶ 9.  Plaintiff Willow Wren Turkal is a resident of San Jose, California and was employed by Twitter from June 2021 to November 2022.  *Id*. ¶ 10.

Elon Musk acquired Twitter in October 2022.  *Id.* ¶ 18.  Musk has been criticized for making "sexist, demeaning, and hostile comments" against women.  *Id.* ¶¶ 22-25.  Soon after the acquisition, Twitter initiated a Reduction-in-Force ("RIF") that affected approximately 2,621 out of its 5,134 employees, most of whom were notified of their layoff on November 4, 2022.  *Id.* ¶¶ 18, 20, 29.  Musk brought in a small group of managers who made the layoff decisions under his supervision.  *Id.* ¶ 21.  Plaintiffs were laid off during the RIF.  *Id.* ¶ 46.[1]

---

[1] Plaintiffs do not explicitly state whether they themselves were laid off during the November 4, 2022 RIF, although the parties appear to accept this fact as true in their arguments.  The Court will

United States District Court
Northern District of California

Following the RIF, Musk implemented a policy that required employees to work more hours and in physical offices, rather than remotely as was previously permitted ("Post-RIF Policy"). *Id*. ¶ 41. On November 16, 2022, Musk sent a message to the remaining Twitter employees asking whether they agreed to work under new conditions that would be "extremely hardcore" and require "working long hours at high intensity." *Id*. ¶ 44. The message instructed those who wished to remain employed by Twitter to respond "yes" by the following day. *Id*. As a result of the "ultimatum," more employees chose to leave Twitter. *Id*. ¶ 45. Plaintiffs allege that the RIF and Post-RIF Policy forced a disproportionate number of women to leave Twitter and were the products of sex-based discrimination. *Id.* ¶¶ 26, 43, 45.

On December 7, 2022, Plaintiffs filed a complaint on behalf of themselves and other female Twitter employees whose jobs were affected by the "layoffs, terminations, and constructive discharges since Elon Musk acquired the company." *Id.* at 12. They bring claims under Title VII of the Civil Rights Act of 1964 ("Title VII") for sex-based discrimination. Plaintiffs also seek a declaratory judgement and injunction under 28 U.S.C. §§ 2201 & 2202 prohibiting Twitter from seeking the release of employees' claims without providing notice of their rights and this pending case. *Id.* Turkal brings an additional claim under the California Fair Employment and Housing Act ("FEHA") Cal. Gov. Code § 12900, *et seq. Id.*; ECF No. 27 at 32.[2] On December 8, 2022, Plaintiffs filed complaints with the Equal Employment Opportunity Commission ("EEOC"), and Turkal additionally filed with the California Department of Fair Employment and Housing ("DFEH"). ECF No. 27 at 18.

Twitter filed the instant motion on January 26, 2023, and the Court took the motion under submission without a hearing on March 27, 2023. ECF No. 32.

---

accept this as true for the sake of its analysis, however, Plaintiffs should allege the date that they were laid off if they amend their complaint.

[2] Plaintiffs concede that Turkal, not Strifling, is permitted to bring a FEHA claim, ECF No. 27 at 32, however, their complaint states Twitter's actions "constitute unlawful discrimination against *Plaintiffs* and other similarly situated female Twitter employees on the basis of sex in violation of the FEHA." ECF No. 1 at 12 (emphasis added). Because the Court is dismissing all of Plaintiffs' claims, Twitter's request to dismiss Strifling's FEHA claim is moot. However, Plaintiffs should, on amendment, correct their complaint to reflect that Turkal alone brings a FEHA claim.

2

## II.      JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

## III.     LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Factual allegations need not be detailed, but facts must be "enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  While this standard is not "akin to a 'probability requirement' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  In determining whether a plaintiff has met the plausibility requirement, a court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  A plaintiff may "plead[] facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Arista Records, LLC v. Doe 3*, 603 F.3d 110, 120 (2d Cir. 2010)).

United States District Court
Northern District of California

## IV.   DISCUSSION

### A.   Exhaustion of Administrative Remedies

To bring a claim under Title VII, a plaintiff is required to first "exhaust her administrative remedies by filing a timely charge with the EEOC, or the appropriate state agency, thereby affording the agency an opportunity to investigate the charge" and obtain a right-to-sue notice before filing suit in federal court. *BKB v. Maui Police Dep't.*, 276 F.3d 1091, 1099 (9th Cir. 2002). A plaintiff who brings a claim under FEHA must do the same with the DFEH. *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1135 (9th Cir. 2012). However, the Ninth Circuit recognizes equitable exceptions to the administrative exhaustion requirement "where the remedies are inadequate, inefficacious, or futile, where pursuit of them would irreparably injure the plaintiff, or where the administrative proceedings themselves are void." *United Farm Workers of Am., AFL-CIO v. Ariz. Agric. Emp't Rels. Bd.*, 669 F.2d 1249, 1253 (9th Cir. 1987); *see SJCBC, LLC v. Horwedel*, 201 Cal. App. 4th 339, 346 (2011). Thus, filing a timely complaint with the EEOC "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). Similarly, the California Supreme Court has explained that although "[e]xhaustion of *administrative* remedies is 'a jurisdictional prerequisite to resort to the courts,'" *Johnson v. City of Loma Linda*, 24 Cal. 4th 61, 70 (2000) (emphasis in original) (quoting *Abelleira v. Dist. Court of Appeal,* 17 Cal. 2d 280, 293 (1941)), "'jurisdictional prerequisite' does not mean subject matter jurisdiction in the context of exhaustion of administrative remedies." *Kim v. Konad USA Distrib., Inc.*, 226 Cal. App. 4th 1336, 1347 (2014).

Twitter argues that Plaintiffs failed to exhaust their administrative remedies because they filed charges with the EEOC and DFEH only after they filed their suit in this Court.[3] ECF No. 20 at 17-18. Twitter further contends that Plaintiffs cannot cure this error by belatedly obtaining right-to-sue notices from the EEOC and DFEH. ECF No. 28 at 19. Plaintiffs concede that they

---

[3] The Court will not consider Plaintiffs' notices at ECF No. 29 and ECF No. 30 because they were filed after Twitter's reply without leave of the Court. *See* Civil L.R. 7-4(d).

4

filed suit before filing charges with the EEOC and DFEH and receiving right-to-sue notices. ECF No. 27 at 18. However, they argue that the Court should permit their claims to proceed, rather than requiring them to refile after they receive the right-to-sue notices, because they filed the charges "nearly simultaneously with filing their initial complaint" and expect to receive the notices shortly. *Id.* They further argue that the administrative exhaustion requirement is non-jurisdictional such that the Court can and should excuse Plaintiffs from this requirement. Plaintiffs also argue that the EEOC's and DFEH's inability to enjoin Twitter from seeking terminated employees' release of claims without proper notice would irreparably harm the putative class. *Id.* at 20. Twitter replies that there is no such risk of irreparable harm because it already agreed to not seek any releases of claims, without notification of the instant suit, in another pending action. ECF No. 28 at 20. Thus, in Twitter's view, Plaintiffs' "purported emergency" was already "dispelled." *Id.*

The Court declines to excuse Plaintiffs' failure to exhaust their administrative remedies because they have not demonstrated that compliance with the requirement would irreparably harm the putative class. At the time Plaintiffs filed suit, Twitter had agreed to not seek the general releases of claims until a motion for a protective order in *Cornet v. Twitter, Inc.* was to be decided. Order Adopting Proposed Briefing Schedule, *Cornet v. Twitter., Inc*, No. 3:22-cv-06857-JD (N.D. Cal. Nov. 18, 2022), ECF No. 15. On December 14, 2022, the court granted the plaintiff's motion and ordered Twitter to "provide notice of the pendency of [the *Cornet*] case before asking an employee to release his or her legal claims." Order Re Litigation Notice, *Cornet v. Twitter, Inc.*, No. 3:22-cv-06857-JD (N.D. Cal. Dec. 14, 2022), ECF No. 42 at 3. The court approved a joint proposed notice that included information, not only on the *Cornet* case, but on the instant suit as well. Order Adopting Approving Joint Proposed Notice, *Cornet v. Twitter, Inc.*, No. 3:22-cv-06857-JD (N.D. Cal. Dec. 20, 2022), ECF No. 43-1 at 2; ECF No. 44.

However, even if Plaintiffs had exhausted their administrative remedies, the following deficiencies exist with the remaining claims.

**B.    Disparate Treatment**

A plaintiff may bring a Title VII or FEHA claim on a theory of disparate treatment.

United States District Court
Northern District of California

1    *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).[4]  Disparate

2    treatment occurs "where an employer 'treat[s] [a] particular person less favorably than others

3    because of' a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (quoting *Watson v.*

4    *Forth Worth Bank & Tr.*, 487 U.S. 977, 985-86 (1988)).  To state a disparate treatment claim, a

5    plaintiff must allege that "the defendant had a discriminatory intent or motive" in taking some

6    employment-related action against them.  *Watson*, 487 U.S. at 986.  Thus, "[i]t is insufficient for a

7    plaintiff alleging discrimination under the disparate treatment theory to show the employer was

8    merely aware of the adverse consequences the policy would have on a protected group." *Wood v.*

9    *City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012) (quoting *Am. Fed'n of State, Cnty., &*

10   *Mun. Emps. v. Washington*, 770 F.2d 1401, 1405 (9th Cir. 1985)).

11      Twitter argues that Plaintiffs fail to establish a prima facie case of intentional

12   discrimination either under the *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)

13   ("*McDonnell Douglas*") or *International Brotherhood of Teamsters v. United States*, 431 U.S. 324

14   (1977) ("*Teamsters*") framework.  ECF No. 20 at 19.  Plaintiffs argue that that the statistics

15   demonstrating that women were impacted at a "highly disproportionate rate" during the RIF and

16   Post-RIF Policy – coupled with "overtly sexist statements" from Musk – support their allegations

17   of disparate treatment under either the *McDonnell Douglas* or *Teamsters* framework.  ECF No. 27

18   at 23.

19      As an initial matter, neither *McDonnell Douglas* nor *Teamsters* framework applies at the

20   pleading stage.  *Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019); *Serrano v. Cintas*

21   *Corp.*, 699 F.3d 884, 897-898 (6th Cir. 2012).  Both frameworks employ "burden-shifting"

22   analyses, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 366-67 (2011); *Young v. Buttigieg*, No.

23   19-cv-01411-JCS, 2021 WL 981305, at *6 (N.D. Cal. Mar. 16, 2021), that are "plainly

24   inapplicable" at the pleading stage.  *Young*, 2021 WL 981305, at *6.  The Supreme Court in

25   _____

26   [4] The Court analyzes Plaintiffs' Title VII and FEHA claims together because "California courts
     have relied upon federal interpretations of Title VII to interpret analogous provisions of the
27   California Fair Employment and Housing Act (FEHA)."  *Bradley v. Harcourt, Brace & Co.*, 104
     F.3d 267, 270 (9th Cir. 1996).  Thus, "[d]iscrimination under FEHA and Title VII is proven using
28   the same factors."  *Wynes v. Kaiser Permanente Hosps.*, 936 F. Supp. 2d 1171, 1192 (E.D. Cal.
     2013).

United States District Court
Northern District of California

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002), held that because the *McDonnell Douglas* framework is "an evidentiary standard, not a pleading requirement," "the requirements for establishing a prima facie case under *McDonnell Douglas*" do not "apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." The Ninth Circuit in *Austin*, 925 F.3d at 1137, clarified that, rather than making a prima facie showing under either framework, a plaintiff who brings a Title VII claim must abide by the *Twombly* and *Iqbal* pleading standards. Thus, a plaintiff must provide "sufficient, nonconclusory allegations plausibly linking" the discriminatory conduct to the fact that the plaintiff is of a protected class to state a Title VII or FEHA claim. *Austin*, 925 F.3d at 1138; *accord Serrano* 699 F.3d at 897 ("*Swierkiewicz* compels the conclusion that a plaintiff is not required to plead whether she intends to employ the *McDonnell Douglas* or the *Teamsters* burden-shifting evidentiary framework.")

The Court finds that, although Plaintiffs are not required to make a prima facie showing under the *McDonnell Douglas* or *Teamsters* framework, they nonetheless fail to allege a plausible link between their layoff during the RIF and the fact that they are women, for two reasons.[5]

First, Plaintiffs' complaint is devoid of basic information: they do not describe their positions prior to the RIF or allege that they were performing satisfactorily in those positions.[6] Thus, they are unable to allege that similarly situated men were not laid off during the RIF.

---

[5] Plaintiffs also allege that the Post-RIF Policy was an act of intentional discrimination that "would clearly be expected to have (and did have) a disproportionate impact on women." ECF No. 27 at 23. A plaintiff must allege that "she was subject to an adverse employment action" to plead a disparate treatment claim. *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018). However, Plaintiffs were not subject to the Post-RIF Policy because they were no longer working at Twitter when it was enacted. Thus, the Court will not consider whether the Post-RIF Policy was an act of intentional discrimination against Plaintiffs.

[6] Plaintiffs argue that because "they were laid off, rather than terminated for cause" it is "impli[ed] that their job performance was satisfactory." ECF No. 27 at 23 n.4. However, when a plaintiff is laid off during an RIF, the Ninth Circuit nonetheless considers if the plaintiff has sufficiently alleged their job performance was satisfactory. *Cf. Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1208 (9th Cir. 2008) (holding that there was a triable issue of fact whether the plaintiff, terminated as a part of an RIF, was performing his job satisfactorily). A plaintiff must ultimately allege facts – whether that includes allegations of their job performance – to establish a plausible link between the discriminatory conduct and the fact that the plaintiff is of a protected class. Thus, the Court addresses Plaintiffs' allegations of their job performance not because it is a required component of every pleading, but rather because Plaintiffs rely on it to speak to the plausibility of their claims.

United States District Court
Northern District of California

*Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (describing those who "have similar jobs and display similar conduct" to the plaintiff as being "similarly situated"). Nor do they identify the "small group of managers" who acted "under the close supervision of Musk" in making the layoff decisions. Courts have consistently relied on this information to find a plausible link between the discriminatory conduct and the fact that the plaintiff is of a protected class.

For example, in *Hilber v. International Lining Technology*, No. C 12-00003 LB, 2012 WL 3542421, at *5 (N.D. Cal. Jul. 24, 2012), the court held that the plaintiff properly pleaded a claim for disparate treatment because he identified his position and further alleged that he "was not told of any problems with his job performance," had to "do less important and more menial tasks" while "Hispanic laborers hired from Laborers Local 139 Hall got to participate in seaming material and leak testing," and "was sent home early one day and was not given work on another day even though other laborers did work those days."

Similarly, in *Williams v. Wolf*, No. 19-cv-00652-JCS, 2020 WL 1245369, at *10 (N.D. Cal. Mar. 16, 2020), the court adopted "a broader view of causation" in light of the Ninth Circuit's "disavowal of applying the *McDonnell Douglas* prima facie case elements to a plaintiff's allegations at the pleading stage" and held that the plaintiff had sufficiently pleaded a claim for disparate treatment. The plaintiff alleged that her supervisor had stated that she would never support the plaintiff's promotion because the plaintiff had filed a grievance against her supervisor, "she ha[d] been singled out for criticism or discipline on a number of occasions for conduct that is common in her office by non-African American employees," and "her work performance was as good or better than that of her peers." *Id.*

Second, Plaintiffs also fail to allege that Twitter engaged in a pattern or practice of discrimination. When a plaintiff "allege[s] a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, [they] ultimately ha[ve] to prove 'more than the mere occurrence of isolated or accidental or sporadic discriminatory acts.'" *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (quoting *Teamsters*, 431 F.3d at 336); *see also Teamsters*, 400 F.3d at 336 ("[A] pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized

United States District Court
Northern District of California

nature.") (quoting 110 Cong. Rec. 14270 (1964)).  The Ninth Circuit made clear that a pattern or practice is "discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace."  *Cherosky v. Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003).

Plaintiffs do not allege that discrimination was widespread throughout Twitter.  Instead, they allege that Musk, not Twitter, engaged in a pattern or practice of discrimination by implementing the RIF followed by the Post-RIF Policy.  ECF No. 27 at 24.  However, setting aside the issue of whether conduct solely attributed to Musk can be imputed to Twitter, the RIF and Post-RIF Policy are two discrete acts insufficient to support the allegation that discriminatory conduct was "a routine and regular part" of Twitter's workplace.  *See e.g.*, *Sperling v. Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346, 1364 (D.N.J. 1996) ("Another reason that plaintiffs' claim does not fall within the framework of a pattern-or-practice case is that the employment practice which plaintiffs assert was [the defendant's] standard operating procedure was used only once, i.e., the Guidelines were used only during [the RIF].").

Further, even if the Court did hold that the RIF and Post-RIF Policy constitute a "pattern or practice," Plaintiffs' remaining allegations, namely their statistics and Musk's statements, fail to support that Twitter knew that granting discretion to the managers would result in that discretion being used in a discriminatory manner.  It is true that, "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."  *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977).  However, the Supreme Court "ha[s] not suggested that any particular number of 'standard deviations' can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination."  *Watson*, 487 U.S. at 995 n.3.[7]  Rather, courts are required to assess "the 'significance' or 'substantiality' of numerical disparities on a case-by-case basis" which reflects

---

[7] While *Watson* discussed the evaluation of statistics in the context of a disparate impact claim, its reasoning is nonetheless applicable to a "pattern or practice" claim because *Watson* relied on *Teamsters*, in which the court examined a "pattern or practice" claim.  *See e.g., Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 552 (9th Cir. 1982) (relying on the admonition in *Teamsters* that the usefulness of statistical evidence "depends on all of the surrounding facts and circumstances" in its decision to reject the proposition that standard deviations of 1.3 and 2.46 supported an inference of intentional discrimination as effectuated through a pattern or practice) (quoting *Teamsters*, 431 U.S. at 340).

the recognition that "statistics 'come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances.'"  *Id.* (quoting *Teamsters*, 431 U.S. at 340).  Absent the "facts and circumstances" discussed previously and which are commonly relied upon at the pleading stage – such as Plaintiffs' positions at Twitter, whether they were performing satisfactorily, the treatment of similarly situated men, and the identity of the managers – Plaintiffs fail to allege disparate treatment.

Plaintiffs' inclusion of "several of Musk's public statements belittling women and questioning their role in the workplace" do not cure this deficiency.  ECF No. 27 at 25.  "[T]he cold numbers" of statistics can be brought "convincingly to life" by personal experiences.  *Teamsters*, 431 U.S. at 339 (1977).  Plaintiffs argue that Musk's public statements are "anecdotal evidence" that serve this purpose.  ECF No. 27 at 25.  While "comments suggesting that the employer may have considered impermissible factors are clearly relevant to a disparate treatment claim . . . 'stray' remarks are insufficient to establish discrimination."  *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438-39 (9thf Cir. 1990).  Isolated remarks, unrelated to the discriminatory employment decision, are generally insufficient to establish discriminatory intent.  *See id.*; *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (holding that a comment "uttered in an ambivalent manner" and "not tied directly to" the plaintiff's termination was "at best weak circumstantial evidence of discriminatory animus"); *cf. Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985) (finding the defendant's statements that the "police force had no women and no Blacks" and encouraging plaintiff to apply for a department that was "literally begging for minorities and especially females" created a triable issue of fact despite plaintiff being unable to provide a "proper statistical record.").

Here, Musk's statements that Plaintiffs offer to demonstrate animus toward women, although more than isolated incidents, were not tied directly to the RIF, as Musk made them prior to his acquisition of Twitter.  ECF No. 1 ¶¶ 22-25.  Further, Plaintiffs do not allege that Musk made the layoff decisions, but rather that a group of managers did so under his supervision.  *Id.* ¶ 21.  Plaintiffs attempt to analogize this case to *Usher v. O'Reilly Automotive Inc.*, No. 14-cv-189 PA (FFMx), 2014 WL 12597587, at *5 (C.D. Cal. May 27, 2014), which is readily

10

distinguishable.  There, the court held that the plaintiff sufficiently stated a claim under FEHA, despite its acknowledgment that that "actual allegations may not show that the comments made to Plaintiff were 'directly tied' to Plaintiff's termination."  *Id.*  However, in *Usher*, the plaintiff had been directly subjected to discriminatory comments that increased in 2011 and "became an everyday occurrence by 2012."  *Id.* at 1.  At one point, the plaintiff's supervisor stated that the defendant had made undesirable changes in the plaintiff's schedule "in hopes that Plaintiff would quit voluntarily due to his age."  *Id.*  Musk's comments do not rise to the level of those in *Usher* so as to constitute sufficient, nonconclusory allegations plausibly linking the RIF to discrimination on the basis of Plaintiffs' sex.

Thus, Plaintiffs fail to establish a plausible link between their layoff during the RIF and their sex and fail to state a claim for disparate treatment.

### C.    Disparate Impact

A plaintiff may also bring a Title VII or FEHA claim on the theory that a facially neutral, employment practice created a disparate impact upon a protected class.  *Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002); *Mahler v. Judicial Council of Cal.*, 67 Cal. App. 5th 82, 113 (2021).  In order to state a disparate impact claim, a plaintiff must allege the existence of a "significant disparate impact on a protected class caused by a specific, identified, employment practice or selection criterion."  *Stout*, 276 F.3d at 1121.  As discussed above, "an employment discrimination plaintiff need not plead a prima facie case of discrimination" to survive a motion to dismiss.  *Swierkiewicz*, 534 U.S. at 515.

Twitter first argues that Plaintiffs cannot state a disparate impact claim because they improperly "recast a claim for intentional discrimination as a disparate impact claim."  ECF No. 20 at 23.  Plaintiffs argue that cases "can, and routinely do, proceed under both disparate treatment and disparate impact theories of liability."  ECF No. 27 at 27.

 "[A] person may not be sure in advance upon which legal theory she will succeed, and so [parties are permitted] to 'set forth two or more statements of a claim or defense alternately or hypothetically,' and to 'state as many separate claims or defenses as the party has regardless of consistency.'"  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999) (quoting Fed. R.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Civ. P. 8(e)(2) (2006)); *accord PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 858-59 (9th

2  Cir. 2007).  Thus, Plaintiffs can plead that the RIF was either an act of intentional discrimination

3  or a facially neutral policy that had a disparate impact.  *See Barrett v. Forest Lab'ys, Inc.*, 39 F.

4  Supp. 3d 407, 436 (S.D.N.Y. 2014) ("Nor is it problematic that the [complaint] identifies one

5  practice in support of both a pattern-or-practice disparate treatment claim and a disparate impact

6  claim."); *City of Oakland v. Wells Fargo Bank, N.A.*, Case No. 15-cv-04321-EMC, 2018 WL

7  3008538, at *15 (N.D. Cal. June 15, 2018) (holding that, although the plaintiff's allegations

8  "suggested intentional discrimination," there was nonetheless a valid disparate impact claim),

9  *rev'd in part on other grounds* 14 F.4th 1030 (9th Cir. 2021).

10       Twitter does not contest that Plaintiffs can plead in the alternative, but rather argues that

11  "[a] plaintiff can plead in the alternative only if she sets forth facts plausibly pleading each

12  alternative claim."  ECF No. 28 at 16.  As discussed above, Plaintiffs have not set forth facts that

13  plausibly plead a theory of disparate treatment.  Therefore, the remaining question, and the heart

14  of the parties' dispute, is whether Plaintiffs have set forth facts so as to plausibly plead a theory of

15  disparate impact.

16                    **a.        Identification of a Specific Employment Practice**

17       To state a claim on a theory of disparate impact, Plaintiffs must first allege "the occurrence

18  of certain outwardly neutral employment practices."  *Katz v. Regents of the Univ. of Cal.*, 229 F.3d

19  831, 835 (9th Cir. 2000) (quoting *Palmer v. United States*, 794 F.2d 534, 538 (9th Cir. 1986)).[8]  A

20  plaintiff "generally cannot attack an overall decisionmaking process in the disparate impact

21  context, but must instead identify the particular element or practice within the process that causes

22  an adverse impact."  *Stout*, 276 F.3d at 1124.

23       Here, Plaintiffs attack the RIF.[9]  They allege that layoff decisions "were made under

24  _____

25  [8] Although the plaintiff in *Katz* brought a claim under the Age Discrimination in Employment Act
    (ADEA), its holding applies to the instant suit because "[t]he criteria applied to a Title VII

26  discrimination claim also apply to claims arising under the ADEA," *Palmer v. United States*, 794
    F.2d 534, 537 (9th Cir. 1986), and that "same analytical framework [applies] to claims brought

27  under FEHA."  *Katz v. Regents of the Univ. of Cal.*, 229 F.3d 831, 835 (9th Cir. 2000).

28  [9] Plaintiffs also allege that the Post-RIF Policy effectuated the mass layoff and "suffice[s] to
    identify a more specific employment practice."  ECF No. 27 at 19.  However, the Court will not

                                            12

extremely hurried circumstances, with little if any regard given to employees' job performance, qualifications, experience, and abilities" by "a small group of managers," some of which were brought in from other Musk-owned companies who "did not have much, if any, knowledge about Twitter's operations." ECF No. 1 ¶¶ 19, 21. Twitter argues that Plaintiffs fail to identify a "specific practice, test, or standard" so as to constitute "a specific RIF-related employment practice." ECF No. 20 at 24. Plaintiffs contend that they "plead allegations that go beyond the mere existence of the mass layoff." ECF No. 27 at 29.

A plaintiff can identify a subjective or objective practice used to make the layoff decisions. *Pottenger v. Potlach Corp.*, 329 F.3d 740, 749 (9th Cir. 2003) (holding that an RIF can constitute a specific employment practice because the Ninth Circuit had previously found a "policy of committing employment decisions in an RIF to the subjective discretion of its managers constituted a specific employment practice subject to disparate impact analysis"); *Watson*, 487 U.S. at 991 ("[A] disparate impact analysis may in principle be applied to subjective as well as to objective practices"). Therefore, an RIF can constitute such a practice insofar as the plaintiff alleges that "an employer[] [had a] facially neutral practice of committing employment decisions to the subjective discretion of supervisory employees" because that is "an employment practice properly subject to a disparate impact analysis." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990).

Plaintiffs sufficiently allege the existence of a facially neutral, employment practice: Twitter's delegation of layoff decisions to a small group of managers, which largely did not consider objective criteria – such as "job performance, qualifications, experience, and abilities" – in making its decisions. ECF No. 1 ¶¶ 19, 21. Twitter is incorrect that Plaintiffs need to allege "the factors Twitter did consider that are responsible for the purported disparities" at the pleading stage. ECF No. 28 at 12. Courts have consistently accepted allegations that employment

_____

consider whether the Post-RIF Policy constitutes an employment practice because Plaintiffs were not working at Twitter when the Post-RIF Policy was enacted. *Pottenger v. Potlach Corp.*, 329 F.3d 740, 750 (9th Cir. 2003) ("To bring a disparate impact claim, [a plaintiff] must show that [they were] subject to the particular employment practice with the alleged disparate impact."). Regardless of whether the Post-RIF Policy is a "constructive discharge" or not, it was not a discharge to which Plaintiffs were subjected. ECF No. 27 at 30.

United States District Court
Northern District of California

1    decisions were delegated to the subjective discretion of supervisors, and thus devoid of objective

2    criteria, as sufficient so as to constitute an identifiable employment practice.

3         For example, in *Rose*, the Ninth Circuit held that the plaintiff sufficiently identified an

4    employment practice by alleging that "[e]mployment decisions as to which jobs would be

5    eliminated" and the question of "who would fill the remaining positions" were "essentially left to

6    the discretion of the managers" during an RIF.  902 F.2d at 1420, 1424-25.  The Ninth Circuit did

7    not require the plaintiff to identify the criteria managers relied upon in exercising their discretion.

8         Similarly, in *National Fair Housing Alliance v. Federal National Mortgage Association*,

9    294 F. Supp. 3d 940, 948 (N.D. Cal. 2018), the plaintiff identified the delegation of discretion and

10   failure to consider objective factors as the specific employment practices.  The court held that the

11   policies identified by plaintiff – "delegation of discretion [to lower-level Fannie Mae employees]

12   or failure to supervise and differential maintenance based on the properties' age and value"– were

13   "sufficient as a matter of law" to allege that Fannie Mae's upkeep of Real Estate Owned properties

14   had a disparate impact on communities of color.  *Id.*  The court in *Ramirez v. GreenPoint

15   Mortgage Funding, Inc.*, 633 F. Supp. 2d 922, 928 (N.D. Cal. 2008), similarly held that a policy

16   which "allegedly allowed [the defendant's] loan officers and brokers to charge additional fees

17   based on subjective criteria rather than objective criteria related to creditworthiness" was a

18   sufficient employment practice.

19        Thus, Plaintiffs sufficiently allege a specific employment practice.

20                        **b.    Causation**

21        Plaintiffs must also allege that the identified employment practice caused "a significant

22   disparate impact on a protected class."  *Stout*, 276 F.3d at 1121.  Such allegations largely include

23   "statistical evidence of a kind and degree sufficient to show that the practice in question has

24   caused" caused the disparate impact.  *Watson*, 487 U.S. at 994.

25        Plaintiffs have not sufficiently alleged that the managers' ability to exercise their discretion

26   caused the gender disparity in the layoffs overall, and critically, Plaintiffs' own layoffs.  They rely

27   upon statistics and Musk's statements to demonstrate that "women were far more likely than men

28   to be laid off from Twitter."  ECF No. 1 ¶ 39.  However, as discussed previously, Plaintiffs fail to

United States District Court
Northern District of California

14

allege basic facts that would situate them within the statistics.  Plaintiffs allege almost nothing about themselves – including their positions prior the RIF or their qualifications and performance history – that place the statistics in context.

Although "contentions regarding whether the Plaintiffs' methodology is flawed are best reserved for resolution at summary judgment phase," *Nat'l Fair Hous. All.*, 294 F. Supp. 3d at 948, Plaintiffs must nonetheless show that their statistics analyze the correct group, or does not otherwise "use[] the wrong denominator" to plausibly plead causation between the employment practice and the disparate impact.  *Liu v. Uber Techs. Inc.*, No. 20-cv-07499-VC, 2022 WL 1613285, at *1 (N.D. Cal. May 23, 2022).  The Court cannot determine whether Plaintiffs sufficiently alleged causation without allegations as to which group Plaintiffs belonged to at Twitter.  Thus, they have failed to allege causation.  Accordingly, Plaintiffs have also failed to state a disparate impact claim.

### D.  Declaratory Judgment Act

As discussed above, Plaintiffs' counsel has already obtained agreement from Twitter that they will not seek the general releases of claims from Twitter employees without notice of the instant suit and associated rights.  Therefore, Plaintiffs' claim under the Declaratory Judgment Act, seeking such an injunction, is moot.  *Nome Eskimo Cmty. v. Babbit*, 67 F.3d 813, 815 (9th Cir. 1995).  The Court dismisses this claim without prejudice.  If Plaintiffs wish to amend their complaint with a request for injunctive relief, they must identify how the relief they now seek differs from that already obtained in *Cornet*.

### E.  Motion to Strike Class Claims

Twitter also asks that the Court strike the class action claims, arguing that "[b]ecause Plaintiffs could not have been injured by the Post-RIF Policies, they lack standing to assert a disparate impact claim arising from the alleged injuries of others who were subject to those policies."  ECF No. 20 at 28.  Twitter further argues that Plaintiffs fail to "plead a precise and ascertainable class definition."  *Id*. at 31.  Because the Court has dismissed all the claims in the complaint, however, it need not and does not decide Twitter's alternative motion to strike.  The Court denies Twitter's request to strike as moot.

15

1    Twitter is entitled to raise this alternative argument in response to any amended complaint,

2    but Twitter should be aware that the Court disfavors striking class allegations in lieu of or prior to

3    a fully briefed motion for class certification brought after discovery has been completed.  *See*

4    *Thorpe v. Abbott Labs., Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008) ("Motions to strike

5    class allegations are disfavored because a motion for class certification is a more appropriate

6    vehicle for the arguments [the defendant] advances herein."); *see e.g.*, *Falkenberg v. Alere Home*

7    *Monitoring, Inc.*, No. 13-cv-00341-JST, 2015 WL 800378, at *5 (N.D. Cal. Feb. 23, 2015).

8                                    **CONCLUSION**

9    For the foregoing reasons, Twitter's motion is granted.  Plaintiffs' complaint is dismissed

10   with leave to amend because Twitter has not shown that amendment would prejudice Twitter, is

11   sought in bad faith, would produce an undue delay, or would be futile.  *See AmerisourceBergen*

12   *Corp v. Dialyst West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).  Plaintiffs may file an amended

13   complaint within twenty-one days of this order solely to cure the deficiencies identified by this

14   order.  Failure to file a timely amended complaint will result in dismissal with prejudice.

15        **IT IS SO ORDERED.**

16   Dated:  May 8, 2023



17   _____

18                          JON S. TIGAR
                        United States District Judge

EXHIBIT 4

1   MORGAN, LEWIS & BOCKIUS LLP
2   Eric Meckley, Bar No. 168181
    eric.meckley@morganlewis.com
3   Brian D. Berry, Bar No. 229893
    brian.berry@morganlewis.com
4   Kassia Stephenson, Bar No. 336175
    kassia.stephenson@morganlewis.com
5   One Market, Spear Street Tower
    San Francisco, CA  94105-1596
6   Tel:    +1.415.442.1000
7   Fax:    +1.415.442.1001

8   MORGAN, LEWIS & BOCKIUS LLP
    Ashlee N. Cherry, Bar No. 312731
9   ashlee.cherry@morganlewis.com
10  1400 Page Mill Road
    Palo Alto, CA  94304
11  Tel:    +1.650.843.4000
    Fax:    +1.650.843.4001
12
13  MORGAN, LEWIS & BOCKIUS LLP
    Joseph A. Govea, Bar No. 319683
14  joseph.govea@morganlewis.com
    300 South Grand Avenue
15  Twenty-Second Floor
    Los Angeles, CA  90071-3132
16  Tel:    +1.213.612.2500
    Fax:    +1.213.612.2501
17
18  Attorneys for Defendant
    TWITTER, INC.
19                      UNITED STATES DISTRICT COURT

20                      NORTHERN DISTRICT OF CALIFORNIA

21  CAROLINA BERNAL STRIFLING and          Case No. 4:22-cv-07739-JST
22  WILLOW WREN TURKAL, on behalf of
    themselves and all others similarly situated,
23                                                 **DEFENDANT TWITTER, INC.'S**
                                                   **NOTICE OF MOTION AND MOTION**
24                        Plaintiffs,              **TO STRIKE PORTIONS OF THE**
                                                   **FIRST AMENDED COMPLAINT;**
25              v.                                 **MEMORANDUM OF POINTS AND**
                                                   **AUTHORITIES**
26  TWITTER, INC.,

27                        Defendant.               Date:    August 31, 2023
                                                   Time:    2:00 p.m.
28                                                 Judge:   Hon. Jon S. Tigar

MORGAN, LEWIS &                                    TWITTER'S NOTICE OF MOTION AND
 BOCKIUS LLP                                          MOTION TO STRIKE THE FAC
ATTORNEYS AT LAW                                      CASE NO. 4:22-CV-07739-JST
 SAN FRANCISCO

1   **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2       **PLEASE TAKE NOTICE** that on August 31, 2023 at 2:00 p.m. or as soon thereafter as

3   may be heard in Courtroom 6 on the 2nd Floor of the United States Courthouse, located at 1301

4   Clay Street, Oakland, California 94612, Defendant Twitter, Inc. will, and hereby does, move this

5   Court pursuant to Rule 12(f) of the Federal Rules of Civil Procedure for an order striking portions

6   of the First Amended Complaint.

7       The Court should strike Sydney Frederick-Osborne as a Plaintiff in this case, along with

8   the third and fourth causes of action for age discrimination in violation of the Age Discrimination

9   in Employment Act, 29 U.S.C. § 621, *et seq.* and the California Fair Employment and Housing

10  Act, Gov. Code § 12900, *et seq.*, and all allegations related to purported age discrimination,

11  because those amendments violate the Court's May 8, 2023 Order Granting Motion to Dismiss

12  (ECF No. 38), which permitted Plaintiffs to amend their complaint "solely to cure the deficiencies

13  identified" by the Court's order.  Specifically, the Court should strike Frederick-Osborne from the

14  caption, all references to her in the amended complaint, and all allegations related to purported

15  age discrimination as they appear in paragraphs 1, 3, 4, 7, 8, 11, 13, 39, 40, 44, 46, 47, 48, 49, 54,

16  55, 58, and Prayer for Relief sections (b), (d), (e), and (g).

17      The Motion is based on this Notice of Motion, the Memorandum of Points and

18  Authorities, the pleadings on file herein, the Court's May 8, 2023 Order Granting Motion to

19  Dismiss, and such arguments and admissible evidence as may be presented at the time of hearing.

20  Dated: June 16, 2023                    MORGAN, LEWIS & BOCKIUS LLP

21

22                                          By   /s/ *Brian D. Berry*

23                                              Eric Meckley
                                                Brian D. Berry
24                                              Ashlee N. Cherry
                                                Joseph A. Govea
25                                              Kassia Stephenson
                                                Attorneys for Defendant
26                                              TWITTER, INC.

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

TWITTER'S NOTICE OF MOTION AND
MOTION TO STRIKE THE FAC
CASE NO. 4:22-CV-07739-JST

1

**TABLE OF CONTENTS**

2                                                                                          **Page**

3     I.     INTRODUCTION ............................................................................................. 1

4     II.    PROCEDURAL BACKGROUND ................................................................... 1

5     III.   ARGUMENT .................................................................................................... 3

6     IV.    CONCLUSION ................................................................................................. 5

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TWITTER'S NOTICE OF MOTION AND
MOTION TO STRIKE THE FAC
CASE NO. 4:22-CV-07739-JST

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

*Aikins v. S. Helena Hosp.*
5    1994 WL 794759 (N.D. Cal. Apr. 4, 1994) ............................................................................ 4

6

*Andrew W. v. Menlo Park City School Dist.*
7    2010 WL 3001216 (N.D. Cal. July 29, 2010) ...................................................................... 4

8 *Becton, Dickinson & Co. v. Cytek Biosciences Inc.*
   2019 WL 6327203 (N.D. Cal. Nov. 26, 2019) ..................................................................... 3
9

*Benton v. Baker Hughes*
10    2013 WL 3353636 (C.D. Cal. June 30, 2013) ..................................................................... 4

11 *Celgard, LLC v. Shenzhen Senior Tech. Material Co. (US) Research Inst.*
   2022 WL 19569565 (N.D. Cal. Sept. 27, 2022) .................................................................. 3
12

13 *Cover v. Windsor Surry Co.*
   2016 WL 3421361 (N.D. Cal. June 22, 2016) ..................................................................... 3
14

*DeLeon v. Wells Fargo Bank, N.A.*
15    2010 WL 4285006 (N.D. Cal. Oct. 22, 2010) ..................................................................... 3

16 *Fields v. Bank of New York Mellon*
   2017 WL 5665404 (N.D. Cal. Nov. 27, 2017) ..................................................................... 3
17

18 *Gerritsen v. Warner Bros. Ent. Inc.*
   116 F. Supp. 3d 1104 (C.D. Cal. 2015) ........................................................................... 3, 4
19

*In re Asyst Techs., Inc. Derivative Litig.*
20    2008 WL 4891220 (N.D. Cal. Nov. 12, 2008) ..................................................................... 4

21 *Jameson Beach Prop. Owners Ass'n v. United States*
   2014 WL 4925253 (E.D. Cal. Sept. 29, 2014) ..................................................................... 4
22

23 *Kennedy v. Full Tilt Poker*
   2010 WL 3984749 (C.D. Cal. Oct. 12, 2010) ..................................................................... 4
24

*PB Farradyne, Inc. v. Peterson*
25    2006 WL 2578273 (N.D. Cal. Sept. 6, 2006) ................................................................... 3, 4

26 *Peguero v. Toyota Motor Sales, USA, Inc.*
   2021 WL 2910562 (C.D. Cal. Apr. 26, 2021) ..................................................................... 4
27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

TWITTER'S NOTICE OF MOTION AND
MOTION TO STRIKE THE FAC
CASE NO. 4:22-CV-07739-JST

*Raiser v. City of Los Angeles*
2014 WL 794786 (C.D. Cal. Feb. 26, 2014) ................................................................. 4

*Zeman v. Twitter, Inc., et al.*
N.D. Cal. Case No. 3:23-cv-01786-SI ...................................................................... 2

**STATUTES**

The Age Discrimination in Employment Act ................................................................. 1

The California Fair Employment and Housing Act ....................................................... 1

Title VII of the Civil Rights Act ................................................................................... 1

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

TWITTER'S NOTICE OF MOTION AND
MOTION TO STRIKE THE FAC
CASE NO. 4:22-CV-07739-JST

## I.   **INTRODUCTION**

Plaintiffs Strifling and Turkal are former Twitter employees who allege Twitter discriminated against them and other female employees on the basis of their sex when it implemented a reduction in force on November 4, 2022.  The Court granted Twitter's Motion to Dismiss their original complaint for failure to state a sex-discrimination claim under Title VII of the Civil Rights Act of 1964 and Fair Employment and Housing Act ("FEHA").  In doing so, the Court granted Plaintiffs leave to amend their complaint "solely to cure the deficiencies identified by [the dismissal] order."  ECF No. 38.  Despite this express limitation, Plaintiffs filed an amended complaint ("FAC") that purports to add a new Plaintiff, Sydney Frederick-Osborne, and purports to assert new age-discrimination claims under the ADEA and FEHA on behalf of Frederick-Osborne and a putative class and collective of former employees age 50 or older.  The Court should strike the FAC's purported addition of Frederick-Osborne as a Plaintiff and strike the claims and allegations related to age discrimination.

## II.   **PROCEDURAL BACKGROUND**

On December 7, 2022, Plaintiffs Turkal and Strifling filed an original complaint in this action alleging individual and class claims for sex discrimination under Title VII and the FEHA. ECF No. 1.  Twitter filed a motion to dismiss the complaint on January 26, 2023.  ECF No. 20. After the parties had fully briefed the motion, the Court took it under submission without a hearing and then, on May 8, 2023, issued an order granting the motion with leave to amend.  ECF No. 38.  In granting Plaintiffs leave to amend, the Order explicitly stated, "Plaintiffs may file an amended complaint within twenty-one days of this order ***solely to cure the deficiencies identified by this Order***."  *Id.* (Order at 16) (emphasis added).  On May 26, 2023, Plaintiffs filed their FAC. ECF No. 41.  The FAC purports to add a new Plaintiff, Sydney Frederick-Osborne, who alleges new class and collective claims for age discrimination under the ADEA and FEHA.  *See* ECF No. 41 (FAC ¶¶ 1, 3, 4, 7, 54, 55, 58, and Counts III and IV).

The Court should view Plaintiffs' amendments against the background of Plaintiffs' counsel's litigation conduct in two other cases pending in the Northern District.  On November 16, 2022, three weeks before filing this action, Plaintiffs' counsel filed a separate putative class

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

TWITTER'S NOTICE OF MOTION AND
MOTION TO STRIKE THE FAC
CASE NO. 4:22-CV-07739- JST

action alleging disability discrimination against Twitter in the matter entitled *Borodaenko v. Twitter, Inc.*, N.D. Cal. Case No. 3:22-cv-7226-AMO, which was assigned to Judge Gilliam. *Borodaenko* Docket, ECF No. 1.  Several months later, on April 13, 2023, Plaintiffs' counsel filed another separate putative class and collective action alleging age discrimination against Twitter in the matter entitled *Zeman v. Twitter, Inc., et al.*, N.D. Cal. Case No. 3:23-cv-01786-SI, which is pending before Judge Illston.  *Zeman* Docket, ECF No. 1.

In *Borodaneko*, Judge Gilliam granted Twitter's motion to dismiss the disability discrimination claims on May 5, 2023—one court day before this Court granted Twitter's motion to dismiss the claims in this sex discrimination action.  *Borodaenko* Docket, ECF No. 35.  A few days after Judge Gilliam granted Twitter's motion to dismiss in *Borodaenko*, he reassigned the case to Judge Martinez-Olguin.  *Id.*, ECF No. 37.  Seeing an opportunity for judge shopping, Plaintiffs' counsel filed a motion to relate *Borodaenko* (the earliest-filed case) with *Zeman* and this case.  *Id.*, ECF No. 38.  Twitter opposed the motion, explaining that the cases do not satisfy the standard for related cases under Local Rule 3-12, and that Plaintiffs' motion was a transparent exercise in gamesmanship given that Plaintiffs' counsel had repeatedly represented that the cases were not related, only to change their position immediately after Judge Gilliam reassigned *Borodaenko* and on the heels of unfavorable dismissal orders in that case and in this case.  *Id.*, ECF No. 39.

On May 23, 2023, the Court in *Borodaenko* denied the motion to relate cases. *Borodaenko* Docket, ECF No. 41.  Three days later, Plaintiffs filed their FAC in this case and purported to add a new Plaintiff with age discrimination claims that are the same as the claims in *Zeman* (*compare* ECF No. 41 *with Zeman* Docket, ECF No. 1), and they did so while Twitter's motion to dismiss in *Zeman* is pending before Judge Illston (*Zeman* Docket, ECF No. 25). Plaintiffs' counsel then filed a Motion to Consolidate the three cases on June 6, 2023 in *Borodaenko*, hoping to succeed where their motion to relate failed—by obtaining an order reassigning this case and *Zeman* to Judge Martinez-Olguin.  As explained below, however, this case does not properly include the age-discrimination claims that Plaintiffs purported to add to the FAC as an artifice to obtain judicial reassignment.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

TWITTER'S NOTICE OF MOTION AND
MOTION TO STRIKE THE FAC
CASE NO. 4:22-CV-07739- JST

1  **III.   ARGUMENT**

2       Courts routinely strike or dismiss allegations in an amended complaint that exceed the

3  scope of an order granting leave to amend.  For instance, in *Fields v. Bank of New York Mellon*,

4  2017 WL 5665404 (N.D. Cal. Nov. 27, 2017), this Court granted the plaintiff "leave to amend

5  *solely* for the purpose of curing the deficiencies identified" in its dismissal order.  *Id.* at *1

6  (emphasis in original).  Despite this express limitation, the plaintiff "included in the FAC several

7  new defendants and causes of action."  *Id.*  This Court did not hesitate to strike the new parties

8  and causes of action from the amended complaint because the amendments "exceed[ed] the scope

9  of leave to amend granted by the court."  *Id.* at *3 (quoting *Gerritsen v. Warner Bros. Ent. Inc.*,

10  116 F. Supp. 3d 1104, 1125 (C.D. Cal. 2015), and citing *PB Farradyne, Inc. v. Peterson*, 2006

11  WL 2578273, at *3 (N.D. Cal. Sept. 6, 2006) (striking allegations that were "outside the scope of

12  the leave to amend granted" by a prior court order and denying leave to amend to include such

13  allegations)).

14       Similarly, in *Celgard, LLC v. Shenzhen Senior Tech. Material Co. (US) Research Inst.*,

15  2022 WL 19569565 (N.D. Cal. Sept. 27, 2022), this Court granted the plaintiff "[l]eave to amend

16  solely *to cure the deficiencies* identified" in its dismissal order.  *Id.* at *1 (emphasis in original).

17  Because the plaintiff "was not given leave to amend to assert whole new theories of liability," this

18  Court granted the defendant's motion to dismiss the new claims as beyond the scope of the prior

19  order.  *Id.* at *1-2 (citing *DeLeon v. Wells Fargo Bank, N.A.*, 2010 WL 4285006, at *3 (N.D. Cal.

20  Oct. 22, 2010) ("[W]here leave to amend is given to cure deficiencies in certain specified claims,

21  courts have agreed that new claims alleged for the first time in the amended pleading should be

22  dismissed or stricken."), and *Cover v. Windsor Surry Co.*, 2016 WL 3421361, at *3 (N.D. Cal.

23  June 22, 2016) (dismissing claim that "exceeds the scope of allowable amendment under my

24  previous order")).

25       This Court's orders in *Fields* and *Celgard* are in accord with the rulings by other district

26  courts in California.  Indeed, courts do not permit plaintiffs to allege new claims when doing so

27  exceeds the scope of an order granting leave to amend.  *See, e.g., Becton, Dickinson & Co. v.

28  Cytek Biosciences Inc.*, 2019 WL 6327203, at *2 (N.D. Cal. Nov. 26, 2019) (striking plaintiff's

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

TWITTER'S NOTICE OF MOTION AND
MOTION TO STRIKE THE FAC
CASE NO. 4:22-CV-07739- JST

1   Sherman Act and unfair competition claims because the court granted leave to amend only to

2   "cure the deficiencies identified" by the court's prior order); *Andrew W. v. Menlo Park City*

3   *School Dist.*, 2010 WL 3001216, at *2 (N.D. Cal. July 29, 2010) (striking new claims in the

4   amended complaint brought under the Rehabilitation Act and 42 U.S.C. § 1983 because the court

5   granted leave to amend only to address the issues raised in the defendant's motion to dismiss the

6   original complaint); *Benton v. Baker Hughes*, 2013 WL 3353636, at *3 (C.D. Cal. June 30, 2013)

7   ("The court's order granted [plaintiff] leave to amend only to address the deficiencies in his

8   existing causes of action identified in its order, however. It did not grant [plaintiff] leave to add

9   new claims . . . . The addition of [plaintiff]'s new claims therefore exceeds the scope of the leave

10  to amend granted, and it is appropriate to strike the newly added claims on this basis.")

11  (collecting cases), *aff'd sub nom. Benton v. Hughes*, 623 F. App'x 888 (9th Cir. 2015); *Kennedy*

12  *v. Full Tilt Poker*, 2010 WL 3984749, at *1 (C.D. Cal. Oct. 12, 2010) (dismissing plaintiffs'

13  federal RICO claim because it exceeded the permissible scope of leave to amend and plaintiffs

14  had not sought leave to add new claims); *PB Farradyne, Inc.*, 2006 WL 2578273, at *3;

15  *Gerritsen*, 116 F. Supp. 3d at 1125.

16       Nor do courts permit plaintiffs to add new parties when doing so would exceed the scope

17  of an order granting leave to amend.  *See, e.g.*, *In re Asyst Techs., Inc. Derivative Litig.*, 2008 WL

18  4891220, at *3 (N.D. Cal. Nov. 12, 2008) (striking new plaintiff from amended complaint

19  because court granted plaintiffs leave to supplement their allegations related to standing but not to

20  add a new plaintiff); *Aikins v. S. Helena Hosp.*, 1994 WL 794759, at *1 (N.D. Cal. Apr. 4, 1994)

21  (same); *Peguero v. Toyota Motor Sales, USA, Inc.*, 2021 WL 2910562, at *13 (C.D. Cal. Apr. 26,

22  2021) (striking new plaintiffs from the amended complaint because the court granted plaintiffs

23  leave only to amend deficiencies identified in the court's order); *Kennedy*, 2010 WL 3984749, at

24  *1 (striking new defendants from plaintiffs' amended complaint because plaintiffs had not sought

25  leave of court to add new parties, and the court granted leave only to add state law claims); *Raiser*

26  *v. City of Los Angeles*, 2014 WL 794786, at *1-2 (C.D. Cal. Feb. 26, 2014) (dismissing amended

27  complaint that added new defendant and theories of liability for exceeding the "specific, limited

28  scope of leave"); *Jameson Beach Prop. Owners Ass'n v. United States*, 2014 WL 4925253, at *4

(E.D. Cal. Sept. 29, 2014) ("When the language of an order clearly states that a plaintiff may only amend to address certain deficiencies identified in the order, . . . a plaintiff is barred from adding new claims or parties.").

Here, Plaintiffs' FAC purports to add a new Plaintiff (Frederick-Osborne) and to assert brand-new individual, class, and collective claims for age discrimination, despite the fact that the Court granted them leave "*solely* to cure the deficiencies identified by" its prior dismissal order. ECF No. 38 (emphasis added). The Court should therefore strike the new Plaintiff and the new age-discrimination claims and allegations because they exceed the scope of Plaintiffs' leave to amend.

**IV.    <u>CONCLUSION</u>**

For the reasons stated above, Twitter respectfully requests an order striking Plaintiff Frederick-Osborne, the individual, class, and collective claims for age discrimination, and all allegations related to purported age discrimination.

Dated: June 16, 2023                              MORGAN, LEWIS & BOCKIUS LLP


                                                  By   /s/ *Brian D. Berry*
                                                  ─────────────────────────
                                                        Eric Meckley
                                                        Brian D. Berry
                                                        Ashlee N. Cherry
                                                        Joseph A. Govea
                                                        Kassia Stephenson
                                                        Attorneys for Defendant
                                                        TWITTER, INC.

DB2/ 45953502.5

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO                         5                    TWITTER'S NOTICE OF MOTION AND
                                                          MOTION TO STRIKE THE FAC
                                                          CASE NO. 4:22-CV-07739- JST

# EXHIBIT 5

MORGAN, LEWIS & BOCKIUS LLP
Eric Meckley, Bar No. 168181
eric.meckley@morganlewis.com
Brian D. Berry, Bar No. 229893
brian.berry@morganlewis.com
Roshni C. Kapoor, Bar No. 310612
roshni.kapoor@morganlewis.com
One Market
Spear Street Tower
San Francisco, CA 94105-1596
Tel:    +1.415.442.1000
Fax:    +1.415.442.1001

MORGAN, LEWIS & BOCKIUS LLP
Jonathan D. Lotsoff (*pro hac vice* forthcoming)
jonathan.lotsoff@morganlewis.com
110 North Wacker Drive
Chicago, IL 60606-1511
Tel:    +1.312.324.1000
Fax:    +1.312.324.1001

Attorneys for Defendants
TWITTER, INC., and X CORP.

MORGAN, LEWIS & BOCKIUS LLP
Joseph A. Govea, Bar No. 319683
joseph.govea@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132
Phone: +1.213.612.2500
Fax: +1.213.612.2501

MORGAN, LEWIS & BOCKIUS LLP
Carolyn M. Corcoran, (*pro hac vice*)
carolyn.corcoran@morganlewis.com
101 Park Avenue
New York, NY 10178-0060
Tel:    +1.212.309.6000
Fax:    +1.212.309.6001

Attorneys for Defendants
TWITTER, INC. and X CORP.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ZEMAN, on behalf of himself and all others similarly situated,

Plaintiff,

v.

TWITTER, INC., and X CORP.,

Defendants.

Case No. 3:23-cv-01786-SI

**DEFENDANTS TWITTER, INC., AND X CORP.'S NOTICE OF MOTION AND MOTION TO DISMISS THE COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**

Date:        June 30, 2023
Time:        10:00 a.m.
Judge:       Hon. Susan Illston

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

1  **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2       **PLEASE TAKE NOTICE** that on June 30, 2023 at 10:00 a.m. or as soon thereafter as

3  may be heard in Courtroom 1 on the 17th floor of the United States Courthouse, located at 450

4  Golden Gate Avenue, San Francisco, California 94102, Defendants Twitter, Inc. and X Corp.

5  will, and hereby do, move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) for an

6  order dismissing the Complaint for failure to state a claim upon which relief can be granted.

7       1.     Plaintiff's first and second causes of action for discrimination in violation of the

8  Age Discrimination in Employment Act, 29 U.S.C. § 621, and the New York State Human Rights

9  Law, N.Y. Exec § 296, fail to state a claim because Plaintiff does not allege facts sufficient to

10 support a plausible disparate treatment claim.

11      2.     Plaintiff's first and second causes of action for discrimination in violation of the

12 Age Discrimination in Employment Act, 29 U.S.C. § 621, and the New York State Human Rights

13 Law, N.Y. Exec § 296, fail to state a claim because Plaintiff does not allege facts sufficient to

14 support a plausible disparate impact claim.

15      3.     Plaintiff's first and second causes of action for discrimination in violation of the

16 Age Discrimination in Employment Act, 29 U.S.C. § 621, and the New York State Human Rights

17 Law, N.Y. Exec § 296, fail to state a claim because Plaintiff does not allege facts plausibly

18 suggesting that he has standing to state claims on behalf of employees terminated after the

19 reduction in force or terminated for reasons other than the reduction in force (*e.g.*, termination for

20 cause or voluntary separation).

Dated: May 12, 2023               MORGAN, LEWIS & BOCKIUS LLP

21

22                           By  */s/ Brian D. Berry*

23                              Eric Meckley
                             Brian D. Berry

24                              Jonathan D. Lotsoff
                             Roshni C. Kapoor

25                              Joseph A. Govea
                             Carolyn M. Corcoran

26

27                              Attorneys for Defendants
                             TWITTER, INC. and X CORP.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

1

**TABLE OF CONTENTS**

2   I.      INTRODUCTION ................................................................................................. 1

3   II.     THE COMPLAINT'S MATERIAL ALLEGATIONS.......................................... 2

4           A.      The Allegations About Plaintiff. ............................................................. 2

5           B.      Plaintiff's Statistics. ............................................................................... 2

6           C.      Musk's Comment. ................................................................................... 3

7           D.      The Collective and Class Claims. ........................................................... 4

8   III.    LEGAL STANDARD .......................................................................................... 4

9   IV.     ARGUMENT ....................................................................................................... 6

10          A.      Plaintiff Fails to State a Claim for Intentional Age Discrimination....... 6

11                  1.      The Complaint Contains No Facts to Support an Inference That
                            Twitter Would Not Have Terminated Him "But For" His Age. ... 6

12                  2.      Plaintiff Fails to Allege that Twitter Engaged In a Pattern or
13                          Practice of Discrimination............................................................ 7

14                          a.      Plaintiff Does Not Allege that Discrimination Was "a
                                    Routine and Regular Part" of Twitter's Workplace........ 7
15
                            b.      Plaintiff's Statistics Do Not Support an Inference of
16                                  Intentional Discrimination. ............................................ 8

17                          c.      Plaintiff's Sole Anecdotal Allegation Does Nothing to
                                    Bolster His Benign Statistics.......................................... 9
18
            B.      Plaintiff Fails to State A Disparate Impact Claim.................................. 11
19
                    1.      The ADEA and NYSHRL Do Not Recognize Plaintiff's 'Subgroup'
20                          Claim Based on Employees Age 50 or Older. ............................ 12

21                  2.      Plaintiff Cannot State a Disparate Impact Claim By Simply Re-
                            Labelling His (Failed) Disparate Treatment Claim.................... 13
22
23                  3.      Plaintiff Fails to Allege a Statistically Significant Disparity. ... 14

24                  4.      The Complaint Fails to Isolate and Identify a Specific Employment
                            Practice Responsible for the Alleged Disparities....................... 15

25          C.      Because Plaintiff Was Laid Off in the RIF, He Lacks Standing to State a
                    Claim Related to Employees Terminated Subsequently or for Other
26                  Reasons. ................................................................................................ 16

27   V.     CONCLUSION................................................................................................... 17

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                                                         MEMORANDUM OF POINTS AND
                                        i                              AUTHORITIES ISO MOTION TO DISMISS
                                                                           CASE NO. 3:23-cv-01786-SI

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Fed'n of State, Cnty., & Mun. Emps. v. Washington*,
770 F.2d 1401 (9th Cir. 1985) ............................................................................................ 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................... 5

*Barrett v. Forest Labs. Inc.*,
39 F. Supp. 3d 407 (S.D.N.Y. 2014) ................................................................................... 14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................. 4, 5, 10

*Bohlke v. General Elec. Co.*,
742 N.Y.S.2d 131 (3d Dep't. 2002) ..................................................................................... 13

*Cozzi v. County of Marin*,
787 F.Supp.2d 1047 (N.D. Cal. Apr. 18, 2011) .................................................................. 10

*Criley v. Delta Air Lines, Inc.*,
119 F.3d 102 (2d Cir. 1997) ............................................................................................... 12

*Davis v. D.C.*,
925 F.3d 1240 (D.C. Cir. 20019) ........................................................................................ 15

*Di Mascio v. General Elec. Co.*,
739 N.Y.S.2d 854 (3d Dep't 2002) ...................................................................................... 13

*Durante v. Qualcomm, Inc.*,
144 F. App'x. 603 (9th Cir. 2005) ...................................................................................... 11

*E.E.O.C. v. McDonnell Douglas Corp.*,
191 F.3d 948 (8th Cir. 1999) .............................................................................................. 12

*Enoh v. Hewlett Packard Enter. Co.*,
2018 WL 3377547 (N.D. Cal. July 11, 2018) ..................................................................... 16

*Freyd v. Univ. of Oregon*,
990 F.3d 1211 (9th Cir. 2021) ............................................................................................ 16

*Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*,
694 F.2d 531 (9th Cir. 1982) ............................................................................................. 8, 9

*Gilbreath v. Brookshire Grocery Co.*,
400 F. Supp. 3d 580 (E.D. Tex. Aug. 21, 2019) ................................................................. 15

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009) ........................................................................................ 6

*Hazelwood Sch. Dist. V. United States*,
  433 U.S. 299 (1977) ........................................................................................ 9

*Int'l Bhd. Of Teamsters v. U.S.*,
  431 U.S. 324 (1977) ................................................................................. 7, 11

*Kinnally v. Rogers Corp.*,
  2009 WL 597211 (D. Ariz. Mar. 9, 2009) .................................................... 13

*Mahler v. Jud. Council of California*,
  67 Cal. App. 5th 82 (2021) ........................................................................... 15

*Marcus v. Leviton Mfg. Co., Inc.*,
  661 F. App'x 29 (2d Cir. 2016) ....................................................................... 6

*Maresco v. Evans Chematics, Div. of W.R. Grace & Co.*,
  964 F.2d 106 (2d Cir. 1992) .......................................................................... 13

*Maybin v. Hilton Grand Vacations Co., LLC*,
  343 F.Supp.3d 988 (D. Haw. Sept. 28, 2018) ............................................... 10

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
  521 F.3d 1097 (9th Cir. 2008) ......................................................................... 5

*Mish v. TForce Freight, Inc.*,
  2021 WL 4592124 (N.D. Cal. Oct. 6, 2021) ................................................... 5

*Moss v. U.S. Secret Serv.*,
  572 F.3d 962 (9th Cir. 2009) ........................................................................... 5

*Nidds v. Schindler Elevator Corp.*,
  113 F.3d 912 (9th Cir. 1996) ......................................................................... 10

*Obrey v. Johnson*,
  400 F.3d 691 (9th Cir. 2005) ........................................................................... 7

*Oinonen v. TRX, Inc.*,
  2010 WL 396112 (N.D. Tex. Feb. 3, 2010) ..................................................... 8

*Paige v. California*,
  233 F. App'x 646 (9th Cir. 2007) ............................................................... 9, 14

*Pottenger v. Potlatch*,
  329 F.3d 740 (9th Cir. 2003) ................................................................... 11, 16

*Rudebusch v. Hughes*,
  313 F.3d 506 (9th Cir. 2002) ........................................................................... 8

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Rudwall v. Blackrock, Inc.*,
2011 WL 767965 (N.D. Cal. Feb. 28, 2011) ........................................................................ 13

*Schechner v. CBS Broad., Inc.*,
2010 WL 2794374 (N.D. Cal. July 15, 2010) .................................................................... 8, 9

*Schechner v. KPIX-TV*,
2011 WL 109144 (N.D. Cal. Jan. 13, 2011) ........................................................................ 13

*Smith v. City of Jackson*,
544 U.S. 228 (2005) ............................................................................................................. 11

*Smith v. Tennessee Valley Auth.*,
924 F.2d 1059 (6th Cir. 1991) ............................................................................................. 12

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................................................. 16

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ................................................................................................. 5

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ............................................................................................... 5

*Stockwell v. City & Cnty. of San Francisco*,
749 F.3d 1107 (9th Cir. 2014) ............................................................................................. 11

*Stout v. Potter*,
276 F.3d 1118 (9th Cir. 2002) ...................................................................................... 12, 15

*Strifling v. Twitter, Inc.*,
(N.D. Cal. Case No. 22-cv-07739-JST) ..................................................................... passim

*Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015) ............................................................................................................. 15

*W. Mining Council v. Watt*,
643 F.2d 618 (9th Cir. 1981) ................................................................................................. 5

*Warth v. Seldin*,
422 U.S. 490 (1975) ............................................................................................................. 16

*Watson v. Fort Worth Bank & Tr.*,
487 U.S. 977 (1988) ............................................................................................................... 6

*Wood v. City of San Diego*,
678 F.3d 1075 (9th Cir. 2012) ............................................................................................... 6

*Zamora v. Penske Truck Leasing Co., L.P.*,
2021 WL 809403 (C.D. Cal. Mar. 3, 2021) ......................................................................... 5

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

**Statutes**

The Age Discrimination in Employment Act ........................................................................... *passim*

The New York State Human Rights Law ................................................................................ *passim*

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ....................................................................... 4, 5

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

v

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

**I.      INTRODUCTION**

Plaintiff John Zeman is a former Twitter employee who alleges Defendants Twitter, Inc. and X Corp. (collectively "Twitter") discriminated against him and other employees aged 50 or older when it implemented a reduction in force ("RIF") on November 4, 2022, that affected the majority of Twitter's U.S. workforce.  On that basis, Plaintiff asserts putative collective and class action claims for age discrimination under the Age Discrimination in Employment Act ("ADEA") and the New York State Human Rights Law ("NYSHRL").  Notably, Plaintiff modeled his Complaint on the failed sex-discrimination complaint in *Strifling v. Twitter, Inc.* (N.D. Cal. Case No. 22-cv-07739-JST), another RIF-related putative class action brought by Plaintiff's counsel of record that Judge Tigar recently dismissed.  *See* Request for Judicial Notice ("RJN"), Ex. 1 (ECF No. 38, Order Granting Motion to Dismiss, filed May 8, 2023).

Plaintiff predicates his disparate impact claim on his allegation that the RIF generated a disparity between employees aged 50 or older and employees aged 49 and younger that measures 1.936 standard deviations from a normal distribution.  This claim fails as a matter of law because a disparate impact claim lies under the ADEA and the NYSHRL only for the entire class of protected employees (*i.e.*, employees aged 40 or older as a group (ADEA) or employees aged 18 or older (NYSHRL)).  The statutes do not recognize a disparate impact claim for a "subgroup" of employees aged 50 or older (or other subgroups of older workers).  Plaintiff's statistics are also insufficient to state a disparate impact claim because a measure of 1.936 standard deviations is below the threshold for statistical significance under Ninth Circuit law.  What is more, Plaintiff's disparate impact claim fails because he targets only purportedly intentional conduct and because he fails to isolate and identify a specific employment practice to challenge with his claim.

Plaintiff's disparate treatment claim fares no better.  The Complaint is devoid of basic information about the circumstances of his termination such as his job at Twitter, his qualifications, his job performance, the qualifications and performance of younger comparators who were not subject to the RIF, and the identity and age of the managers who selected him for the RIF.  In addition, because his statistics are too weak to even support an inference of disparate impact, they are nowhere near sufficient to support an inference of intent, especially when the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

RIF was a single event that cannot constitute a pattern or practice of age discrimination. Nor can Plaintiff plausibly allege systemic disparate treatment of older workers based on a stray comment from 51-year-old Musk about human longevity that has no nexus whatsoever to the RIF.

The Court should also reject Plaintiff's bid to state claims arising from terminations that post-date the RIF because Plaintiff lacks standing to pursue those claims.

At bottom, Plaintiff's Complaint falls well short of pleading any plausible claim for relief. The Court should grant Twitter's motion.

## II.    THE COMPLAINT'S MATERIAL ALLEGATIONS

### A.    <u>The Allegations About Plaintiff.</u>

Plaintiff John Zeman is a resident of New York, New York, where he worked for Twitter from April 2011 until November 2022. Compl. ¶ 6. The Complaint alleges nothing else about Plaintiff except that he was part of Twitter's November 4, 2022 "mass layoff," at which time he was 63 years old. *Id.* ¶ 34. For example, the Complaint does not state Plaintiff's job position, responsibilities, qualifications, or whether Plaintiff was satisfactorily performing his job before the layoff. The Complaint does not state the job responsibilities or qualifications of any younger comparator, or the identity or age of any manager who selected him for the RIF.

### B.    <u>Plaintiff's Statistics.</u>

In April 2022, Musk planned to purchase Twitter. *Id.* ¶ 17. Shortly after Musk completed the acquisition in October 2022, Twitter conducted a "mass layoff" on or around November 4, 2022, with "some [] laid off earlier and many [] laid off after that date." *Id.* ¶¶ 3, 18, 20. The Complaint alleges that the "[d]ecisions regarding which employees would be laid off" were made "quickly" and "under extremely hurried circumstances, with little if any regard to employees' job performance, qualifications, experience, and abilities." *Id.* ¶¶ 19, 21. It further alleges that a "small group of managers, under close supervision by Musk," including managers from Musk's other companies who "did not have much, if any, knowledge about Twitter's operations," made the "majority" of the layoff decisions. *Id.* ¶ 21.

The Complaint does not identify any layoff-related policy, process, or selection criteria that applied to Plaintiff or any other employee. It also offers no allegation about impacted

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

1  employees' (including Plaintiff's) job positions, responsibilities, qualifications, or job

2  performance. Nor does it identify any manager who selected Plaintiff or others for layoff, the

3  location of any layoff decision, or any information about the decision-making process, including

4  what Musk's alleged "supervision" of the selection process entailed.

5      The Complaint's allegation of discrimination rests almost exclusively on data and

6  statistics allegedly derived from Twitter's disclosures to employees under the Older Workers

7  Benefit Protection Act ("OWBPA") that show "which Twitter employees in the United States

8  were retained and which were laid off on November 4, 2022." Compl. ¶ 25. According to

9  Plaintiff, Twitter laid off approximately 2,686 out of 4,964 employees as part of its November 4

10 RIF. *Id.* Although Plaintiff possesses the age demographics of Twitter's workforce before and

11 after the RIF, the Complaint is silent about the age-related statistics for workers aged 40 and over.

12 *See generally* Compl. Instead, the Complaint focuses on employees aged 50 and older.

13 According to the Complaint, Twitter laid off 149 of 248 employees (or 60% of employees) age 50

14 or older, and it laid off 2,537 of 4,716 employees (or 54% of employees) under age 50 in the

15 United States. *Id.* ¶¶ 26, 27. A labor economist, Dr. Mark Killingsworth, allegedly performed a

16 chi-squared test that shows this demographic distribution is 1.936 standard deviations from the

17 normal expected distribution. *Id.* ¶ 28.[1]

18      **C.**   **Musk's Comment.**

19      Plaintiff claims that the layoffs of workers aged 50 and older "resulted from

20 discrimination" as allegedly demonstrated by "publicly discriminatory remarks about older

21 people" by Musk. Compl. ¶ 4. Plaintiff does not allege any age-based animus directed towards

22 him or any other Twitter employee, nor does Plaintiff allege any ageist comments by Musk or any

23 decision-maker in connection with the RIF. Plaintiff also does not allege that any of the

24 unidentified decisionmakers harbored any age-based animus towards him or other workers over

25 50 years old (or over 60 years old). Rather, the Complaint asserts only that Musk, who was 51

---

[1] Although Plaintiff does not bring a claim on behalf of employees aged 60 or older, *see* Compl. pp. 7-8 (Counts I and II), his Complaint asserts that Twitter laid off 24 out of 33 (or 73% of) employees aged 60 and older, and 2,662 out of 4,931 employees (or 54% of) employees under age 60. *Id.* ¶¶ 30, 31. He alleges that a chi-squared statistical test shows that this demographic distribution is 2.154 standard deviations from normal. *Id.* ¶ 32.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

years old when he acquired Twitter, "has a history of bias and making ageist comments." *Id.* ¶ 22; RJN, Ex. 2 (NYT article at p. 1). The Complaint provides a single example of this purported "history" of discriminatory bias. In a media interview from March 2022—more than seven months before the RIF—Musk reportedly said that he "doesn't believe humans should live for longer":

> I don't think we should try to have people live for a really long time. That it would cause asphyxiation of society because the truth is, most people don't change their mind, … they just die. So, if they don't die, we will be stuck with old ideas and society wouldn't advance … [a]nd it is just impossible to stay in touch with the people if you are many generations older than them.

*Id.* ¶¶ 17, 23; RJN, Ex. 3 (Fox Business article at pp. 1-2). Musk made this statement in a discussion about "declining birthrate" and human "longevity" as possible "threat[s] to the future of civilization," the "proper[]" functioning of "democracy," and how he himself is "not afraid of dying." RJN, Ex. 2 at p. 2. The interview contains no comments about Musk's views about workers age 50 and over or about employment practices at Twitter, a company that he did not acquire until months later. Plaintiff provides no nexus between Musk's human-longevity comments and the RIF selections that Plaintiff challenges here.

### D. The Collective and Class Claims.

Plaintiff asserts collective claims under the ADEA, 29 U.S.C. § 621 and class claims under NYSHRL, N.Y. Exec § 296, based on Twitter "conducting mass layoffs in a manner that resulted in a disproportionate impact on employees" age 50 and over. Compl. at pp. 7-8. He purports to represent "all Twitter employees across the United States age fifty (50) or older who have lost their jobs since Elon Musk acquired the company" in a collective action under the ADEA and a class action under NYSHRL. Compl. ¶¶ 7, 8.

## III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint's allegations. A court must dismiss a claim unless the complaint articulates "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). The "plausibility standard is not akin to a 'probability

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

1   requirement,' but rather, it asks for more than a sheer possibility that a defendant has acted

2   unlawfully" or "facts that are 'merely consistent with' a defendant's liability." *Ashcroft v. Iqbal*,

3   556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556-57). A complaint must contain

4   "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of

5   action." *Twombly*, 550 U.S. at 555; *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009)

6   ("[B]are assertions . . . amounting to nothing more than a 'formulaic recitation of the elements'"

7   of a claim "are not entitled to an assumption of truth") (quoting *Iqbal*, 556 U.S. at 681).

8   Therefore, the Court may not "assume the truth of legal conclusions merely because they are cast

9   in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981);

10  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996) (holding that "[c]onclusory

11  allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for

12  failure to state a claim.").

13          The Court considers whether the pleading's "factual content . . . allows the court to draw

14  the reasonable inference that the defendant is liable for the misconduct alleged," such that "it is

15  not unfair to require the opposing party to be subjected to the expense of discovery and continued

16  litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Dismissal is required when a

17  complaint lacks a cognizable legal theory or fails to allege facts sufficient to support a cognizable

18  legal theory. *Twombly*, 550 U.S. at 555; *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d

19  1097, 1104 (9th Cir. 2008); Fed. R. Civ. P. 12(b)(6).

20          In a putative class action, the plausibility standard under Twombly applies not only to the

21  named plaintiff's individual claims, but also to the class claims. *See, e.g.*, *Mish v. TForce*

22  *Freight, Inc.*, 2021 WL 4592124, at \*8 (N.D. Cal. Oct. 6, 2021) (dismissing class claims under

23  *Twombly* standard); *Zamora v. Penske Truck Leasing Co., L.P.*, 2021 WL 809403, at \*3 (C.D.

24  Cal. Mar. 3, 2021) (dismissing class claims because "Plaintiffs do not assert any factual support

25  for their class allegations . . . Plaintiffs cannot point to a fish in the surf to force Defendant on a

26  deep-sea charter [of class discovery]").

27  / / /

28  / / /

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

1    **IV.    ARGUMENT**

2        **A.    Plaintiff Fails to State a Claim for Intentional Age Discrimination.**

3        Under the ADEA and NYSHRL, it is unlawful for an employer to intentionally

4    discriminate against an employee because of his or her age.  29 U.S.C. § 621; N.Y. Exec §

5    296(1)(a).  To state a disparate treatment claim, a plaintiff must allege that "the defendant had a

6    discriminatory intent of motive" in taking some employment-related action against them.  *Watson*

7    *v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988); RJN, Ex. 1 (*Strifling* Order at 6).  It is not

8    enough to allege that "the employer was merely aware of the adverse consequences the policy

9    would have on a protected group."  *Wood v. City of San Diego*, 678 F.3d 1075, 1081 (9th Cir.

10   2012) (quoting *Am. Fed'n of State, Cnty., & Mun. Emps. v. Washington*, 770 F.2d 1401, 1405

11   (9th Cir. 1985)).  Both the ADEA and NYSHRL require the plaintiff to plead that his age was the

12   "but-for" cause of an adverse employment action.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167,

13   177 (2009) (ADEA requires "but-for" causation); *Marcus v. Leviton Mfg. Co., Inc.*, 661 F. App'x

14   29, 33 (2d Cir. 2016) (applying but-for causation to NYSHRL age claim because "age

15   discrimination claims under the NYSHRL have long been considered to be identical to those

16   under the ADEA").

17           **1.    The Complaint Contains No Facts to Support an Inference That
18                   Twitter Would Not Have Terminated Him "But-For" His Age.**

19       Plaintiff alleges he was 63 years old when Twitter selected him for layoff as part of the

20   RIF.  Compl. ¶¶ 6, 34.  The Complaint says nothing about Plaintiff's role, qualifications, job

21   performance, or abilities.  *See generally* Compl.  Nor does the Complaint allege any facts about

22   circumstances plausibly suggesting that ***but-for*** his age, Plaintiff would not have been laid off.

23   *Id.*  For example, the Complaint does not allege anything about the comparative qualifications,

24   job performance, or abilities of younger employees who worked in substantially similar positions

25   and were not laid off.  *Id.*  Nor does it identify the managers who made the RIF decisions, state

26   the age of those managers, or allege that any of those unidentified decision-makers harbored any

27   age animus towards Plaintiff or any other employee, or even that the managers knew the

28   employees' ages when making RIF selections.  *Id.*  Thus, Plaintiff's disparate treatment claim

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

fails here because his complaint is "devoid of basic information" that suggests a "plausible link between [his] layoff during the RIF and the fact [of his age]." *See* RJN, Ex. 1 (*Strifling* Order at 7) (dismissing sex-based disparate treatment claim against Twitter related to the RIF for several reasons, including that plaintiffs "do not describe their positions prior to the RIF or allege that they were performing satisfactorily in those positions. Thus, they are unable to allege that similarly situated men were not laid off during the RIF. . . Nor do they identify the 'small group of managers' who 'acted under close supervision of Musk' in making the layoff decisions.").

## 2. Plaintiff Fails to Allege that Twitter Engaged in a Pattern or Practice of Discrimination.

A plaintiff can state a claim for intentional discrimination under a "pattern or practice" theory when the allegations suggest that discrimination "was the company's ***standard operating procedure***." *Int'l Bhd. Of Teamsters v. U.S.*, 431 U.S. 324, 336 (1977) (emphasis added). A plaintiff must plead "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id.* Rather, the allegations must suggest that discrimination is "the regular rather than the unusual practice" and is "repeated, routine, or of a generalized nature." *Id.* at 336; *see also Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (citing *Teamsters*). The Ninth Circuit has made clear that "a pattern or practice is 'discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace.'" RJN, Ex. 1 (*Strifling* Order at 8) (quoting *Cherosky v. Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003)). Typically, a plaintiff supports a pattern or practice claim with allegations of significant statistical disparities coupled with anecdotal evidence that bring "the cold numbers convincingly to life." *Id.* at 339; *Teamsters*, 431 U.S. at 336.

Plaintiff fails to state a pattern or practice claim because neither his statistics alone, nor his statistics coupled with his anecdotal allegations, plausibly allege a pattern or practice of intentional age discrimination.

### a. Plaintiff Does Not Allege that Discrimination Was "a Routine and Regular Part" of Twitter's Workplace.

Plaintiff alleges the layoff decisions "were made quickly" in "just days" after Musk's acquisition, under "extremely hurried circumstances," by a "small group of managers" who "did

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

not have much, if any, knowledge about Twitter's operations." Compl. ¶¶ 18-21. These allegations undermine any inference that the layoffs were part of Twitter's standard operating procedure because "Plaintiff[] do[es] not allege that discrimination was widespread throughout Twitter." RJN, Ex. 1 (*Strifling* Order at 9). Instead, the RIF was an isolated event that was not a "'routine and regular part' of Twitter's workplace." *Id.* (citing *Sperling v. Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346, 1364 (D.N.J. 1996) ("Another reason that plaintiffs' claim does not fall within the framework of a pattern-or-practice case is that the employment practice which plaintiffs assert was [the defendant's] standard operating procedure was used only once, i.e., the Guidelines were used only during [the RIF].")); *Oinonen v. TRX, Inc.*, 2010 WL 396112, at *4 (N.D. Tex. Feb. 3, 2010) (granting defendant's motion to dismiss plaintiffs' ADEA claim arising from a single layoff because such a "one-shot event cannot constitute a pattern or practice of discrimination."). Accordingly, Plaintiff fails to state a pattern or practice claim even before considering his statistics and anecdotes. RJN, Ex. 1 (*Strifling* Order at 9).

   **b.**  **Plaintiff's Statistics Do Not Support an Inference of Intentional Discrimination.**

  Statistics alone will not support a claim for intentional discrimination except in "rare" cases where there is a "stark pattern" of discrimination over and above the threshold of statistical significance for a disparate impact claim. *See Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*, 694 F.2d 531, 553 (9th Cir. 1982) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). That is so because taking a "purely statistical" approach to intentional discrimination "would almost completely blur the distinction between 'impact' and 'intent,' and thus eliminate the legal difference between disparate impact and disparate treatment lawsuits." *Id.* at 552; *see also Schechner v. CBS Broad., Inc.*, 2010 WL 2794374, at *7 (N.D. Cal. July 15, 2010) (collecting cases). Applying this rationale, the Ninth Circuit has rejected an inference of discriminatory intent from statistics that showed standard deviations as high as 2.46, noting that "statistics must be considerably more stark" than 2.46 standard deviations to draw an inference of intentional discrimination. *Gay*, 694 F.2d at 553; *Rudebusch v. Hughes,* 313 F.3d 506, 515 (9th Cir. 2002) (affirming *Gay* and explaining that it "rejected the proposition that

1    standard deviations of 1.3 and 2.46 were sufficiently representative, at least on their own, to make

2    an inference of discrimination.")

3        Here, Plaintiff alleges that his expert analyzed Twitter's RIF data and found a disparity

4    among workers age 50 and over that is 1.936 standard deviations from the normal demographic

5    distribution.  Compl. ¶ 28.  On that basis, he purports to assert a claim for intentional

6    discrimination.  *Id.* at pp. 7-8.  But a disparity at 1.936 standard deviations is not even statistically

7    significant,[2] and, of course, it is far short of the 2.46 standard deviations that the Ninth Circuit

8    rejected in *Gay* and even farther from the "stark" statistical results that might support a plausible

9    inference of intentional discrimination.  *Gay*, 694 F.2d 531 at 552; *Schechner*, 2010 WL 2794374,

10   at *7.  Thus, Plaintiff's statistics alone cannot support an inference of intentional discrimination

11   as a matter of law.

12            c.      **Plaintiff's Sole Anecdotal Allegation Does Nothing to Bolster
                      His Benign Statistics.**

13       The Supreme Court has "admonished" that statistics "come in infinite variety" and their

14   "usefulness depends on all of the surrounding facts and circumstances."  *Hazelwood Sch. Dist. V.*

15   *United States*, 433 U.S. 299, 312 (1977) (quoting *Teamsters*, 431 U.S. at 340)).  As a result, a

16   plaintiff will try to bring "the cold numbers" of statistics "convincingly to life" through personal

17   anecdotes and other circumstantial evidence.  *Gay*, 694 F.2d at 553 (quoting *Teamsters*, 431 U.S.

18   at 339).

19       Here, the Complaint lacks any meaningful anecdotal allegations to support a plausible

20   inference that age was the "but for" cause of the RIF selections.  Indeed, there are no allegations

21   of age animus towards Plaintiff or any other Twitter employee.  Plaintiff's only attempt to

22   identify age animus is one stray quote from an interview with Musk, who was 51 years old at the

23   time and many months away from acquiring Twitter.  RJN, Ex. 2 at p. 1.  In the interview, Musk

24   allegedly stated that society should "not try to have people live for a really long time" because

25   then "society wouldn't advance."  Compl. ¶ 23; RJN, Ex. 3 at p. 1.  Musk's comment offers no

26   insight into Musk's disposition toward workers over the age of 50 or 60 at Twitter.  Compl. ¶¶ 18,

27

28   _____
     [2] *See Paige v. California*, 233 F. App'x 646, 648 (9th Cir. 2007) (recognizing statistical
     significance threshold of 1.96 standard deviations).

23; RJN Ex. 3 at pp. 1-4.   Even if the comment did suggest that Musk harbors discriminatory animus toward older workers, it still would not support an inference of discrimination because the comment was "not tied directly to the RIF, as Musk made them prior to his acquisition of Twitter."  *Compare* RJN, Ex. 1 (*Strifling* Order at 10), *with* Compl. ¶ 21.  The comment is further divorced from the RIF because a "small group of managers" other than Musk made the RIF selections, *id.* ¶ 21, and the Complaint contains no factual allegations that suggest Musk's purported age animus influenced those unidentified managers—or that the managers were even aware of his purported animus—when making the RIF selections.  To be sure, the Complaint tries to hint at some connection by alleging that the managers worked "under close supervision by Musk."  *Id.*  But that is a pure conclusion that courts ignore under *Twombly*.

In short, Musk's comment does not support any inference of age animus—let alone an inference of "but-for" causation—because the Complaint contains nothing to link the comment to the actual RIF decisions (or to any other policy or practice at Twitter).  *See, e.g.*, RJN, Ex. 1 (*Strifling* Order at 10) ("Isolated remarks, unrelated to the discriminatory employment decision, are generally insufficient to establish discriminatory intent"); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918-19 (9th Cir. 1996) (supervisor's comment that he wanted to get rid of "old timers" who did not "kiss the ass" of the supervisor did not support an inference of age discrimination because the comment was not tied directly to plaintiff's layoff and was "ambiguous"); *Maybin v. Hilton Grand Vacations Co., LLC*, 343 F.Supp.3d 988, 998 (D. Haw. Sept. 28, 2018) (finding comments that "the older agents, including [plaintiff], were too slow, can't learn, have a different way of doing things, are hard to teach new ways of sales, are too old to change, and don't have the energy necessary for sales," did not "explicitly reference age; rather, their intent and meaning must be circumstantially inferred . . . [nor did they] evince an extraordinarily strong showing of bias based upon [plaintiff's] age, especially because these comments are not linked directly to his termination"); *Cozzi v. County of Marin*, 787 F.Supp.2d 1047, 1058-59 (N.D. Cal. Apr. 18, 2011) (supervisor's comments regarding wanting "fresh faces" did not constitute evidence of age discrimination "because such remarks do not lead to the inescapable conclusion that [supervisor] wanted 'younger' faces or that she favored younger

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

1    employees.").

2         In short, Plaintiff's weak statistics combined with this single interview with Musk that

3    was not even about employee retention, let alone at Twitter, are a far cry from what Plaintiff

4    would need to allege a plausible inference that the RIF decisions were the product of a standard

5    operating procedure of age discrimination at Twitter.

6         **B.**    **Plaintiff Fails to State a Disparate Impact Claim.**

7         The ADEA recognizes a disparate impact theory of liability.  *Smith v. City of Jackson*, 544

8    U.S. 228, 232 (2005).  Disparate impact claims "involve employment practices that are facially

9    neutral in their treatment of different groups but that in fact fall more harshly on one group than

10    another." *Teamsters*, 431 U.S. at 335.  "A disparate impact claim challenges 'employment

11    practices that are facially neutral in their treatment of different groups but that in fact fall more

12    harshly on one group than another and cannot be justified by business necessity.'"  *Pottenger v.*

13    *Potlatch,* 329 F.3d 740, 748 (9th Cir. 2003) (quoting *Teamsters*, 431 U.S. at 335 n.15).  As the

14    Supreme Court has explained, "it is not enough to simply allege that there is a disparate impact on

15    workers, or point to a generalized policy that leads to such an impact.  Rather, the employee is

16    'responsible for isolating and identifying the specific employment practices that are allegedly

17    responsible for any observed statistical disparities.'"  *Smith*, 544 U.S. at 241 (quoting *Wards Cove*

18    *Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989)).  The Ninth Circuit has stressed that

19    "'[i]dentifying a specific practice is not a trivial burden' in [] discrimination cases alleging

20    disparate impact."  *Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1114 (9th Cir.

21    2014) (quoting *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 101 (2008)).

22         As a result, "[p]laintiffs generally cannot attack an overall decisionmaking process in the

23    disparate impact context, but must instead identify the particular element or practice within the

24    process that causes an adverse impact."  *Durante v. Qualcomm, Inc.*, 144 F. App'x. 603, 606 (9th

25    Cir. 2005) (quoting *Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002)); *Am. Fed'n of State,*

26    *Cty., & Mun. Emps., AFL-CIO (AFSCME)*, 770 F.2d at 1405 ("Disparate impact analysis is

27    confined to cases that challenge a specific, clearly delineated employment practice applied at a

28    single point in the job selection process.").  A "decisionmaking process may be analyzed as a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

1    single employment practice if 'the complaining party can demonstrate to the court that the

2    elements of a respondent's decisionmaking process are not capable of separation for analysis.'"

3    *Stout*, 276 F.3d at 1124 (quoting 42 U.S.C. § 2000e–2(k)(1)(B)(i)).

4        Here, Plaintiff fails to allege a plausible disparate impact claim for several reasons.

5               **1.    The ADEA and NYSHRL Do Not Recognize Plaintiff's 'Subgroup'
                        Claim Based on Employees Aged 50 or Older.**

6

7        The ADEA prohibits discrimination against employees who are "at least 40 years of age"

8    on the basis of their age.  29 U.S.C. §§ 623(a), 631(a).  The NYSHRL prohibits discrimination

9    against employees who are "eighteen years of age or older."  N.Y. Exec. Law § 296.  Although

10   Plaintiff has access to Twitter's OWBPA disclosure that states the ages of the employees it

11   retained and the ages of those it laid off as part of the RIF, *see* Compl. ¶ 25, the statistics for the

12   category of older workers protected by the ADEA and NYSHRL are conspicuously absent from

13   the Complaint.  Ignoring those protected classes, Plaintiff alleges the RIF had a "disproportionate

14   impact on employees age fifty (50) and older."  Compl. at pp. 7-8 (Counts I and II).  But the

15   ADEA does not recognize a disparate impact claim predicated on disparities for a "subgroup" of

16   older workers who are age 50 or older.  *E.E.O.C. v. McDonnell Douglas Corp*., 191 F.3d 948, 951

17   (8th Cir. 1999) ("If disparate-impact claims on behalf of subgroups were cognizable under the

18   ADEA, the consequence would be to require an employer engaging in a RIF to attempt what

19   might well be impossible: to achieve statistical parity among the virtually infinite number of age

20   subgroups in its work force.  Adoption of such a theory, moreover, might well have the

21   anomalous result of forcing employers to take age into account in making layoff decisions, which

22   is the very sort of age-based decision-making that the statute proscribes."); *Smith v. Tennessee

23   Valley Auth*., 924 F.2d 1059 (6th Cir. 1991) ("A plaintiff cannot succeed under a disparate impact

24   theory by showing that younger members of the protected class were preferred over older

25   members of the protected class.") (citing *Lowe*, 886 F.2d at 1373); *Criley v. Delta Air Lines, Inc*.,

26   119 F.3d 102, 105 (2d Cir. 1997) (disparate impact claim under the ADEA must "allege a

27   disparate impact on the entire protected group, i.e., workers aged 40 and over.") (citing *Lowe v.

28   Commack Union Free Sch. Dist*., 886 F.2d 1364, 1372–73 (2d Cir.1989)).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

Although the Ninth Circuit has not decided the issue, district courts in this Circuit have repeatedly rejected "subgroup" disparate impact claims under the ADEA. *See, e.g., Kinnally v. Rogers Corp.*, 2009 WL 597211, at *10 (D. Ariz. Mar. 9, 2009) ("The Court agrees with the circuits that have rejected disparate impact claims based on age sub-groups. The Court believes that the Ninth Circuit Court of Appeals would also agree with those circuits"); *Schechner v. KPIX-TV*, 2011 WL 109144, at *5 (N.D. Cal. Jan. 13, 2011) ("[C]ourts have consistently held that the relevant group for purposes of a disparate impact age discrimination cases consists of individuals aged 40 or older."); *Rudwall v. Blackrock, Inc.*, 2011 WL 767965, (N.D. Cal. Feb. 28, 2011) ("[Plaintiff's] Rudwall's relevant statistical data fail to compare the impact of BlackRock's 2008 terminations on employees aged 40 and older to the impact on those aged 39 and younger, and thus they fail to support a prima facie case of disparate impact age discrimination.").

Like the ADEA, the NYSHRL does not recognize a "subgroup" claim. *Bohlke v. General Elec. Co.*, 742 N.Y.S.2d 131 (3d Dep't. 2002) ("Applying the Second Circuit's rationale that a plaintiff must show a disparate impact on the entire protected class in order to recover, it is impossible for plaintiffs herein to assert an age discrimination claim based upon disparate impact under the [NYSHRL] when all of defendant's employees are over the age of 18 and fall within the protected class."); *Di Mascio v. Gen. Elec. Co.*, 739 N.Y.S.2d 854 (3d Dep't 2002) (same).

As a result, Plaintiff's disparate impact "subgroup" claim fails as a matter of law.

### 2. Plaintiff Cannot State a Disparate Impact Claim by Simply Re-Labelling His (Failed) Disparate Treatment Claim.

A plaintiff cannot recast a claim for intentional discrimination as a disparate impact claim when the "premise for disparate impact liability coalesces with the discharge which [the plaintiff] claims to have constituted disparate treatment." *Maresco v. Evans Chematics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir. 1992). If this were not so, disparate impact law would simply "provide a means to circumvent the subjective intent requirement in any disparate treatment case." *Id.*

In *Zawacki v. Realogy Corp.*, for instance, the court rejected the disparate impact "label" on the plaintiff's age-based discrimination claims because the complaint alleged "the Defendant's

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

1  procedures in conducting the RIFs were nothing more than a cover for behind-the-scenes,

2  intentional discrimination against its older employees." 628 F. Supp. 2d 274, 281 (D. Conn.

3  2009). Similarly, in *Barrett v. Forest Labs., Inc*., 39 F. Supp. 3d 407, 438 (S.D.N.Y. 2014), the

4  court explained that although the complaint characterized the defendants' policy of giving weight

5  to performance evaluations as the source of discrimination, "the real source of the disparity [wa]s

6  the managers' allegedly discriminatory reviews" where managers gave women unjustifiably low

7  performance evaluations. As such, the allegations in *Barrett* were "not a situation where

8  Defendants followed a facially-neutral practice that created a disparity," but rather "a situation in

9  which managers intentionally treated male and female employees differently. That is a disparate

10  treatment claim." *Id.*

11      Plaintiff alleges that Twitter intentionally targeted Twitter employees over age 50 for

12  termination. Compl. ¶ 22 ("Musk has a history of bias and making ageist comments"); *id.* ¶ 4

13  ("Musk has made publicly discriminatory remarks about older people, further confirming that the

14  mass termination's greater impact on older employees resulted from discrimination."); *id.* ¶ 21

15  (alleging managers made the RIF decisions "under close supervision by Musk.") In light of those

16  allegations, there is no way to construe Plaintiff's theory as anything but a claim for intentional

17  discrimination, and he cannot circumvent the proof requirements of a disparate treatment claim in

18  connection with the RIF through the expedient of placing the "disparate impact" label on his

19  discrimination allegations.

20          **3.      Plaintiff Fails to Allege a Statistically Significant Disparity.**

21      As noted above, *see supra* § IV.A.2.b, the Ninth Circuit had recognized that a disparity is

22  not statistically "significant" for purposes of a disparate impact analysis unless it reflects at least

23  1.96 standard deviations or the circumstances warrant departure from that generally accepted

24  standard. *See Paige v. California*, 233 F. App'x 646, 648 (9th Cir. 2007) (explaining that "the

25  1.96 threshold conforms with accepted conventions in the social science field and with the federal

26  government's internal standards," and concluding that the district court "committed clear error by

27  not using the 1.96 mark") (citing *Segar v. Smith,* 738 F.2d 1249, 1282 (D.C. Cir. 1984)).

28      Here, Plaintiff's statistical allegations fail to meet the threshold for statistical significance

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

1    because she alleges 1.936 standard deviations from the normal distribution, *see* Compl. ¶ 28, and

2    the Complaint contains no facts to suggest that departing from the generally accepted standard of

3    statistical significance is appropriate.

4          **4.**     **The Complaint Fails to Isolate and Identify a Specific Employment**

5                     **Practice Responsible for the Alleged Disparities.**

6            To state a viable disparate impact claim in a RIF case, the complaint must "go beyond the

7    general concept of a 'RIF' to identify actionable practices" that informed the RIF. *See Davis v.*

8    *D.C.*, 925 F.3d 1240, 1250 (D.C. Cir. 2019); *see also Gilbreath v. Brookshire Grocery Co.*, 400

9    F. Supp. 3d 580, 591 (E.D. Tex. Aug. 21, 2019) (collecting cases and explaining that "plaintiffs

10   terminated in a RIF or layoff must identify a specific test, requirement, or practice in the layoff

11   selection process that is allegedly responsible for the purported statistical disparities.").  In

12   addition, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff

13   cannot point to a defendant's policy or policies causing that disparity. A robust causality

14   requirement ensures that '[r]acial imbalance ... does not, without more, establish a prima facie

15   case of disparate impact' . . . ." *Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Communities*

16   *Project, Inc.*, 576 U.S. 519, 542 (2015) (citing *Wards Cove*, 490 U.S. at 653); *Mahler v. Jud.*

17   *Council of California*, 67 Cal. App. 5th 82, 113-14 (2021) (same).

18           The Complaint does not come close to identifying a specific RIF-related employment

19   practice to challenge with a disparate impact claim, and instead, asserts an unidentified "small

20   group of managers" made RIF decisions "under extremely hurried circumstances, with little if

21   any regard given to employees' job performance, qualification, experience, and abilities." *Id*. at

22   ¶¶ 19, 21.  But those allegations address only what factors Twitter allegedly ***did not*** consider;

23   they do not address what factors Twitter ***did*** consider that are responsible for the purported

24   disparities.  Thus, the Complaint lacks allegations sufficient to support a disparate impact claim

25   based on the RIF.  *See Stout*, 276 F.3d at 1121-22 (in a pay and promotion case, observing that

26   the proper unit of analysis for the disparate impact claim was not the entire promotion process or

27   the overall promotion rate after the final stage of the process, but rather the selection rate at an

28   "intermediate stage" where a screening panel selected which candidates would proceed to an

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI

interview stage); *Enoh v. Hewlett Packard Enter. Co.*, 2018 WL 3377547, at *14 (N.D. Cal. July 11, 2018) (allegation that the defendant "'allowed an overwhelmingly Caucasian group of selectors to use a 'hazy' selection process for its employment decisions,' is too vague to support Plaintiffs' disparate impact claims."); *see also Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1224 (9th Cir. 2021) (recognizing disparate impact claim where the plaintiff challenged a specific practice pay practice but "d[id] not challenge the general practice of awarding retention bonuses").

As noted above, the Complaint offers only bottom-line statistics on the RIF, Compl. ¶¶ 26-32, but it does not allege any specific practice, test, or standard that was responsible for some or all of the alleged disparities. Accordingly, Plaintiff's disparate impact claim must fail for this additional reason.

**C.** **Because Plaintiff Was Laid Off in the RIF, He Lacks Standing to State a Claim Related to Employees Terminated Subsequently or for Other Reasons.**

Article III requires Plaintiffs to "clearly . . . allege facts demonstrating each element" of standing at the pleading stage. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff has standing only if she suffered an injury in fact, which is an invasion of a legally protected interest that is "concrete and particularized." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). An injury is "particularized" only if it affects a plaintiff "in a personal and individual way." *Id.* at 339. Consequently, a plaintiff may assert a claim that arises only from her own injuries—a plaintiff cannot state a claim arising from purported injuries "suffered by other, unidentified members" of a purported class. *See Warth v. Seldin*, 422 U.S. 490, 502 (1975) (dismissing putative class action for lack of standing by the named plaintiffs). In disparate impact cases, a plaintiff must show he was "subject to the particular employment practice" that caused the demographic disparity. *Pottenger*, 329 F.3d at 750 (affirming summary judgment on disparate impact claim because the plaintiff was not subject to the RIF he challenged); RJN, Ex. 1 (*Strifling* Order at 12, n.9 (citing *Pottenger* and rejecting plaintiffs' argument that they could target post-RIF policies for a disparate impact claim when they were not subject to those policies.); *see also id.* at 7, n.5.

Here, Plaintiff purports to assert claims for all employees over age fifty "who have lost their jobs with the company" after Musk's acquisition.   Compl. ¶¶ 7, 8.  But Plaintiff alleges Twitter terminated him during the RIF on November 4 and further acknowledges that not all employees "lost their jobs" on November 4.  *Id*. ¶¶ 20, 34.  Because Plaintiff could not have suffered the same injuries as employees who subsequently separated from Twitter or separated from Twitter for reasons other than the RIF (*e.g.*, termination for cause or voluntary separation), Plaintiff lacks standing to state a claim on behalf of "all employees" over age 50.  *See* RJN, Ex.1 (*Strifling* Order at 7, n.5); *id.* at 12, n.9.

## V.     CONCLUSION

For the reasons stated above, the Complaint fails to state a disparate treatment claim or a disparate impact claim.  Twitter therefore respectfully requests an order dismissing the Complaint in its entirety.

Dated: May 12, 2023

MORGAN, LEWIS & BOCKIUS LLP

By  */s/ Brian D. Berry*
Eric Meckley
Brian D. Berry
Jonathan D. Lotsoff
Roshni C. Kapoor
Joseph A. Govea
Carolyn M. Corcoran

Attorneys for Defendants
TWITTER, INC. and X CORP.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

MEMORANDUM OF POINTS AND
AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:23-cv-01786-SI