# EXHIBIT 1

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3

4

5      DMITRY BORODAENKO,

6                      Plaintiff,

7            vs.                          No. 32:-cv-07226-AMO

8      TWITTER, INC. and X CORP.,

9                      Defendants.

       _____/

10

11

12

13

14                    VIDEO DEPOSITION OF

15                    DMITRY BORODAENKO

16

17

18

19

20     Date:              July 11, 2025

21     Time:              9:31 a.m.

22     Location:          One Market, Spear Street Tower

23                        San Francisco, California 94105

24     Reported by:       Jennifer J. Matteo, CSR, RPR, CRR

25                        CSR No. 12139

                                                      Page 1

```
1                    A P P E A R A N C E S

2

3      FOR THE PLAINTIFF(S):

4                 LICHTEN & LISS-RIORDAN, P.C.

5                 BY:  HODA KATEBI, ESQ.

6                 729 Boylston Street, Suite 2000

7                 Boston, Massachusetts  02116

8

9

10     FOR THE DEFENDANT(S):

11                MORGAN, LEWIS & BOCKIUS LLP

12                BY:  ERIC MECKLEY, ESQ.

13                One Market, Spear Street Tower

14                San Francisco, California 94105

15                eric.meckley@morganlewis.com

16

17

18

19

20

21

22

23

24

25     ALSO PRESENT: PETER YAROSCHUK, Videographer
```

Page 2

```
 1                    INDEX OF EXAMINATION

 2                                                    PAGE

 3    DMITRY BORODAENKO

 4       Examination By Mr. Meckley:                     8

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1                    INDEX OF EXHIBITS
 2     NUMBER              DESCRIPTION                PAGE
 3     Exhibit 1    Offer letter, XCO/BOR 000106 - 110     21
 4     Exhibit 2    Code of Business Conduct & Ethics,     35
                    XCO/BOR 000126 - 135
 5
       Exhibit 3    Emails, XCO/BOR 000240 - 246           86
 6
       Exhibit 4    Screenshot,                           100
 7                  LLR_TWITTER_BORODAENKO_000171
 8     Exhibit 5    Screenshot,                           106
                    LLR_TWITTER_BORODAENKO_000302
 9
       Exhibit 6    Screenshot,                           109
10                  LLR_TWITTER_BORODAENKO_000282, 283
11     Exhibit 7    Email, LLR_TWITTER_BORODAENKO_000049  114
12     Exhibit 8    Screenshot,                           117
                    LLR_TWITTER_BORODAENKO_000284
13
       Exhibit 9    Screenshot,                           119
14                  LLR_TWITTER_BORODAENKO_000292
15     Exhibit 10   Screenshot,                           121
                    LLR_TWITTER_BORODAENKO_000295 - 297
16
       Exhibit 11   Screenshot,                           134
17                  LLR_TWITTER_BORODAENKO_000285 - 287
18     Exhibit 12   Screentshot,                          137
                    LLR_TWITTER_BORODAENKO_000303
19
       Exhibit 13   Screenshot,                           145
20                  LLR_TWITTER_BORODAENKO_000288
21     Exhibit 14   Screenshot,                           150
                    LLR_TWITTER-BORODAENKO_000294
22
       Exhibit 15   Screenshot,                           152
23                  LLR_TWITTER_BORODAENKO_000293
24     Exhibit 16   Screenshot of a meme,                 154
                    LLR_TWITTER_BORODAENKO_000304, 280
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 17    Screenshot of tweet, XCO/BOR 000284

5

1                INDEX OF EXHIBITS (Continued)
2    NUMBER                DESCRIPTION                PAGE
3    Exhibit 18    Screenshot of tweet, XCO/BOR 000281      167
4    Exhibit 19    Slack message, XCO/BOR 000407            168
5    Exhibit 20    Screenshot of tweet, XCO/BOR 000282      172
6    Exhibit 21    Tweet, XCO/BOR 000283                    173
7    Exhibit 22    Slack message, XCO/BOR 000394            173
8    Exhibit 23    Messages in eraser on 2022-11-10,        176
                   XCO/BOR 000395
9
     Exhibit 24    Thread in social-watercooler             177
10                 starting at 2022-11-10, XCO/BOR
                   000402 - 403
11
     Exhibit 25    Slack message, XCO/BOR 000408            179
12
     Exhibit 26    Slack message, XCO/BOR 000285            180
13
     Exhibit 27    Spreadsheet, XCO/BOR 000417              184
14
     Exhibit 28    Screenshot of a document,                187
15                 LLR_TWITTER_BORODAENKO_000042
16   Exhibit 29    Slack messages, XCO/BOR 000319 - 321     197
17   Exhibit 30    Email from Elon Musk, XCO/BOR            199
                   000256, 257
18
     Exhibit 31    Slack messages, XCO/BOR 000326 - 330     200
19
     Exhibit 32    Slack message, XCO/BOR 000400            203
20
     Exhibit 33    Slack messages, XCO/BOR 000410, 411      206
21
     Exhibit 34    Slack message, XCO/BOR 000413            208
22
     Exhibit 35    Email from Nelson Abramson to            209
23                 Infrastructure Team, dated
                   11/11/2022, XCO/BOR 000270, 271
24
     Exhibit 36    Email from Elon Musk to                  211
25                 team@twitter, dated 11/11/2022,

```
            XCO/BOR
                                                        6
 1                  INDEX OF EXHIBITS (Continued)
 2      NUMBER                DESCRIPTION                PAGE
```

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 37 | Twitter dated 11/17/2022, XCO/BOR 000279 | 212 |
| Exhibit 38 | Slack message, XCO/BOR 000412 | 214 |
| Exhibit 39 | Twitter Playbook, XCO/BOR 000001 - 54 | 217 |
| Exhibit 40 | Spreadsheet, XCO/BOR 000418 | 223 |
| Exhibit 41 | Offer letter, LLR_TWITTER_BORODAENKO_000100, 101 | 239 |
| Exhibit 42 | Resume, LLR_TWITTER_BORODAENKO_000097 - 99 | 240 |
| Exhibit 43 | Email chain, LLR_TWITTER_BORODAENKO_000190 - 194 | 244 |

```
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    JULY 11, 2025                                    9:31 A.M.

2                    P R O C E E D I N G S

3            THE VIDEOGRAPHER:  Good morning.  We are going

4    on the record at 9:31 a.m. on July 11, 2025.  Please

5    note that microphones are sensitive and may pick up

6    whispering and private conversations.  Please mute your

7    phones at this time.  Audio and video recording will

8    continue to take place unless all parties agree to go

9    off the record.

10            This is Media Number 1 of the video-recorded

11    deposition of Dmitry Borodaenko taken by counsel for

12    defendant in the matter of Dmitry Borodaenko versus

13    Twitter, Incorporated and X Corp filed in the United

14    States District Court, Northern District of California.

15    Case No. 3:22-cv-07226-AMO.  The location of this

16    deposition is One Market Street, Spear Tower,

17    San Francisco, California 94105.

18            My name is Peter Yaroschuk representing

19    Veritext.  I am the videographer.  I am not related to

20    any party in this action nor am I financially interested

21    in the outcome.  If there are any objections to

22    proceeding, please state them at the time of your

23    appearance.

24            Counsel and all present, please now state your

25    appearances and affiliations for the record, beginning

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1     with the noticing attorney.
 2             MR. MECKLEY:  I'm Eric Meckley of
 3     Morgan Lewis, counsel for defendants.
 4             MS. KATEBI:  Good morning.  This is Hoda
 5     Katebi with Lichten & Liss-Riordan with the plaintiff.
 6             THE VIDEOGRAPHER:  Thank you.
 7             Will the court reporter please introduce
 8     yourself and administer the oath to the witness and then
 9     counsel may proceed.
10             THE REPORTER:  Good morning.  My name is
11     Jennifer Matteo.  I am a California licensed
12     stenographer, No. 12139.
13              Please raise your right hand.
14                     DMITRY BORODAENKO,
15             Being first duly sworn by the Certified
16             Shorthand Reporter to tell the truth, the
17             whole truth, and nothing but the truth,
18             testified as follows:
19                       EXAMINATION
20     BY MR. MECKLEY:
21        Q.   All right.  Mr. Borodaenko, today is your
22     deposition in the lawsuit that you filed against
23     Twitter.
24             Have you ever had your deposition taken
25     before?
```

Page 8

1     BY MR. MECKLEY:

2          Q.    Yes.

3          A.    I have not.

4          Q.    Okay.  You started working at Twitter on what

5     date?

6          A.    I don't remember specific date.  That would

7     have been middle of 2021.

8          Q.    So approximately June of 2021?

9          A.    Maybe May/June I think.  Yeah, probably June.

10         Q.    Okay.  And from June of 2021 to now, where

11    have you resided?

12         A.    In Scotts Valley, California.

13         Q.    In the same location there?

14         A.    Same location, yes.

15         Q.    And during that same period, June 2021 to the

16    present, have other persons resided with you at your

17    address?

18         A.    That would be my immediate family.

19         Q.    And who are they?

20         A.    My wife -- should I name them?

21         Q.    Yes.

22         A.    Yeah, okay.  My wife, Julia Borodaenko.  My

23    son, Andre Borodaenko, and my son Yan, Y-A-N,

24    Borodaenko.

25         Q.    Okay.  Anyone else reside at that --

                                              Page 16

1    Q.    Okay.  So after you obtained your -- well,
2    strike that.
3          Between getting your undergraduate degree and
4    your Ph.D., did you work as a computer software
5    engineer?
6    A.    Yes.
7    Q.    Okay.  So did you first begin working as a
8    computer software engineer in 1999?
9    A.    Yes.
10   Q.    So at the time you started in Twitter, had you
11   worked as a computer software engineer for approximately
12   12 years?
13   A.    Probably more than that if you do the math.
14   1999 to 2021, that's 22 years.  Part of that time would
15   be as a manager.
16   Q.    Okay.  So when you began at Twitter, you had
17   approximately 22 years of experience as a computer
18   software engineer; is that fair?
19   A.    As I said, engineer or manager in the field.
20   Q.    Okay.  So 22 years as a direct computer
21   software engineer or managing other engineers?
22   A.    Yes, that would be correct.
23   Q.    Okay.  All right.  And when you started at
24   Twitter, were you in a manager role then or individual
25   contributor?

                                                   Page 20

1          A.    I was hired by Twitter as a manager.

2          Q.    Okay.  One of the things we'll be doing today

3     is looking at documents.  And the way the process will

4     work is the court reporter will mark them, give you a

5     copy, look at it, then we'll ask questions about it.

6                Okay?

7          A.    Okay.

8                MR. MECKLEY:  So this is the first document

9     we're going to mark.  It's going to be called Exhibit 1.

10               (Exhibit 1 was marked for identification.)

11               THE WITNESS:  Should I read it?

12    BY MR. MECKLEY:

13         Q.    Yes, you can just review it to the extent you

14    need to familiarize yourself with it.  I'll describe it

15    for the record.

16               So Exhibit 1 is a multipage document stamped

17    106 through 110.  It appears to be an offer letter to

18    Mr. Borodaenko, dated May 10, 2021.

19         A.    Uh-huh.

20               Okay.

21         Q.    All right.  Do you recognize Exhibit 1,

22    Mr. Borodaenko?

23         A.    Looks familiar.

24         Q.    All right.  And on the last page of the

25    document, you'll see there's a signature there.

                                              Page  21

1          Did you sign this document either, you know,

2    electronically or some other way on May 11, 2021?

3        A.    This looks like the offer letter that I have

4    signed.

5        Q.    Okay.  Does that look like your signature

6    either electronically or otherwise on the last page?

7        A.    Yeah.

8        Q.    Going back real quick to the programming

9    language, was Scala, S-C-A-L-A, one of the computer

10   programming languages that Twitter was written in code?

11       A.    I believe so, yes.

12       Q.    Is that a language that you were proficient

13   in?

14       A.    No.

15       Q.    Before coming to work at Twitter in 2021, had

16   you previously worked as a manager at any company?

17       A.    Yes.

18       Q.    And was that immediately before coming to

19   Twitter?

20       A.    No.

21       Q.    What company had you worked as a manager?

22       A.    The most recent?

23       Q.    The one that was immediately before Twitter.

24       A.    Oh, before Twitter I didn't work as a manager.

25   I worked as an engineer.

                                                  Page 22

```
1          Q.    Okay.  And below your address there's an email
2     there, A-N-G-D-R-A-U-G at Gmail.com.
3                Do you see that?
4          A.    Yes.
5          Q.    Is that your personal email?
6          A.    Yes.
7          Q.    Is that still your personal email?
8          A.    Yes.
9          Q.    And was that true throughout the time you
10    worked at Twitter?
11         A.    Sorry?
12         Q.    Was that true throughout the time you worked
13    at Twitter?
14         A.    Yes.
15         Q.    First paragraph here says your employment will
16    commence on June 7, 2021.
17               And was that true?
18         A.    Sounds right.
19         Q.    All right.  You will be providing services
20    from the company's US - CA San Francisco location.
21               Do you see that?
22         A.    Yes.
23         Q.    Did you start work at Twitter's San Francisco
24    office?
25         A.    What do you mean "at"?
```

Page 25

1        Q.   Did you work in the San Francisco office

2  physically?

3        A.   Physically, no.

4        Q.   Okay.  When you started your employment with

5  Twitter, were you working physically in any office of

6  the company?

7        A.   No.

8        Q.   Were you entirely remote?

9        A.   What do you mean "entirely"?

10        Q.   Did you -- let's just start with 2021, which

11  is about like a six-and-a-half-month period when you

12  worked at Twitter.

13        During 2021, did you ever work in any Twitter

14  office physically?

15        A.   No.

16        <u>Q.   In 2022, my understanding is you had your</u>

17  <u>employment terminated November 15 of 2022.</u>

18        <u>Does that sound right?</u>

19        <u>A.   Yes.</u>

20        Q.   Okay.  During the time you were employed by

21  Twitter in 2022, did you ever physically go into any

22  Twitter office?

23        A.   Yes.

24        Q.   Okay.  And first let's just identify which

25  Twitter offices you physically went into in 2022.

1          A.    Probably on the order of an hour.

2          Q.    So if you could look at the paragraph number 2

3    on Exhibit 1 entitled "Position."

4                It says, quote, "Your job title will be

5    MGR" -- which I assume is manager -- "site reliability

6    ENG" -- which I assume is engineering.

7                Was that your understanding of your starting

8    job title?

9          A.    Yes.

10         Q.    And during your employment with the company,

11   did your job title ever change?

12         A.    It's hard to answer yes and no.  You need to

13   qualify.

14         Q.    When you started, your job title was manager,

15   site reliability engineer.

16               At the time your employment terminated, was

17   your title still manager, site reliability engineer?

18         A.    There was a promotion in the middle, but that

19   was in progress.  So that's why I'm struggling to answer

20   yes and no.

21         Q.    Can you explain what you mean there was a

22   promotion in progress?

23         A.    As in I was approved for promotion to senior

24   manager.

25         Q.    And how do you know you were approved for that

                                                  Page 29

1      Q.   And were those employees fired for, like, a

2    reason?

3      A.   Yes.

4      Q.   Can you describe the scenario that led to

5    that?

6      A.   Oh, one was terminated for performance.

7    Another because of position elimination.

8      Q.   All right.  Can you take a look at the page

9    that's stamped 109 of Exhibit 1.

10     A.   Looking at it.

11     Q.   All right.  Paragraph 14 at the bottom, it

12   says, quote, "Employment Relationship:  Employment with

13   the company is for no specific period of time.  Your

14   employment with the company will be 'at will' meaning

15   either you -- meaning that either you or the company may

16   terminate your employment at any time and for any reason

17   with or without cause."

18          Do you see that?

19     A.   Yes.

20     Q.   Was it your understanding that during your

21   employment with Twitter, you were employed at will?

22     A.   In the definition of the term, yes.

23     Q.   And you -- the language that I just quoted to

24   you, did you understand what that meant?

25     A.   I'm not an attorney myself, so in layperson's

                                                    Page 33

1    terms, yes.

2        Q.    During your employment at Twitter, did you

3    ever ask anyone any questions about what the "at will"

4    language in your offer letter meant?

5        A.    I don't recall.

6        Q.    Did you ever attempt to seek any clarification

7    at any point during your employment at Twitter about

8    what your at will employment relationship with the

9    company meant?

10       A.    That's a very broad question.  I would have

11   probably have conversations about employment in general

12   within the company, but any kind of conversation could

13   fall under this.

14       Q.    Why do you say any kind of conversation could

15   fall under this?

16       A.    It's a question about my or anybody else's

17   employment status at Twitter.  So anything related to

18   employment status, as far as I understand your question,

19   would fall under this.

20       Q.    Okay.  Then I will clarify my question for

21   you.

22       A.    Thank you.

23       Q.    Did you ever seek any type of clarification

24   from either human resources, employee relations or any

25   manager of yours at Twitter regarding what at will

Page 34

1    employment meant?

2        A.   If worded specifically like that, no.

3        Q.   All right.  And do you recall that the

4    employee you fired for performance at Mirantis was

5    employed at will?

6        A.   Yes.

7        Q.   All right.

8             MR. MECKLEY:  Let's mark this as Exhibit 2.

9             (Exhibit 2 was marked for identification.)

10   BY MR. MECKLEY:

11       Q.   Mr. Borodaenko, Exhibit 2 is a document

12   stamped 126 through 135 and it's entitled "Code of

13   Business Conduct and Ethics."

14            Let me know when you're ready.

15       A.   Okay.

16            (Witness reviews document.)

17            THE WITNESS:  Yup.

18   BY MR. MECKLEY:

19       Q.   Can you take a look at the last page of

20   Exhibit 2, please.

21       A.   Looking at it.

22       Q.   And did you apply your signature here on

23   May 11, 2021?

24       A.   I believe, yeah, I did.

25       Q.   All right.  And above your signature, it says,

                                        Page 35

1    "I hereby acknowledge that I'm aware of Twitter's Code

2    of Business Conduct and Ethics (the 'Code'), have access

3    to it, and have read and understood it.  I hereby

4    confirm that:  I will comply with the Code; and I'm

5    aware of how to seek guidance and report violations."

6            Do you see that?

7        A.    I do.

8        Q.    And you understood that the Code of Business

9    Conduct and Ethics applied to you during your employment

10   with Twitter; is that right?

11       A.    Yes.

12       Q.    All right.  Now, if you could take a look at

13   the page immediately before that.  Paragraph 15 is

14   entitled "Management Responsibilities."  It says, "In

15   addition to fulfilling the expectations of a Twitter

16   employee, managers have some additional

17   responsibilities."

18            Bullet point "Be the embassadors of Twitter

19   values and model them in your everyday work life,

20   setting a strong ethical tone and building a culture of

21   integrity with your team."

22            Do you see that?

23       A.    I do.

24       Q.    And did you understand that what I just quoted

25   to you was one of your responsibilities as a manager at

                                                     Page 36

1    the company?

2         A.    Yes.

3         Q.    As a manager of site reliability engineering,

4    can you describe for me what your duties were?

5         A.    At what level of detail?

6         Q.    How about broadly.

7         A.    Broadly?  Supervise a team of site reliability

8    engineers, set their tasks, review their performance,

9    ensure communication within the team and with internal

10   and external parties as needed, and make sure that the

11   team's work provides value to the company.

12            THE REPORTER:  Work provides what?

13            THE WITNESS:  Value for the company.

14   BY MR. MECKLEY:

15        Q.    And can you describe what site reliability

16   meant in the context of Twitter?

17        A.    In the context of Twitter, same as in industry

18   generally, it means building and maintaining systems

19   that allow a service to operate reliably at scale with

20   efficiency and, well, fulfilling its -- fulfilling the

21   needs of its users.

22        Q.    So that sounds like -- and I think you made

23   this clear -- sort of the general concept in the

24   industry of site reliability.

25        A.    Yes.

                                         Page 37

1    Q.   Specific to Twitter, what did that mean for

2   users of Twitter?

3    A.   For the users of Twitter, that would mean that

4   users would be able to use the site around the globe

5   24/7 without disruption.

6    Q.   Did site reliability at Twitter involve like

7   security of the site?

8    A.   Some aspects of reliability, yes.

9    Q.   Can you describe what aspects of site

10   reliability involved security of the site?

11    A.   Twitter's site reliability organization

12   included multiple teams responsible for different

13   services within Twitter infrastructure.  Some of those

14   services would be essential to various security aspects

15   of the service, such as account security, making sure

16   that people can't impersonate other people's account or

17   data protection so that the private -- private data they

18   have within Twitter database don't get exposed.  And

19   so...

20    Q.   Was site reliability under the infrastructure

21   organization at Twitter?

22    A.   Yes.

23    Q.   And was that called Blue Bird?

24    A.   No.

25    Q.   Was it Red Bird?

Page 38

1          A.    Blue and Gold.

2          Q.    And what were they in the context of

3    functionality?

4          A.    In broad terms Blue Bird would be responsible

5    for product service, as in things people actually

6    interact with on Twitter.  And Gold Bird would be

7    associated with revenue generation.

8          Q.    So in your role, what systems within the site

9    and network did you have access to?

10         A.    Broadly speaking, relation databases and data

11   platform tools.  For example, relation database MySQL.

12   For an example of a data platform, Hadoop.  MySQL is

13   M-Y-S-Q-L.  Hadoop is H-A-D-O-O-P.

14         Q.    H-A-D-O-O-P?

15         A.    Yeah.

16         Q.    And first was Sequel?

17         A.    MySQL, M-Y-S-Q-L.

18         Q.    Okay.  Did you have access to active directory

19   when you worked at Twitter?

20         A.    No.

21         Q.    How about infrastructure access?

22         A.    That is very broad term.  Please specify

23   like...

24         Q.    So were there systems within infrastructure

25   that you had access to in your role at Twitter?

Page 40

1        A.    Yes.

2        Q.    Can you tell me what those were?

3        A.    Well, MySQL would be one of them.

4        Q.    What were the others?

5        A.    Basically all of the systems I had access to

6    can be qualified as parts of infrastructure.

7        Q.    I see.

8              So every system that was under the

9    infrastructure umbrella is one that you had access to in

10   your role?

11       A.    No, the other way around.  Every system I had

12   access to would be infrastructure.  I didn't have access

13   to all of infrastructure.

14       Q.    Okay.  So other than MySQL and Hadoop, what

15   other systems within infrastructure did you have access

16   to?

17       A.    I believe I mentioned before Puppet.  That was

18   a system as well of programming language.

19       Q.    It was a system as well?

20       A.    Yeah, it's a system that has its own

21   programming language.

22       Q.    And --

23       A.    So that would -- I would have access to that.

24       Q.    And just to clarify, was it Puppet?

25       A.    Yes.

Page 41

1        Q.    P-U-P-P-E-T?

2        A.    Correct.

3        Q.    Okay.  Any other systems within infrastructure

4    you had access to?

5        A.    I don't recall.

6        Q.    All right.  And when you worked at Twitter did

7    you have sudo access to all the systems that you

8    referenced?  S-U-D-O.

9        A.    No.

10        Q.    Do you know what sudo access means?

11        A.    Yes, I do.

12        Q.    What's your understanding of what it means?

13        A.    I believe in this context you're referring to

14    administrative privileges, system administrative

15    privileges.

16        Q.    System administrator, you could function as a

17    system administrator?

18        A.    Yeah, like sudo is an acronym that stands for

19    superuser.

20        Q.    Did you have that sudo access over anything in

21    Twitter within Twitter's systems?

22        A.    No, not that I recall.

23        Q.    Would you agree that maintaining the security

24    of the Twitter site was crucial to ensuring that it

25    operated and functioned as intended?

1              MS. KATEBI:  Objection to form.

2              THE WITNESS:  Can you qualify that?

3     BY MR. MECKLEY:

4          Q.   Sure.

5              Would you agree that maintaining the security

6     of Twitter's infrastructure was important to ensuring

7     that it operated as intended?

8              MS. KATEBI:  Objection to form.

9              THE WITNESS:  There were many parts of your

10    question that are very vague.  Like, as intended, for

11    example, I don't understand.  That can refer to any

12    number of things.

13    BY MR. MECKLEY:

14         Q.   Did you believe it was important to maintain

15    the security of Twitter's website?

16         A.   Maintain security, yes.

17         Q.   Okay.  What type of security concerns exist

18    for technology companies like Twitter?

19         A.   Many different kinds.  There is private data

20    protection.  There is protection from intrusions.  There

21    is protection from data breaches, from denial of

22    service.  Those are very broad categories of security

23    threats a company like Twitter would need to prepare

24    for.

25         Q.   All right.  Would you agree that the security

                                              Page 43

1      threats.  So it is a possible threat, yes.

2          Q.    And was that type of security and ensuring

3      that protection something that was in the scope of your

4      responsibilities as a site reliability engineer?

5          A.    Generally, yes.  Not specifically because my

6      team was not responsible for specific services that

7      ensured that kind of protection.

8          Q.    Whose team was?

9          A.    I don't recall.  There would be, like, whole

10     security organization owning various aspects of it.

11         Q.    Within Twitter, what was the name or

12     description for the team that was responsible for

13     ensuring that, you know, internal type sabotage could

14     not happen?

15         A.    I don't recall.

16         Q.    But you do recall there was a team that was

17     tasked with that?

18         A.    Yes.

19         Q.    And do you know what they did to protect

20     against like internal sabotage of the site?

21         A.    I did not directly observe their work, no.

22         Q.    Okay.  When you worked at Twitter, did you

23     ever apply for a leave of absence?

24         A.    No.

25         Q.    I believe you in your complaint state that you

                                                    Page 49

1    had cancer at some point; is that correct?

2        A.    Yes.

3        Q.    And what type cancer was it?

4        A.    Testicular.

5        Q.    And when did you have testicular cancer?

6    Well, strike that.

7              When were you diagnosed with testicular

8    cancer?

9        A.    I was diagnosed in 2018.

10       Q.    And did you receive treatment?

11       A.    Yes.

12       Q.    And how long did your treatment last for?

13       A.    Can you qualify what you mean by "treatment"?

14   Specific treatment or overall, like, long-term programs

15   that I was under?

16       Q.    All right.  So we can break it down.

17             So did you -- can you describe for me what

18   treatment you receive for testicular cancer?

19       A.    It was surgery followed by observation,

20   chemotherapy and more observation.

21       Q.    So in terms of the dates, when did you have

22   the surgery?

23       A.    Also in 2018.

24       Q.    When did you have chemotherapy?

25       A.    It began in 2018.  I don't remember exactly

Page 50

1    whether it was '18 or early '19 when it ended.  Give or

2    take a month or two.  Somewhere thereabouts.

3         Q.   The chemotherapy would have ended some time in

4    the early part of 2019?

5         A.   Yes, that would be correct.

6         Q.   Okay.  And who was the provider -- strike

7    that.

8              Who was the primary medical provider

9    responsible for your treatment for cancer?

10         A.   My oncologist would be Dr. Kim-Son Nguyen.

11         Q.   And --

12         A.   Kim-Son with a dash in the middle.  K-I-M,

13    dash, S-O-N.  And last name is N-G-U-Y-E-N.

14         Q.   And what facility does he practice out of?

15         A.   Palo Alto Medical Foundation in Mountain View

16    specifically.

17         Q.   Is that a hospital?

18         A.   It's clinic.

19         Q.   Where's the hospital where you had your

20    surgery?

21         A.   Also in Mountain View.

22         Q.   Do you remember the name of it?

23         A.   El Camino Hospital.

24         Q.   Did you ever have radiation?

25         A.   No.

Page 51

1          Q.    And after the chemo ended in early 2019, did

2     you have any subsequent treatment for the testicular

3     cancer?

4          A.    No.    Just observation.

5          Q.    Did -- well, strike that.

6                Other than the oncologist, Dr. Nguyen, was

7     there anyone else that followed you for your cancer?

8          A.    Not the entire time.    Obviously it would start

9     with urologist who would prescribe the surgery.    Well,

10    no, sorry, correction.    Urologist would refer me to

11    oncologist first who then like prescribe the surgery.

12    Would be the surgeon who did the surgery, but I don't

13    remember the names of either of those two specialists.

14         Q.    Okay.    But you did see a urologist and a

15    surgeon in connection with the treatment of your --

16         A.    Yes.

17         Q.    -- cancer?

18               Were they both at El Camino Hospital?

19         A.    I don't recall.    I think the urologist would

20    have been in -- in the clinic at Palo Alto Medical

21    Foundation.

22         Q.    Okay.    And did your physicians tell you that

23    the testicular cancer had been successfully treated?

24         A.    Successfully treated is not something you do

25    with cancer, so please qualify.    Like are you talking

                                                    Page 52

1    about surgery or about chemo or about observation?

2         Q.   Sure.

3         A.   Sorry.

4         Q.   Sure.

5              Did any of your medical providers tell you

6    that your surgery was successful?

7         A.   Yes.

8         Q.   And did any of your medical providers tell you

9    that your chemotherapy was successful?

10        A.   Chemotherapy, yeah, eventually.

11        Q.   Right.

12             Because with chemotherapy, one of the things

13   they can do afterwards is take a biopsy to see if there

14   are any cancer cells remaining.

15             Did that happen for you?

16        A.   So biopsy happened after surgery, which is how

17   the cancer type was identified.

18        Q.   So -- so following chemotherapy, one way to

19   check is through scans to make sure there's no further

20   tumor growth.

21        A.   That's with most of what my observation was.

22   Most, yeah.

23        Q.   Right.

24             And with respect to cancer, I mean one of the

25   phrases that's used is "in remission."

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          A.    Yes.

2          Q.    You're familiar with that?

3          A.    Yes.

4          Q.    Did your medical providers tell you that your

5     cancer was in remission?

6          A.    Eventually.

7          Q.    Okay.   And when did they tell you that your

8     cancer was in remission?

9          A.    As far as I remember, around January 2023.

10         Q.    And is it possible that they told you that

11    your cancer was in remission prior to that time?

12         A.    No.

13         Q.    And why does that date stick in your mind?

14         A.    Because I remember that my follow-up visit

15    with my oncologist, when they scheduled my final scan

16    that confirmed my remission, was in November 2022.  And

17    it took me a while to schedule the scan, and then for

18    the oncologist to review the result and sign off on

19    whether or not it would be considered remission.

20         Q.    I see.

21               So November of 2022 was the final scan that

22    you had?

23         A.    It was the final visit with my oncologist.

24    I don't remember when the scan was.  Oncologist would

25    have scheduled the scan after that date.  Maybe it was

Page 54

1    December.  I'm not quite sure which -- how it fell out.

2        Q.   Okay.  So to sort of break down the

3    chronology, you had a visit with your oncologist in

4    November of 2022; is that right?

5        A.   Yes.

6        Q.   And at that visit, a final scan was scheduled?

7        A.   Yes.

8        Q.   Okay.  And that final scan happened in?

9        A.   December or January.  And then after that

10   scan, oncologist notified me that -- I don't even

11   remember whether I went for another follow-up visit or

12   they notified me remotely and said, yeah, your scan is

13   clean, you're good.  I don't recall that detail.  Sorry.

14       Q.   Okay.  Between when you stopped chemotherapy

15   and when you had your final scan, were there scans in

16   the interim period?

17       A.   Yes, regularly.

18       Q.   Regularly.

19            Like how frequently?

20       A.   Every six months.  I think it was every --

21   first year it was every three months, but I think it was

22   eventually reduced to six months, as far as I remember.

23   So on that kind of cadence.

24       Q.   Over the history of scans that you had, were

25   you notified that they were all normal, not showing

Page 55

1    tumor growth?

2        A.   There were not showing tumor growth.  There

3    was some artifacts on the scan, but as they observed

4    them over time, the doctor was satisfied that there

5    wasn't developing.

6        Q.   Artifacts meaning like scarring from surgery,

7    things like that?

8        A.   There was something they called glass

9    something something in the lungs that were concerned

10   about at first.

11       Q.   Can you spell -- when you say glass,

12   G-L-A-S-S?

13       A.   Like -- yeah, I don't recall specific term.

14   It was like glass-like artifact in the lung.  But what

15   was it?  CAT scan or CT scan.  I don't remember.

16       Q.   When you say -- "in the lung," is that what

17   you said?

18       A.   Yeah.

19       Q.   Were the scans you were having over this

20   period of time, were they of your testicles or were they

21   of your entire body?

22       A.   Entire body.  Well -- yeah, body.

23       Q.   Did you have all your scans at the El Camino

24   Hospital?

25       A.   No.

1      A.   Not recently.

2      Q.   -- in the last like 60 days?

3      A.   Sixty days, no.

4      Q.   Was it in one of those reports that it talked

5   about a glass-like artifact in the lung?

6      A.   Yeah.

7      Q.   And that report, I would imagine, would have

8   the most specific information about what that actually

9   means and was found?

10     A.   Yeah.

11     Q.   All right.  Was it in one lung or both lungs?

12     A.   I don't recall.  I think it was both.

13     Q.   And during the time you were employed by

14  Twitter, were you taking any type of medications related

15  to cancer treatment?

16     A.   No.

17     Q.   And since you were told that your cancer was

18  in remission, have you received any further treatment

19  for cancer?

20     A.   You could say so.

21     Q.   And can you explain what you mean?

22     A.   Colonoscopy.

23     Q.   Was that specific to cancer or just annual?

24     A.   I had some polyps removed that could develop

25  into cancer.

                                        Page 58

1      Q.   Was it just the regular recommended

2  colonoscopy screening that all men over 50 are

3  prescribed?

4      A.   My general physician recommended that I do it

5  early because of my cancer history and family cancer

6  history.

7      Q.   How old are you?

8      A.   I'm born in '78 so that would make me 47.

9      Q.   Okay.  All right.

10          During the period you worked at Twitter, from

11  June of 2021 to November of 2022, was the -- strike

12  that.

13          Were you getting any active treatment for

14  cancer other than having scans?

15      A.   Blood tests.

16      Q.   Were they blood test specifically for cancer?

17      A.   Yeah, for tumor markers.

18      Q.   Okay.  All right.  During the period that you

19  worked for Twitter, did any of your medical providers

20  give you any type of restrictions or limitations that --

21  that you were subject to?

22      A.   Not in writing.

23      Q.   So there's nothing that you can recall that

24  was written from a medical provider that prescribed any

25  type of restriction or limitation on your activities; is

Page 59

1    that true?

2         A.   During my time at Twitter?

3         Q.   Yes.

4         A.   Yes.

5         Q.   Okay.  How about prior to you working at

6    Twitter, did you get anything in writing from any

7    medical provider regarding any type of limitations or

8    work restrictions?

9              MS. KATEBI:  Objection.  Form.

10             THE WITNESS:  Yes.

11   BY MR. MECKLEY:

12        Q.   Can you --

13        A.   I did.

14        Q.   Can you describe what that writing was?

15        A.   I can't recall specific wording or specific

16   piece of writing.  I remember that I had received a lot

17   of instructions around the time of my chemotherapy

18   before and after.

19        Q.   And what were the instructions you received on

20   any -- with respect to any type of limitations or

21   restrictions on activity?

22        A.   Specifically one I recall because it,

23   I believe, was important to me at the time was that

24   I can't have any kind of infectious disease, like even a

25   cold before undergoing chemotherapy.  And if I have, my

Page 60

1    that I work remotely and then they stopped recommending

2    that.

3          Q.    Good point to clarify.

4                So after your chemotherapy had ended, some

5    point before COVID hit, your doctor said you could go

6    back to work full time in the office; is that fair?

7          A.    Yes.

8          Q.    Okay.  And then COVID pandemic hits, everyone

9    is working remotely; right?

10          A.    (Nods head.)

11          Q.    Is that "yes"?

12          A.    Facebook, my current employer at the time,

13    instated remote work policy, yes.

14          Q.    And was Facebook working 100 percent remotely

15    when you stopped working there?

16          A.    Yes.

17          Q.    Did you stop working at Facebook in August of

18    2020?

19          A.    Correct.

20          Q.    And then we've already clarified that you

21    started at Twitter in June of 2021; correct?

22          A.    Correct.

23          Q.    Were you working between Facebook and Twitter?

24          A.    No.

25          Q.    Were you doing -- let me clarify that.

Page 64

1           Were you doing sort of, like, independent

2   contractor work, as opposed to being employed by a

3   company?

4       A.   No.

5       Q.   What were you doing between August of 2020 and

6   June of 2021?

7       A.   Eventually looking for a job.  And before

8   that, I took a few months off.

9       Q.   So just looking at maybe say before the start

10  of -- between the end of your chemo and before the start

11  of the COVID pandemic, did any of your doctors give you

12  any written work restrictions?

13      A.   Sorry.  Can you repeat that?

14      Q.   Sure.

15           From -- after your chemotherapy ended, did --

16  and before the COVID-19 pandemic began, did any of your

17  doctors give you any work restrictions or limitations?

18      A.   Not that I recall.

19      Q.   And after the COVID-19 pandemic began, until

20  up -- up until the time you were working at Twitter, did

21  your doctors give you any type of work restrictions or

22  limitations?

23      A.   As far as I remember, verbally.

24      Q.   How about in writing?

25      A.   In writing, I don't believe so, no.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    you were sort of intuiting from what he said?

2        A.   I can't answer that without remembering exact

3    words.

4        Q.   Okay.  And what your understanding was, was

5    that Dr. Nguyen recommended you don't get COVID because

6    if you had COVID and your cancer returned, then you

7    needed to have a healthy immune system and it might

8    delay your treatment for cancer?

9        A.   Sounds right.

10       Q.   So did you understand that Dr. Nguyen was sort

11   of talking about, you know, a hypothetical situation if

12   your cancer returned, it would not be good to have

13   COVID?

14            MS. KATEBI:  Objection.  Form.

15            THE WITNESS:  As far as I understand oncology,

16   it's all about risks and probabilities.  It's very

17   rarely a definitive yes-and-no situation.

18   BY MR. MECKLEY:

19       Q.   It -- it was posited as sort of a -- strike

20   that.

21            Did Dr. Nguyen tell you that getting COVID

22   would make your cancer return?

23       A.   No.

24       Q.   Was that your understanding, that getting

25   COVID would cause you to go out of remission and have

                                              Page 67

1    cancer again?

2        A.    No.

3        Q.    Your understanding was that COVID could delay

4    treatment if you got cancer; is that right?

5        A.    If my cancer returned, yes.

6        Q.    Okay.  Did -- when you -- strike that.

7              When you worked at Twitter, did you believe

8    you were disabled?

9              MS. KATEBI:  Objection --

10             THE WITNESS:  Yes.

11             MS. KATEBI:  -- to the extent it calls for any

12   legal conclusion.

13   BY MR. MECKLEY:

14       Q.    Why did you believe that you were disabled

15   when you worked at Twitter?

16             MS. KATEBI:  Same objection.

17             THE WITNESS:  When I joined Twitter, I filled

18   a form that offered me to report my disability status.

19   And part of the form was that -- have I ever had cancer

20   history, and because I did at the time have a cancer

21   history, I reported that as a disability.

22   BY MR. MECKLEY:

23       Q.    Was that in an application or was that after

24   you were actually employed that you filled out that

25   form?

                                              Page 68

1       A.    That would be during onboarding.

2       Q.    Was that something --

3       A.    I think it was.  Like, maybe 80 percent sure.

4       Q.    Was that something you filled out in paper or

5    electronic?

6       A.    Electronically.

7       Q.    And did you -- just to clarify what you recall

8    putting in the form, was it that you said you were

9    disabled or did you say I had had cancer?

10       A.    The form offered to say yes/no answer to

11    whether you're disabled and a selection of what kind of

12    disability.  I selected cancer history as kind of

13    disability.

14       Q.    Okay.  All right.  Other than filling out that

15    form, did you ever provide any other type of information

16    to Twitter about having had cancer?

17       A.    I did tell my manager.

18       Q.    Which manager is that?

19       A.    That would be the manager at the time of my

20    termination, Hamid Tahsildoost.

21            MR. MECKLEY:  We'll get you the spelling of

22    that.

23            THE WITNESS:  Yes.  It's also another one of

24    those long last names that I would struggle to spell

25    myself.

```
 1      BY MR. MECKLEY:

 2           Q.    Can we just refer to him as Hamid for --

 3           A.    Yes.

 4           Q.    -- ease?

 5           A.    First name is spelled H-A-M-I-D.

 6           Q.    Okay.   Other than Hamid, did you tell anyone

 7      else at Twitter about the fact that you had had cancer?

 8           A.    Maybe, but not likely.   I don't recall.

 9           Q.    Okay.   Hamid is the only one you have a memory

10      of telling you had cancer?

11           A.    Yes.

12           Q.    When you worked at Twitter, did you ever make

13      a request to human resources or employee relations for

14      any type of work accommodation?

15           A.    Other than my manager, no.

16           Q.    Right.

17                 So I'm just asking -- you were aware Twitter

18      had a human resources department?

19           A.    Yes.

20           Q.    Did you ever make a request to that department

21      for any type of work accommodation?

22           A.    Does switching assigned office count as a work

23      accommodation?

24           Q.    Did you make a request to switch offices?

25           A.    Yes.
```

Page 70

1          Q.    When did you do that?

2          A.    Some time in 2022.  I don't remember

3     precisely.

4          Q.    And what was the request you made?

5          A.    So the request was to switch from being

6     assigned to San Francisco office to be assigned to

7     San Jose office.

8          Q.    And why did you make that request?

9          A.    Because that office was closer to where

10    I live.  It would be easier for me to get there.

11         Q.    Was your request to switch offices at all

12    related to your having had cancer?

13         A.    No.

14         Q.    Did you ever make any request to human

15    resources for any type of work accommodation related to

16    having had cancer?

17         A.    To human resources, no.

18         Q.    And to your knowledge did human resources

19    ever -- well, strike that.

20               Did you ever verbally tell anyone in human

21    resources that you had a disability or was or were

22    disabled?

23         A.    I don't recall.

24         Q.    And other than filling out that form on

25    onboarding, did you ever provide anyone at Twitter any

                                              Page 71

1    type of documentation -- well, I guess including that,

2    did you -- did you ever provide anyone at Twitter any

3    documentation from any medical provider regarding your

4    having had cancer?

5                MS. KATEBI:  Objection.  Form.

6                THE WITNESS:  Documentation from medical

7    provider?

8    BY MR. MECKLEY:

9        Q.   Correct.

10       A.   No.

11       Q.   Did you ever provide Twitter any documentation

12   from any medical provider regarding anything related to

13   your medical condition?

14               MS. KATEBI:  Objection.  Form.

15               THE WITNESS:  I don't recall.

16   BY MR. MECKLEY:

17       Q.   Okay.  During your employment with Twitter did

18   you ever communicate with anyone in human resources

19   verbally about anything?

20       A.   Yes.

21               MS. KATEBI:  Objection.  Form.

22   BY MR. MECKLEY:

23       Q.   And what -- what was that?

24       A.   Can you be more specific?

25       Q.   Sure.

                                              Page 72

1     of my reports would also involve HR at one point or

2     another.  So would be conversations like that.

3          Q.   Sure.

4               So then I can clarify.  During your employment

5     with Twitter, did you ever communicate verbally with

6     human resources about your medical condition?

7          A.   I don't recall.

8          Q.   And during your employment with Twitter, did

9     you ever communicate with human resources in writing

10    about your medical condition?

11         A.   You mean after onboarding?

12         Q.   Correct.

13         A.   Probably not.

14         Q.   Do you have a memory of doing that?

15         A.   No memory of doing that, no.

16              MR. MECKLEY:  All right.  You want to take a

17    break.  Let's take a break.

18              MS. KATEBI:  Sure.

19              THE VIDEOGRAPHER:  This marks the end of Media

20    Number 2 in the deposition of Dmitry Borodaenko.  The

21    time is 11:24 a.m.  We are off the record.

22              (Recess taken.)

23              THE VIDEOGRAPHER:  This marks the beginning of

24    Media Number 3 in the deposition of Dmitry Borodaenko.

25    The time is 11:38 a.m.  We are on the record.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    BY MR. MECKLEY:

2        Q.   All right.  So Mr. Borodaenko, in the

3    onboarding form that you said you had completed at

4    Twitter, did you indicate anywhere that you needed any

5    type of accommodation in your job?

6        A.   I don't recall whether that form had an option

7    to do so.

8        Q.   And when you were working at Twitter, how did

9    the fact that you had previously been treated for cancer

10   limit you in your life?

11       A.   Many different ways.  First of all, I had some

12   minor consequences from my chemotherapy like neuropathy,

13   reduced hearing.

14            Secondly, when COVID started, I dramatically

15   reduced my social interactions.  Didn't go to any public

16   spaces for a very long while.  And when I started job

17   search after leaving Facebook, I looked for jobs that

18   would allow me to work remotely, once again to reduce my

19   risk associated with getting COVID or other infectious

20   diseases.

21       Q.   Okay.  So I just wanted to focus in

22   specifically on the time you were working at Twitter,

23   which began in June of 2021.

24            So when you were working at Twitter, were you

25   limited in any respect with respect to neuropathy?

Page 76

1          MS. KATEBI:  Objection, form and to the extent

2     it calls for a legal conclusion.

3          THE WITNESS:  Limited in what?  Performing my

4     work duties?

5     BY MR. MECKLEY:

6          Q.   Yes.

7          A.   Probably not.

8          Q.   Okay.  And when you were working at Twitter,

9     were you limited in any way in performing your work

10    duties as a result of any type of hearing issue?

11         MS. KATEBI:  Same objections.

12         THE WITNESS:  I had to use, you know,

13    videoconferencing set up with headphones to make sure

14    that I would hear everything well enough, but I don't

15    know whether I should attribute that to hearing loss

16    after chemotherapy.

17    BY MR. MECKLEY:

18         Q.   So you're not sure whether using

19    videoconferencing with headphones was related to chemo

20    or just because people do that sometimes?

21         A.   Yeah.

22         Q.   All right.  And then when you were working at

23    Twitter, were you limited in any way with respect to

24    your social interactions?

25         A.   Yes.

Page 77

1      Q.    Okay.   And did any of your medical providers

2    specifically tell you you needed to limit your social

3    interactions when you worked at Twitter?

4      A.    No.

5      Q.    So your desire to limit your social

6    interactions was something that you kind of came to on

7    your own; is that right?

8      A.    There's many things in this sentence.   Can you

9    break it down, please?

10     Q.    Sure.

11           There was no doctor that wrote any type of

12   restriction or limitation on your social interactions,

13   as you testified.

14           So my question was:   Was the reason you

15   limited your social interaction something that you

16   decided would be best for you?

17            MS. KATEBI:   Objection.   Form.

18            THE WITNESS:   It was a way for me to limit my

19   risk.

20   BY MR. MECKLEY:

21     Q.    Okay.   And that's something you decided; is

22   that right?

23            MS. KATEBI:   Objection.   Form.

24            THE WITNESS:   I don't feel like that was much

25   of a choice for me.

1    BY MR. MECKLEY:

2        Q.   My question is more:  Is this something that

3    was dictated by a medical professional or something that

4    you decided on your own?

5             It sounds like it wasn't dictated by a medical

6    professional, but I'd like you to confirm that for me.

7        A.   I'm not sure I agree.  Like dictated is a

8    loaded word.  Can you rephrase?

9        Q.   Well, doctors they make diagnoses, they make

10   prognoses, and they make opinions about restrictions and

11   things like that.

12            So did any of your medical providers provide

13   you with restrictions around the social interactions you

14   could have during the time you worked at Twitter?

15       A.   I don't recall them providing me with specific

16   restrictions in writing during my time at Twitter.

17       Q.   All right.  And, verbally, the only thing that

18   your medical providers communicated to you was Dr.

19   Nguyen basically saying don't get COVID; correct?

20       A.   Do you mean during my entire interaction with

21   Dr. Nguyen, or during the time that overlapped with my

22   time at Twitter?

23       Q.   During the time that you worked at Twitter.

24       A.   Yeah.  Yes.

25       Q.   Okay.  What -- can you tell me the world of

                                                  Page 79

1  right?

2        A.    Yes.

3        Q.    All right.  And did getting COVID stop you

4  from any medical treatment that you, you know, had

5  scheduled?

6        A.    I didn't have any medical treatment scheduled

7  at the time.

8        Q.    Okay.  So getting COVID didn't impact any

9  aspect of, you know, planned medical treatment you had?

10        A.    On account of not having any treatment

11  planned, no.

12        Q.    Okay.  Did you go to Dr. Nguyen and report to

13  him that, hey, I had COVID?

14        A.    No.

15        Q.    And did you go to any of your medical

16  providers and, you know, ask them any type of questions

17  about, hey, now that I think I have COVID, is there

18  something I should be concerned about related to my

19  cancer remission?

20        A.    No.

21        Q.    Other than that one time, any other times you

22  think you got COVID?

23        A.    I don't think so, no.

24        Q.    All right.  And when you worked at Twitter --

25  and let's focus this in, if we could, because you did

                                                    Page 85

1    work for Twitter a little over a year to the fall of

2    2022 up until the termination of your employment,

3    September through November of 2022.

4              Did you otherwise go out in public?

5    A.    No.

6    Q.    Did you go grocery shopping?

7    A.    Yes.

8    Q.    That would be public.

9    A.    Oh.

10   Q.    Right?

11   A.    Well, I mean you go -- you mean go outside my

12   home?

13   Q.    Yes.

14   A.    Well, yes, I would go outside my home.

15   Q.    And you would go to a grocery store.

16         That's a public place; right?

17   A.    Yes.

18   Q.    Would you wear a mask or no mask?

19   A.    Mask.

20   Q.    All right.  And in addition to going out to

21   like grocery stores, you would go out to eat at

22   establishments outside your house; is that right?

23         A.    No, I would not.

24              MR. MECKLEY:  Exhibit 3.

25              (Exhibit 3 was marked for identification.)

Page 86

BY MR. MECKLEY:

Q.    All right.    So Exhibit 3 is a document stamped 240 through 246.    It appears to be a series of emails between Mr. Borodaenko other people named Doyel Mitra and Will Hoffler --

A.    Uh-huh.

Q.    -- and -- over the period September 21 through October 13 of 2022.

Okay?

A.    Uh-huh.

MR. MECKLEY:    Let me know when you're ready.

(Witness reviews document.)

THE WITNESS:    Okay.

BY MR. MECKLEY:

Q.    All right.    So take a look at the page stamped 246.

A.    Uh-huh.

Q.    This appears to be an email to you and Mr. Mitra, dated September 19, from Will Hoffler at Vertica.

Do you see at that?

A.    Looking at that page, yes.

Q.    All right.    And what is Vertica?

A.    It's company that at the time was a vendor of Twitter's.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    Q.   And who was Mr. Hoffler?

2    A.   A representative of that company.  That

3    managed Twitter's contract with Vertica.

4    Q.   And you see in this initial email from

5    September 19, Mr. Hoffler is asking for you and

6    Mr. Doyel or "Doyel" to have a meeting in person with

7    another representative of Vertica.

8         Do you see that?

9    A.   Correction.  Doyel is a woman.

10   Q.   Oh, okay.

11        Was what I said true, looks like they're

12   trying to have an in-person meeting with you, these

13   Vertica reps?

14   A.   That sounds right.

15   Q.   All right.  And then your email, take a look

16   at page stamp 245, appears on September 21 --

17   A.   Uh-huh.

18   Q.   -- 2022.  You wrote back to the subject

19   "In-Person Meeting" --

20   A.   Uh-huh.

21   Q.   -- and said, quote, "I'd be happy to meet in

22   person and talk about the role of Vertica at Twitter."

23        Do you see that?

24   A.   Yup.

25   Q.   And that's something that you wrote and sent;

Page 88

1    is that correct?

2        A.    Yup.

3        Q.    Take a look at the page that's stamped 243.

4    This appears to be an email from you dated September 28,

5    2022, where you wrote, quote, "As mentioned before, me

6    and Doyel will be available at lunchtime on October 6.

7    We're in San Jose area, so any venue within reach, San

8    Jose, Santa Clara, Sunnyvale, Los Gatos, Saratoga,

9    Milpitas will do fine."

10            Do you see that?

11       A.    Yes.

12       Q.    And that's something you wrote and sent to

13   Mr. Hoffler?

14       A.    Looks right.

15       Q.    Look at the first page of Exhibit 3.  Oh,

16   sorry.  Could you look at the page that's stamped 242

17   instead.

18       A.    Sure.

19       Q.    So Mr. Hoffler sent an email dated

20   September 30th of 2022 to you and Doyel saying that

21   Mr. Anderson, "Just tested positive for COVID-19 so

22   we're going to have to postpone our lunch meeting."

23            Do you see that?

24       A.    Yup.

25       Q.    And that's an email you received; right?

Page 89

1        A.    Yup.

2        Q.    And then now take a look at page 241.

3        A.    Uh-huh.

4        Q.    This is an email from you, dated October 3 of

5    2022, to Mr. Hoffler and Doyel.

6              Do you see that?

7        A.    Yeah.

8        Q.    And you say "Thursday, 13th works for us.

9    Thanks."

10             Is that something you wrote?

11       A.    What I see is "Would love to reschedule" --

12    yes, I see that line, yeah.

13       Q.    So you responded to Mr. Hoffler telling him

14    that October 13th would work for you for a lunch

15    meeting --

16       A.    Uh-huh.

17       Q.    -- correct?

18       A.    Correct.

19       Q.    So it's -- it's correct that you knew that

20    Mr. Anderson had actually tested positive for COVID-19

21    as of September 30th and you were agreeable to meet with

22    him in person on October 13th for lunch; is that

23    correct?

24       A.    Can you break this down?

25       Q.    I don't know that I can.

Page 90

1          MR. MECKLEY:  Can you red it back please?

2          (Record read.)

3          THE WITNESS:  Yes, to the first part.  Yes, to

4     the second part.

5          MR. MECKLEY:  All right.

6     BY MR. MECKLEY:

7          Q.   And to have lunch because you have to eat, you

8     have to at least take off a mask or not wear a mask to

9     be able to eat when you're with Mr. Anderson; correct?

10         A.   Yeah.

11         Q.   All right.  And then now take a look at the

12    first page of Exhibit 3 Stamped 240.

13              There's an email.  It appears to be from you

14    to Mr. Hoffler on October 13, 2022, saying --

15         A.   What?  Sorry?

16         Q.   It's in the middle of the page.

17         A.   Okay.

18         Q.   It appears to be an email from you to

19    Mr. Hoffler, dated October 13, 2022, saying "Looking

20    forward to meeting you and Fleming today."

21              Do you see that?

22         A.   Right.  That's stamped at 10:00 a.m.

23         Q.   And that's what you wrote?

24         A.   Uh-huh.

25         Q.   Is that "yes"?

1        A.    Yes.

2        Q.    And it looked like you were scheduled to meet

3   at a restaurant called The Table in San Jose; is that

4   correct?

5        A.    That's correct, yes.

6        Q.    And did you meet with Mr. Hoffler and

7   Mr. Anderson on that date?

8        A.    Yes.

9        Q.    And that was in person?

10       A.    Yes.

11       Q.    Over lunch, not masked; correct?

12       A.    I don't recall whether it was actually lunch.

13   I -- it was outside.  And I don't recall if I ate at

14   that meeting.

15       Q.    You're not denying that you ate; is that

16   right?

17       A.    Maybe, maybe not.  I don't remember.

18       Q.    Okay.

19       A.    I remember the fact of the meeting.

20       Q.    Okay.  All right.  So can -- are you able to

21   explain why you could meet in person with a man that

22   just had COVID-19 but felt you couldn't go into the

23   office to work?

24       A.    Not just, two weeks prior.

25       Q.    Okay.  So do you -- can you explain why you

Page 92

1    right?

2         A.    Yes.

3         Q.    So do you think you're disabled now?

4         A.    Yes.

5         Q.    And in what way are you disabled now?

6         A.    In the same way.  I have a history of cancer.

7         Q.    And does that current status limit your

8    activities or your -- restrict your work in any way?

9              MS. KATEBI:  Objection, form and to the extent

10   it calls for any legal conclusions.

11             THE WITNESS:  In theory or practically?

12   BY MR. MECKLEY:

13        Q.    Practically.

14        A.    Practically, not that I'm aware of.

15        Q.    How about theoretically?

16        A.    Theoretically, absolutely.

17        Q.    How theoretically?

18        A.    Cancer history does not have an expiration

19   date, so there is still a risk that my cancer would

20   recur.  It's just now the time in remission, it was a

21   lower than it was few years ago, but the risk is there

22   still.  And I have to calculate my exposure to things

23   like COVID-19 against that risk.

24        Q.    And how does that limit your activities or

25   restrict you in any way?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    ever review any Twitter policy documents regarding

 2    reasonable accommodation for employees with

 3    disabilities?

 4         A.    I don't recall.

 5         Q.    During your employment with Twitter -- strike

 6    that.

 7               I'm going to ask you whether you ever

 8    communicated with a number of people when you were

 9    employed at Twitter, and I'd like you to tell me if you

10    had communicated with any of them.

11               Okay?

12         A.    Ever at all?

13         Q.    Ever.

14         A.    Uh-huh.   Okay.

15         Q.    James Musk?

16         A.    No.

17         Q.    Andrew Musk?

18         A.    No.

19         Q.    Ross Nordeen?

20         A.    What was the last name?

21         Q.    N-O-R-D-E-E-N.

22         A.    No.

23         Q.    Katie Marcotte?

24         A.    Doesn't ring a bell.

25         Q.    Christopher Stanley?
```

Page 98

```
1            A.    I think, yes.

2            Q.    Elon Musk?

3            A.    Not directly, no.

4            Q.    All right.  Christopher Stanley, what do you

5      recall of any -- if any, communication with him?

6            A.    I saw that name in a slide shot I was in.

7            Q.    Other than that?

8            A.    Other than that, no.

9            Q.    Okay.  Did you ever communicate to Mr. Stanley

10     or any of the people I just listed that you had had

11     cancer?

12           A.    No.

13           Q.    Did you ever communicate to any of those

14     people you were -- felt you were particularly

15     susceptible to COVID?

16           A.    No.

17           Q.    All right.  I think you testified previously

18     that you told your immediate manager, Hamid, that you

19     had had cancer; is that right?

20           A.    Correct.

21           Q.    Did Hamid communicate to you that he had

22     shared that information with anyone else?

23           A.    I don't recall.

24           Q.    Do you have any reason to believe that Hamid

25     shared that information with anyone else at Twitter?
```

Page 99

1    A.    I do because that's the reason I told him.

2    Q.    And did you tell Hamid that -- strike that.

3          Did Hamid tell you that he was going to share

4    that information with anyone else, that you had had

5    cancer?

6    A.    I don't recall.

7    Q.    And do you have any information that indicates

8    Hamid did share that information with anyone else that

9    you had cancer?

10   A.    I received confirmation from Hamid in response

11   to my message that acknowledged my concerns.

12   Q.    All right.  But do you have any information

13   that Hamid then told anyone else in the company that you

14   had cancer?

15   A.    I don't recall.

16   Q.    Okay.

17         MR. MECKLEY:  This is Exhibit --

18         MS. KATEBI:  Four.

19         MR. MECKLEY:  -- 4.

20         (Exhibit 4 was marked for identification.)

21   BY MR. MECKLEY:

22   Q.    Exhibit 4 is a one-page document stamped

23   Borodaenko 171.  Let me know when you're ready.

24   A.    Yeah.

25   Q.    What is Exhibit 4?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1         A.    Generally until my risk profile changes in a

2    way that would make it safer for me.

3         Q.    And was that indeterminate at that time that

4    you wrote this?

5         A.    At the time, yes, I could not predict neither

6    the trajectory of my cancer diagnosis, nor the

7    trajectory of the pandemic.

8         Q.    Okay.  All right.  And you said you

9    screenshotted this Exhibit 4; right?

10        A.    Yes.

11        Q.    Did you give the screenshot to anyone?

12        A.    That -- do I need to answer that?

13              MS. KATEBI:  Yes, you should answer that.

14              THE WITNESS:  Well, I did share this with my

15    attorney.

16    BY MR. MECKLEY:

17        Q.    Okay.  Anyone else besides your attorney?

18        A.    No.

19              MR. MECKLEY:  Okay.  All right.  Let's have

20    this as Exhibit 5.

21              (Exhibit 5 was marked for identification.)

22    BY MR. MECKLEY:

23        Q.    Exhibit 5 is a one-page document stamped

24    Borodaenko 302.

25              (Witness reviews document.)

Page 106

1                    THE WITNESS:   Yeah.

2    BY MR. MECKLEY:

3          Q.    All right.   What is Exhibit 5?

4          A.    That also looks like a screenshot of a chat.

5          Q.    On what app?

6          A.    Signal.

7          Q.    With whom?

8          A.    With Dave Beckett.

9          Q.    Who is Dave Beckett?

10         A.    An engineer at the time at Twitter.

11         Q.    Was Dave Beckett someone who reported to you?

12         A.    No.

13         Q.    Were they a manager of yours?

14         A.    No.

15         Q.    Do you recall what their position was?

16         A.    Staff engineer I think.   Or senior staff.

17   I don't recall specifically.

18         Q.    So --

19         A.    An engineer.

20         Q.    So Mr. Beckett was an individual contributor,

21   not a manager?

22         A.    Correct.

23         Q.    All right.   And it appears on November 10,

24   2022, you wrote "I am not coming to the office.   I am at

25   risk.   Between us, cancer survivor, and I'm not risking

                                                    Page 107

1    my life to tick a box for an idjit child."

2         Why were you writing that to Mr. Beckett?

3    A.    What do you mean "why"?

4    Q.    Why were you writing that to Mr. Beckett?  Why

5    would you want to share that information with him?

6    A.    I don't recall specific motivation.

7         Q.    All right.  And you screenshotted Exhibit 4

8    communications with Hamid and the communication with

9    Dave Beckett on the same date because you thought it was

10   important to save those messages; is that right?

11        A.    No.

12        Q.    Then why did you screenshot them?

13        A.    This one I screenshotted recently because

14   I was asked to provide all the communications I had

15   relevant to the case.

16        Q.    All right.  So the Signal communications with

17   Mr. Beckett, they weren't auto deleting, so they're

18   still on your Signal app?

19        A.    Correct.

20        Q.    Got it.

21             MR. MECKLEY:  We're at about 12:30.  I was

22   going to suggest we take a break for lunch.  I was

23   thinking of maybe pushing through to avoid that, but

24   I don't think we're going to be able to do that and have

25   people be comfortable.  So...

Page 108

1    statement to Ms. Leung on November 1?

2          A.    That I wasn't sure that acquisition would be

3    completed successfully until after it was completed

4    successfully.

5          Q.    What did you mean when you said "or I'd have

6    left already"?

7          A.    Probably at the time, like if I'm trying to

8    reconstruct my thinking, that if I had to some way to

9    know with hundred percent probability whether or not

10   that deal was going to close, I would have started

11   looking for another job.

12         Q.    I see.

13               So just so I understand, the interpretation of

14   this is:  If you had known the deal would have actually

15   gone through, you would have tried to leave; is that

16   right?

17         A.    It -- it would have been possible, yeah.

18         Q.    Okay.

19         A.    Yeah.

20               (Exhibit 7 was marked for identification.)

21   BY MR. MECKLEY:

22         Q.    All right.   Exhibit 7 is a one-page document

23   stamped Borodaenko 49.

24         A.    Uh-huh.

25         Q.    All right.   Do you recognize Exhibit 7?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1      A.    Yes.

2      Q.    And what is this?

3      A.    That is copy of the email I got from Twitter

4   about my termination.

5      Q.    All right.  And that was on November 15 of

6   2022?

7      A.    That's correct.

8      Q.    All right.  And this says, "We regret to

9   inform you that your employment is terminated

10  effectively immediately.  Your recent behavior has

11  violated company policy.  Our operations team will be

12  reaching out to you with off-boarding instructions.  If

13  you have any follow-up questions, you can email

14  alum@twitter.com."

15          Do you see that?

16     A.    Yes.

17     Q.    All right.  Did you ever email

18  alum@twitter.com with any questions?

19     A.    I think so.  I vaguely remember that I emailed

20  them.

21     Q.    And when you say you think so, what makes you

22  think so?

23     A.    At some point they emailed me about returning

24  my laptop and I emailed back that I've already sent it.

25  That's an exchange I remember having with them.

Page 115

1          Q.    And was it at this email address, Alum, or a
2     different email address about the laptop return?
3          A.    I don't remember.
4          Q.    Okay.  And since your Twitter access would
5     have been cut off at that point, did you email Alum at
6     Twitter using your personal email address?
7          A.    If that's the email I contacted, yes, I would
8     have used personal email.
9          Q.    And was that the Angdraug email?
10         A.    That's the one, yes.
11         Q.    Okay.  A-N-G-D-R-A-U-G.
12         A.    At Gmail.com, yes.
13         Q.    Okay.  And to the extent you do recall
14    emailing Alum about, you know, your laptop return, were
15    there any other questions, other than returning your
16    laptop, that you asked when you emailed Alum at Twitter?
17         A.    No, I don't recall any other questions, no.
18         Q.    Did you send any emails to this Twitter
19    address or another Twitter address asking Twitter what
20    it was that was the policy you had violated?
21         A.    No.
22         Q.    All right.  And this says "We regret to inform
23    you your employment is terminated effective
24    immediately."
25              Was your system access shutoff as soon as you

                                                      Page 116

```
 1    got this?
 2         A.   As you can see, that email was sent in the
 3    middle of the night.  So by the time I woke up and found
 4    that email, yes, my access was already revoked.
 5         Q.   All right.  So was this sent to your personal
 6    email?
 7         A.   Yes.
 8         Q.   Got it.
 9              Okay.
10              (Exhibit 8 was marked for identification.)
11    BY MR. MECKLEY:
12         Q.   All right.  So this is Exhibit 8.
13         A.   Yup.
14         Q.   It's a document stamped Borodaenko 284.
15              What does this represent?
16         A.   That's a screenshot of a Signal chat.
17         Q.   And was it a Signal chat between you and Will
18    Hoffler?
19         A.   Yes.
20         Q.   And he was the rep from Verita [sic]?
21         A.   Vertica.
22         Q.   Vertica.
23         A.   Yes.
24         Q.   Okay.  And are the turquoise bubbles what you
25    were writing to him?
```

Page 117

1    A.   Yes.

2    Q.   All right.   So on November 15, 2022, you

3  wrote, quote, "Heads up.   I just got fired.   Afaik John

4  is still there, but you might want to check just in

5  case."

6         Is that a text you wrote?

7    A.   Yes.

8    Q.   What does A-F-A-I-K mean?

9    A.   As far as I know.

10   Q.   Who's the John you were referring to?

11   A.   One of my reports.

12   Q.   What's the last name?

13   A.   Yeh, Y-E-H.

14   Q.   Okay.   And why were you communicating to

15  Mr. Hoffler that you just got fired?

16   A.   Because before I was terminated, I was in the

17  process of negotiating contract renewal with Vertica as

18  a vendor for Twitter and I wanted Will Hoffler to know

19  that I wouldn't be able to continue that interaction.

20   Q.   Why did you -- well, strike that.

21        Is this -- is Exhibit 8 a screenshot or is

22  that still in your Signal app?

23   A.   It's recently taken screenshot.   I think it's

24  still in my app.

25   Q.   Okay.

Page 118

1                    (Exhibit 9 was marked for identification.)

2        BY MR. MECKLEY:

3            Q.    All right.    Exhibit 9 is a one-page document

4        stamped 292.

5                    What is this, Mr. Borodaenko?

6            A.    That is a screenshot of a Signal app chat.

7            Q.    Okay.    And this is a Signal chat you were

8        having with Jojo A. on November 19, 2022; is that right?

9            A.    Correct.

10           Q.    And who is Jojo A.?

11           A.    Jojo was my previous manager at Twitter before

12       Hamid.

13           Q.    And what's Jojo's last name?

14           A.    Antonio.

15           Q.    And at the time you were having this Signal

16       chat with Jojo Antonio, was he still with Twitter or --

17           A.    No.

18           Q.    Okay.    And where -- where was this person at,

19       in terms of a company?

20           A.    I don't remember the name of the company.

21           Q.    Do you know when Jojo's employment with

22       Twitter ended?

23           A.    Let's see.    Sometime in 2022.    I don't

24       remember exactly.

25           Q.    Was it before the acquisition?

                                                    Page 119

1      A.    It was before the acquisition, yes.

2      Q.    Okay.  So Exhibit 9 it appears Jojo says

3  "I heard you opt out."  And you respond "Not exactly,"

4  with then a symbol like a smiley face.

5            Do you see that?

6      A.    Yes.

7      Q.    He said "You still at Twitter?"

8            And you responded "Nope, got fired."

9            Do you see that?

10     A.    I see that.

11     Q.    Okay.  And why were you letting Jojo know that

12  you got fired?

13     A.    Basically that's the words I chose to tell

14  Jojo that I was no longer at Twitter.

15     Q.    All right.  And then he says "Wait, I thought

16  you get severance if you don't say yes to his email."

17            Do you see that?

18     A.    Yes.

19     Q.    Do you know what email Jojo's referring to

20  there?

21     A.    I've heard about it.

22     Q.    And what is it that you've heard?

23     A.    I've heard there was a fork-in-the-road email

24  that was sent out to Twitter employees, and I assume

25  that's what Jojo was referring to.

Page 120

1      Q.   So he says "Holy shit.  I just found out.  Are

2   you okay?  Oh, and if I just broke the news to you, I'm

3   also sorry," laughing face emoji.

4           And you say, "Thanks.  I'm okay. Still

5   confused about why this happened and more worried about

6   everyone left behind than myself."

7           Do you see that?

8      A.   Yes.

9      Q.   Looks like John says "We just had a social

10  hour with Hamid and the trend that he's finding was

11  around social-water cooler posts."

12          You responded, "I'd love to know what it was

13  in my case.  Pretty sure I was relatively respectful."

14          Do you see that?

15     A.   Yup.

16     Q.   Did you ever -- these are obviously messages

17  that are in Signal.

18          Did you ever have a conversation with John

19  about, you know, this issue of social water cooler posts

20  and this trend that Hamid was finding?

21     A.   As far as I remember, only on Signal.

22     Q.   All right.  What about Hamid, did you ever

23  have a verbal conversation with him about, you know,

24  this understanding that it was social water cooler posts

25  were the reason people were let go?

Page 122

1    claims against Twitter, and now they have common

2    interest in those claims, anything that they're talking

3    about, oh, my lawyer said it's actually this or for

4    example -- you know, things like that that may be legal

5    information that they're getting from the attorneys or

6    any sort of information that is related to legal

7    conversations that they had with an attorney that they

8    discussed later would fall under common privilege.

9              MR. MECKLEY:  Yeah, okay.

10   BY MR. MECKLEY:

11        Q.   So I will make clear my question.  I'm not

12   asking you for anything that was communicated by an

13   attorney or if other people say my attorney said

14   blah-blah-blah.  That's not what I'm asking.

15             So if you carve out things from what attorneys

16   said, my question is:  Did you communicate with any

17   other current or former Twitter employees about this

18   issue of, you know, a trend of finding social water

19   cooler post is a reason they were terminated?

20        A.   I remember that I had conversations in general

21   about the fact that I was terminated.  I can't off the

22   top of my head enumerate people I had those

23   conversations with.  So to the best of my ability

24   I provided what I found in my Signal history that was

25   about that.  Other than that, no, I did not have any

                                            Page  124

1          Q.    Did you meet in person with Jessie Fineman?

2          A.    Name doesn't ring.

3          Q.    You says does?

4          A.    Does not ring a bell.

5          Q.    Does not.

6                Did you meet with any women who had brought

7     claims against Twitter?

8          A.    Well, once again, Yao.

9          Q.    Yao.

10               Any other women?

11         A.    Not that I remember.  Not that I know of.

12         Q.    Okay.

13               MR. MECKLEY:  Actually, I think Exhibit 10

14    should be a two-page document.  I'm noticing that

15    there's another page attached here, so we can attach

16    these.  But can you put that with Exhibit 10?  I think

17    that's the second page.

18               THE WITNESS:  Let me see.  Probably.

19    BY MR. MECKLEY:

20         Q.    So Exhibit 10 should be document stamped 295

21    through 296.

22         A.    Yeah.

23         Q.    So this series of messages between you and

24    John Yeh continued on.  He says "I just went back

25    through your posts and it all looked good to me.  Maybe

                                             Page 131

1    he didn't like the dumpster fire repost.  If you need

2    anything or if I can help out in any way, please don't

3    hesitate to reach out."

4            And then you respond "Thanks."

5    A.    Uh-huh.

6    Q.    Is that "yes"?

7    A.    Yes, to what?  Sorry.

8    Q.    To what I just said.  You went "Uh-huh" and

9    I need verbal words.

10   A.    Right.  Yes.

11   Q.    And then you excerpted John's statement "Maybe

12   he didn't like the dumpster fire repost" and you ask

13   "Was that a tweet I linked?"

14           Is that something you --

15   A.    Did you just say "accept"?

16   Q.    I don't know.

17           What is this --

18   A.    Like what --

19   Q.    What did you do to somehow cut and paste

20   the -- the message from John --

21   A.    Reply to.

22   Q.    Okay.

23   A.    So I replied to that message.

24   Q.    Okay.  And you say "Was that a tweet

25   I linked?"

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    A.    Yes.

2    Q.    Why were you asking him that?

3    A.    Because that's what I thought the dumpster

4  fire repost referenced.

5    Q.    And you said "Which tweet, if you don't mind

6  sharing"; is that correct?

7    A.    Uh-huh, correct.

8    Q.    And then he says, "Yeah, trying to find it in

9  Slack mobile app" and then there's a picture of a -- of

10  the Twitter bird in a room, it's all on fire and it says

11  "This is fine."

12         Do you see that?

13    A.    Yes.

14    Q.    And that's a meme that you reposted?

15    A.    Yes.

16    Q.    Okay.    And you put that meme of the Twitter

17  bird and the room on fire saying "This is fine" in a

18  Slack channel message?

19    A.    Yes.

20    Q.    And that was in the social water cooler

21  channel?

22    A.    As far as I remember, yes.

23    Q.    Okay.    And what was social water cooler?

24    A.    Social water cooler was a Slack channel for

25  nonwork conversations for Twitter employees to

1    socialize.

2        Q.   And it was a Slack channel that was internal

3    to Twitter; correct?

4        A.   Correct.

5        Q.   All right.   And any Twitter employee could

6    access it; is that right?

7        A.   I think so, yes.

8        Q.   Okay.  And it sounds like you and John in your

9    back and forth messages on November 15 were

10   communicating about what you thought might have been the

11   reason you were terminated; is that --

12       A.   Not what I thought.

13       Q.   -- fair?

14       A.   What John thought.

15       Q.   Okay.  And you were inquiring from him, you

16   know, that you wanted to know what -- what it was?

17       A.   Yes.

18       Q.   Okay.

19            (Exhibit 11 was marked for identification.)

20   BY MR. MECKLEY:

21       Q.   All right.   Exhibit 11, document stamped 285

22   through 287.

23       A.   Uh-huh.

24       Q.   Is Exhibit 11 a series of Signal messages

25   between you and Randy Hammons?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1       A.    Yes.

2       Q.    And what was Randy Hammons' position?

3       A.    Before his termination, he was my skip level

4    manager.    I believe his job title at the time was senior

5    director.    Senior director.

6       Q.    And the first message here appears to be from

7    you on November 4; is that correct?

8       A.    Correct.

9       Q.    And you say "Hi, Randy, this is Dmitry.    Hamid

10   told me you were let go.    Are you okay?    How can we

11   help?"

12             So is it your understanding that Randy was let

13   go on November 4th?

14      A.    Yes.

15      Q.    Was your understanding that quite a number of

16   Twitter employees were let go on November 4th?

17      A.    Yes.

18      Q.    Do you have any understanding as to the number

19   in total?

20      A.    Not really, no.

21      Q.    Do you have a sense of the percentage of the

22   workforce that was let go on November 4th?

23      A.    A large percentage.

24      Q.    More than half?

25      A.    On the order of half.

Page 135

1      Q.    Okay.   Then it looks like the next message

2   chronologically between you and Randy Hammons is on

3   November 15th, and you say "I'm out now.   Probably more

4   relieved than distressed."

5           Do you see that?

6      A.    Yup.   I see that.

7      Q.    And it looks like Mr. Hammons responds on

8   November 16 to you and he says "I heard.   All because of

9   posts in SWC.   I'm very sorry, dude.   Anything I can do

10  to help?"

11          Do you see that?

12     A.    I see that.

13     Q.    All right.   And did you ever learn from

14  Mr. Hammons how he heard you had been terminated?

15     A.    No.

16     Q.    Did you ever talk with him verbally?

17     A.    Not that I recall.   I don't think so.

18     Q.    And he said "All because of posts in SWC."

19          Did you understand that to mean social water

20  cooler?

21     A.    Yes.

22     Q.    Okay.   And did you communicate with

23  Mr. Hammons about how he knew or believed that you were

24  terminated because of posts in social water cooler?

25     A.    I don't think I ever asked.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1      Q.   All right.  All right.  So it looks like you

2   responded, quote, "I didn't even post much.  Just shared

3   a 'This is fine' meme that I thought was funny."

4           Do you see that?

5      A.   Yes.

6      Q.   And the "This is fine" meme that you're

7   referring to in that message to Mr. Hammons is the

8   Twitter bird in the room on fire picture that we have in

9   Exhibit 10; is that right?

10     A.   Correct.

11     Q.   All right.

12          (Exhibit 12 was marked for identification.)

13   BY MR. MECKLEY:

14     Q.   Exhibit 12 is one-page document stamped 303.

15   It appears to be a series of Signal messages between you

16   and a Dave Beckett on November 15, 2022.

17          Is that accurate?

18     A.   Yup.

19     Q.   And it appears Mr. Beckett wrote to you "A

20   bunch of folks just got fired for cause this morning.

21   Seems to be for Slack posting."

22          Do you see that?

23     A.   Yes.

24     Q.   And as of November 15, Mr. Beckett was still

25   employed, correct, with Twitter?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    A.   I believe so.

2    Q.   All right.  And did he ever indicate to you

3    how he knew that a bunch of folks just got fired for

4    cause that day?

5    A.   No.

6    Q.   Did he ever indicate to you how he knew that

7    it seemed to be for Slack posting?

8    A.   No.

9    Q.   And then he says, "Damn.  That was you too.

10   Badge of honor."

11        Do you see that?

12   A.   I see that.

13   Q.   And you respond "Thank you.  We should meet

14   and share stories some time soon"; correct?

15   A.   Yes.

16   Q.   Okay.  Did you ever tell Mr. Beckett that you

17   didn't think you were fired for Slack posting?

18        MS. KATEBI:  I'm going to keep that same

19   objection from before.  So in the context of any

20   conversation that you had with your attorneys and

21   proceeded to share with Mr. Beckett, if at all, it would

22   be privileged.

23        THE WITNESS:  Uh-huh.

24        Let me just say at some point later after

25   I started a lawsuit against Twitter, I did inform

Page 138

1    said to Mr. Beckett, did you say was I -- that you

2    weren't or that you were?  I didn't hear.

3         Q.   Did you ever tell Mr. Beckett that you weren't

4    fired for Slack posting?

5              MS. KATEBI:  Same objections as before.

6              THE WITNESS:  I don't remember.

7    BY MR. MECKLEY:

8         Q.   Okay.

9         A.   I'll just leave it at that.

10        Q.   All right.  Did you ever tell Mr. Beckett

11   that -- that his statement was incorrect, that you

12   weren't fired for cause?

13        A.   Not directly, no.

14        Q.   Okay.  Did you ever get any type of writing

15   from Twitter that stated you were laid off?

16        A.   No.

17        Q.   Did you ever get any type of writing from

18   Twitter saying that your termination was a result of

19   reduction in force?

20        A.   No.

21        Q.   Did anyone from Twitter ever tell you that you

22   were terminated as a result of a layoff or reduction in

23   force?

24        A.   No.

25        Q.   Were you ever fired by a company before

Page 140

1     difference between being fired and being laid off?

2              MS. KATEBI:  Objection to the extent it calls

3     for a legal conclusions.

4              THE WITNESS:  Can you qualify that by when and

5     in which case?

6     BY MR. MECKLEY:

7         Q.   Sure.

8              I'm just asking generally:  Do you understand

9     that there's a difference between being fired and being

10    laid off?

11        A.   Yes.

12        Q.   Okay.  And what's the difference in your mind?

13             MS. KATEBI:  Objection to the extent it calls

14    for any legal conclusions.

15             THE WITNESS:  Well, I'm not an attorney so

16    I can only explain my personal understanding.  Without

17    claiming that that's exactly letter of the law, my

18    understanding is that layoff is a reduction in force

19    that eliminates positions of people.  Usually refer to

20    when there's a significant number of such positions.

21    Whereas, getting fired is basically other cases.

22    BY MR. MECKLEY:

23        Q.   What do you mean "other cases"?

24        A.   For example, performance.

25        Q.   So you understood that performance was one

                                                    Page  142

1   reason an employee could be fired?

2       A.   Yes.

3       Q.   And did you understand another reason an

4   employee could be fired would be engaging in some type

5   of like misconduct?

6       A.   Yes.

7       Q.   And did you understand that another reason

8   that an employee could be fired was for violating some

9   type of company policy?

10      A.   Yes.

11      Q.   Okay.  Do you know how many employees of

12  Twitter were terminated on November 15, 2022?

13      A.   Not precisely.

14      Q.   Do you have any sense of the number?

15      A.   Multiple people.  I know the names of a

16  handful.

17      Q.   Okay.  So it's your understanding more than

18  five?  Less than five?

19      A.   Probably more than five.

20      Q.   More than ten?

21      A.   I don't know.  Maybe.

22      Q.   Okay.  Who were the other people that you

23  understood were fired on November 15th, the same day

24  that you were?

25      A.   So Yao and Aiden who came out before.  Who

                                            Page 143

1    "Your recent behavior had violated company policy."

2         Did you seek to inquire what behavior it was

3    had violated company policy?

4         A.    No.

5         Q.    Did you do anything to try to find out what

6    behavior you engaged in that violated company policy?

7         A.    I discussed this with some coworkers as we

8    just covered previously.

9         Q.    Okay.  So you're referring to the Slack

10   messages -- excuse me Signal --

11        A.    Signal --

12        Q.    -- messages?

13        A.    Yes.

14        Q.    All right.  Other than the Signal messages

15   that we've looked at, did you do anything else to try to

16   determine what was the behavior that had violated

17   company policy?

18        A.    No.

19             (Exhibit 13 was marked for identification.)

20   BY MR. MECKLEY:

21        Q.    Exhibit 13 is a one-page document stamped 288.

22   It appears to be a series of Signal messages between

23   Mr. Borodaenko and Gurkan Oluc on November 16 and

24   172022.

25             Is that an accurate description of this?

Page 145

1      A.    Yes.

2      Q.    Who's Gurkan Oluc?

3      A.    It's a former coworker who before my

4   termination reported to me and before November 4

5   reported to another manager.

6      Q.    So on November 17 Mr. Oluc messages you "Do

7   you have any guess on why it may have happened?

8   I didn't see any snarky comments of yours in social

9   water cooler and a few RTs in your Twitter."

10         So your understanding when he's saying "why it

11   might have happened" he's referring to your termination?

12      A.    I think so.

13      Q.    And RTs means re-tweets?

14      A.    I think so.

15      Q.    Okay.  All right.  And you respond "No idea."

16         And you say "They may have trolled through my

17   public tweets, but even that would have been fairly

18   mild."

19         And then you include a link to Twitter, your

20   Twitter site; correct?

21      A.    Yes.

22      Q.    All right.  Was this a link to a tweet you

23   made?

24      A.    Yes.

25      Q.    All right.  And what was the tweet that you

Page 146

1    linked to?

2         A.   I don't remember precisely, but I think what

3    I referred to at the time as I was looking through my

4    Twitter history probably would have been another meme.

5    That one would be in reference to printing out source

6    code as a way to review people's performance.

7         Q.   And why did you flag that particular tweet

8    with a meme for Mr. Oluc?

9         A.   I think that was the only tweet I made around

10   the time that had a meme in it.

11        Q.   Okay.  Well, what about the "This is fine"

12   bird on fire?

13        A.   That I did not tweet, I just linked to

14   somebody else's tweet in Slack.

15        Q.   Okay.  Your Twitter account was public;

16   correct?

17        A.   Yeah.

18        Q.   So that means anyone could look at it?

19        A.   Yes.

20        Q.   And in your message to Mr. Oluc here on

21   November 17 you say "They may have trolled through my

22   public tweets."

23             Who's the "they" you're referring to?

24        A.   Whoever made the decision to terminate me.

25        Q.   When you say "trolled through my public

1    tweets," do you mean like searched?

2         A.    Or scanned.

3         Q.    Scanned, okay.

4              And did you believe that people did that, that

5    actually looked in your tweets?

6         A.    Not really.  It was just a stretch of

7    imagination.

8         Q.    And did you later find out that there were

9    people actually looking in your tweets?

10        A.    I never found out definitely one way or the

11   other.

12        Q.    Did you later find out that people were

13   looking in your Slack posts?

14        A.    Same.

15        Q.    Did you ever hear from any of your colleagues

16   at Twitter, your current or former, other than what

17   we've covered, because some people reference that, but

18   hear from others that that's what was happening, is that

19   people within the company were looking through social

20   water cooler and tweets?

21        A.    I maybe have read about it in the news.  Like

22   somehow I remember hearing about that, but I really,

23   really don't know where from.  It could have been from

24   the news or from some casual conversation somewhere.

25        Q.    Uh-huh.  Do you know --

Page 148

1   BY MR. MECKLEY:

2        Q.   All right.  Let's mark this as Exhibit 16.

3             It's a two-page document, the first is stamped

4   304 and the next is stamped 280.

5             Both appear to be pictures and tweets on

6   Twitter.

7        A.   Uh-huh.

8        Q.   So the first page of this, it looks like a

9   tweet from someone named Shane Celis.

10            Do you see that?

11       A.   Yup.

12       Q.   Is that someone you worked with?

13       A.   That's not a tweet.

14       Q.   Oh, what is it?

15       A.   It's a post on Mastodon.

16            THE REPORTER:  It's a what?

17            THE WITNESS:  A post on Mastodon.

18   M-A-S-T-O-N -- T-O-D-O-N.

19   BY MR. MECKLEY:

20       Q.   And what's Mastodon?

21       A.   It's a social platform.

22       Q.   Like Twitter?

23       A.   In a way.

24       Q.   Okay.  And at the top of Exhibit 16, the first

25   page, it said -- says "Dmitry Borodaenko boosted."

Page 155

1                              Do you see that?

2          A.    Yes.

3          Q.    So are you on Mastodon?

4          A.    Yes.

5          Q.    And what does that mean when you boost?

6          A.    So that's basically Mastodon terminology for

7    re-tweet.

8          Q.    Got it, okay.

9                Now take a look at the second page of

10   Exhibit 16.

11               This looks like a tweet; correct?

12         A.    Yes.

13         Q.    And this was a tweet by you on your public

14   Twitter account?

15         A.    Yes.

16         Q.    And you wrote "I found this meme on #Mastodon.

17   No further comment #AtThisTime."

18               Correct?

19         A.    Yes.

20         Q.    What does the "#AtThisTime" mean?

21         A.    Hard to explain.  "At this time" is a

22   terminology used a lot when somebody doesn't know for

23   certain -- like basically someone disclaiming any

24   knowledge of the future.  Like I don't know what's going

25   to happen at this time, for example.

Page 156

1    Q.    Is "at this time" meant to be sort of funny?

2    A.    Yeah, maybe, in certain context.

3    Q.    Okay.  And then the meme, it looks like you

4    tweeted this on October 29, 2022; correct?

5    A.    Yeah, the date says that.

6    Q.    Yeah.

7          And that's after the acquisition had occurred;

8    correct?

9    A.    Yes.

10   Q.    And just to describe it for the record,

11   it's -- the meme is a picture with the words "Hello

12   Fellow Software Developers, Please Print Your Last 60

13   Days of Code on Paper." and it's a picture of the actor

14   Steve Buscemi dressed up in sort of youthful attire

15   carrying a skateboard with a backwards hat.

16         Is that a fair description of it?

17   A.    Sounds very accurate.

18   Q.    Okay.  And was this a meme that you found

19   funny?

20   A.    Yes.

21   Q.    And why?

22   A.    Because printing code on paper isn't a

23   practice that's been used in software development for

24   awhile.

25   Q.    And -- and what was the funny aspect of having

Page 157

1    Steve Buscemi in it who's an older person dressed up

2    like a young kid?

3           A.   Well, presumably somebody who wants to look

4    like a software developer but is -- they're using

5    outdated references to things.

6           Q.   Okay.  So did you intend this to sort poke fun

7    at the -- what was happening at Twitter?

8                MS. KATEBI:  Objection.  Form.

9                THE WITNESS:  Poke fun is like not the word

10   I use to describe my intent.

11   BY MR. MECKLEY:

12          Q.   Ridicule?

13          A.   No, definitely not that.

14          Q.   Okay.  Then what was your intent?

15          A.   Make light of, I would say.  I would say at

16   the time it was a very stressful environment at Twitter,

17   and I was looking for ways to lighten the mood of my

18   coworkers and make jokes about things to give them

19   reason to laugh about something.

20          Q.   Okay.  And was this something that you were

21   making light of based on something that had happened,

22   like a request that code be printed on paper?

23          A.   Rather it was about something that was in the

24   news.

25          Q.   What was that?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    A.    There was reports in the news that Twitter
2    employees were asked to print out their code.  And
3    that's what this in reference to, printing out code on
4    paper.
5    Q.    And the news that you're referring to, did it
6    say that Elon Musk had asked engineers to print out
7    their code on paper?
8    A.    I don't recall if it referred specifically to
9    Elon Musk.
10    Q.    Okay.  And did you hear from fellow engineers
11    that they had actually been asked to print out their
12    code on paper?
13    A.    Not at the time.  I didn't hear it
14    specifically from anyone.
15    Q.    Did you learn that at some point?
16    A.    No.  I think it was all just news.  I don't
17    know for sure whether or not that actually happened.
18    Q.    Okay.  Did you -- before Twitter terminated
19    your employment, did you hear that there was a code
20    review exercise where engineers had to bring in their
21    code?
22    A.    I don't recall my reports being asked to do
23    that.
24    Q.    Did you hear that any engineers had to do
25    that?

Page 159

1        A.     I don't recall -- I have heard it, but I can't

2    qualify whether I've heard it in the news or internally

3    as well.

4        Q.    Okay.  Did you write code when you were at

5    Twitter?

6        A.    Not really, no.

7        Q.    Did the engineers that reported to you write

8    code?

9        A.    Yes.

10       Q.    Did any of those engineers have to, you know,

11   turn in any of their code for review after the

12   acquisition?

13       A.    I don't recall, but I don't remember them

14   being requested to print it out.

15       Q.    Okay.

16             (Exhibit 17 was marked for identification.)

17             MS. KATEBI:  Also, as mentioned before the

18   break, if you need to stand up you can do so.

19             THE WITNESS:  Yeah, I'm good so far.  So far

20   it's okay.

21             MS. KATEBI:  Awesome.

22   BY MR. MECKLEY:

23       Q.    All right.  Exhibit 17 is a one-page document

24   stamped 284 that appears to be a tweet from you,

25   Mr. Borodaenko, on November 15 attaching the tweet we

                                                    Page 160

1    just looked at in Exhibit 16 of Mr. Buscemi in the meme

2    about printing code.

3                    Do you see that?

4        A.    Yes.

5        Q.    So the tweet that you posted was November 15,

6    the date of your termination; correct?

7        A.    Yes.

8        Q.    And you wrote "I carefully reviewed my every

9    tweet since the Twitter acquisition close on October 28

10   and afaict, this is the only example of my 'recent

11   behavior' that I can possibly qualify as shitposting.

12   I have questions."

13                   That's something you wrote?

14       A.    Yes.

15       Q.    And you tweeted that out to the public;

16   correct?

17       A.    Yes.

18       Q.    All right.  So, is that true, that on the date

19   you were terminated you went and reviewed every tweet

20   since the acquisition?

21       A.    Yes.

22       Q.    And it is true that the Steve Buscemi meme was

23   the only example of recent behavior you felt could

24   possibly qualify as shit posting?

25       A.    Yes.

Page 161

1    BY MR. MECKLEY:

2        Q.   Based on your definition of shitposting, why

3    wouldn't the Twitter bird sitting in the room on fire

4    saying "This is fine" be shitposting?

5             MS. KATEBI:  Objection.  Form.

6             THE WITNESS:  Like why would or would not?

7    BY MR. MECKLEY:

8        Q.   Why wouldn't it be shitposting?

9        A.   I don't know.

10       Q.   Would you agree that the -- the meme with the

11   bird on -- and the room on fire is shitposting?

12            MS. KATEBI:  Objection.  Form.

13            THE WITNESS:  In a sense of posting random

14   things that some people might find funny, sure.

15   BY MR. MECKLEY:

16       Q.   Did you ever consider that some people might

17   not find the Steve Buscemi meme funny?

18            MS. KATEBI:  Objection.  Form.  Calls for

19   speculation.

20            THE WITNESS:  I don't know.

21   BY MR. MECKLEY:

22       Q.   Did you ever consider that the Twitter bird in

23   the room on fire saying "This is fine" would not be

24   considered funny by some people?

25            MS. KATEBI:  Objection.  Form.  Calls for

Page 164

1    speculation.

2              THE WITNESS:  At this point, I have to ask

3    what do you mean, not funny?

4    BY MR. MECKLEY:

5         Q.    The opposite of funny.

6         A.    The opposite or the negative of?

7         Q.    Right, not funny.

8         A.    As in not a reason to laugh, maybe.

9         Q.    Why did you believe it was appropriate to

10   tweet out on the day of your termination the fact that

11   you had gone back and reviewed these tweets and found

12   this one meme as an example of shitposting?

13        A.    As far as I remember, and that's, once again,

14   I can't hundred percent recall every single motivation

15   for all I did, but as far as I remember, I was curious

16   to check whether I unknowingly posted something that

17   could violate Twitter policies.

18        Q.    But why did you do a tweet that was public

19   about that?

20        A.    I don't understand the question.  Why not?

21        Q.    Why did you publicly tweet about having

22   reviewed your, you know, former posts, et cetera?  Why

23   did you do that?

24        A.    Because I did review my post.

25        Q.    Right.

                                           Page 165

1    But people don't have to tweet everything they

2  do.  I'm just wondering:  Why did you find it

3  appropriate to tweet about essentially, you know, this

4  question of why you were terminated?

5       A.   Maybe -- I don't know.  Once again, you're

6  asking me to speculate.  I don't remember precise

7  motivations.  It was many years ago.  If I were to

8  speculate, I felt it was important to me at the time.

9       Q.   Okay.  And I take it since you don't remember

10  your motivations, you don't remember what questions you

11  had where you say "I have questions."

12       A.   No, that was a general statement.

13       Q.   Okay.  You weren't referring to specific

14  questions?

15       A.   No.

16       Q.   Okay.  And in your tweet you say "This is the

17  only example of my recent behavior that could possibly

18  qualify as shitposting."

19       Was it your understanding that other employees

20  of Twitter were terminated for shitposting?

21       MS. KATEBI:  Objection to the extent it calls

22  for any speculation.

23       THE WITNESS:  It wasn't my understanding.  It

24  was something that was discussed in public at the time.

25  Like news report or whatever.

Page 166

1    BY MR. MECKLEY:

2        Q.   Okay.  And were you questioning whether you

3    had been fired for shitposting?

4        A.   I was wondering whether that was the case and

5    that's what motivated me to review my recent tweets.

6            (Exhibit 18 was marked for identification.)

7    BY MR. MECKLEY:

8        Q.   Okay.  Exhibit 18 is a one-page document

9    stamped 281.  It appears to be a tweet from Twitter,

10   Mr. Borodaenko.

11           What is this?

12       A.   It looks like a re-tweet of somebody else's

13   tweet.

14       Q.   I see.

15           And this was a tweet from some person under

16   the name Empty Wheel that you re-tweeted?

17       A.   Yes.

18       Q.   And this was a tweet that said "Remember that

19   the same rules about virality and narcissists that work

20   with Trump work with Elmo."

21           Was it your understanding that Elmo referred

22   to Elon Musk?

23       A.   Yes.

24       Q.   And why were you re-tweeting this on

25   November 4th?

Page 167

```
1    social water cooler channel from November 11, 2022; is
2    that correct?
3         A.    Yes.
4         Q.    And you wrote "I thought this meme originated
5    here?"  And you put a link to a Twitter post.
6               Do you see this?
7         A.    Yeah.
8         Q.    And then this is the Twitter bird in the room
9    on fire saying "This is fine"; is that right?
10        A.    Sounds right.
11        Q.    Okay.  Exhibit 20 is one-page document stamped
12   297.  It appears to be series of Signal messages between
13   you and John Yeh; is that accurate?
14        A.    Yes.
15        Q.    Okay.  It looks like you and John are
16   discussing the meme of the Blue Bird and the room on
17   fire; correct?
18        A.    Yes.
19        Q.    All right.  And you flag that meme and said
20   "Can't have been this one"; correct?
21        A.    So John flagged that meme and I responded.  So
22   once again, this is a reply.  That's why it's quoted.
23        Q.    All right.  Got it.  Okay.
24              And then John told you "I'm trying to find a
25   pattern in the water cooler channel.  Most of the really
```

Page 169

1    outspoken ones are gone and some that reposted tweets

2    are gone.  But the latter seemed kind of random."

3            Do you see that?

4    A.    Yes.

5    Q.    Did you understand what John was referring to

6    are gone meaning employees who had been terminated?

7    A.    I think, yes.

8    Q.    Okay.  And I think this is actually a

9    continuation of what we previously marked as Exhibit 10.

10           Are you able to find that, please?

11    A.    Yeah, I think you're right.  That would be

12    these two.  Okay.

13    Q.    So looks like this is all part of the same

14    Signal messages?

15    A.    That's right.

16    Q.    Okay.  Did John ever communicate to you if he

17    thought you were one of the outspoken ones or the

18    reposted tweet ones?

19    A.    I doubt it because of one of the messages you

20    see here, "I see some folks that were more critical but

21    are still here."  So I assume that means that it's some

22    people who were more outspoken who got terminated.

23    Q.    Okay.  And did you put the crying emoji face

24    after his tweet?

25    A.    Wait, what?

Page 170

1    set up at Twitter.  But in generally, yes, it allows you

2    to do at that.

3         Q.   Okay.  All right.

4              (Exhibit 27 was marked for identification.)

5    BY MR. MECKLEY:

6         Q.   All right.  Showing you what's been marked as

7    Exhibit 25.  This is a document stamped BOR417.

8              It appears to be from a spreadsheet with a

9    number of columns regarding the worker Dmitry

10   Borodaenko.

11        A.   Yup.

12        Q.   Below your name, Mr. Borodaenko, do you see a

13   number there, 026712?

14        A.   Yeah, I see that number.

15        Q.   All right.  Was that your Twitter employee

16   number?

17        A.   I have no idea.

18        Q.   All right.  And I'll represent to you this is

19   from the Twitter Workday system for you.

20        A.   Uh-huh.

21        Q.   Some of the information in here that's input,

22   let's just see if this is accurate.

23              So under religion, would you have reported

24   that you were either atheist, agnostic?

25        A.   I don't remember if I reported anything.

Page  184

1      Q.   All right.

2      A.   Some of the data here looks accurate, but

3  I don't remember ever recall reporting my religion.

4      Q.   Under disability it says, "I do not identify

5  as a disabled/person with a disability."  Do you see

6  that?

7      A.   I see that.

8      Q.   Isn't it true that that's information you

9  reported in Workday?

10     A.   I doubt it.  Maybe it's a default value that

11  I just didn't explicitly fill in.  Maybe that forms that

12  I filled at onboarding didn't propagate to Workday and

13  got left somewhere in Google forms or whatever.  I don't

14  know.

15     Q.   Okay.  So the information that's in Workday

16  that reflects you as not identifying as a disabled

17  person with a disability, you're not sure how that got

18  there?

19     A.   I'm not sure, no.

20     Q.   Okay.

21     A.   Maybe it was a form like -- I don't want to

22  speculate.

23     Q.   Okay.

24     A.   I don't know.

25     Q.   But some of the other information in here,

Page 185

1   re-org that was in the process, but I don't have

2   specific memory of that, no.

3        Q.   As a part of a re-org prior to your

4   termination, weren't you reporting to Ashwin Poojary,

5   P-O-O-J-A-R-Y?

6        A.   I think at the time the org structure too we

7   used internally wasn't available to employees.  So it

8   wasn't very clear, the reporting structure.  So maybe,

9   but I don't recall.

10       Q.   All right.

11       A.   Yeah.

12       Q.   Did your manager Hamid make the decision to

13  terminate your employment?

14       A.   I don't know.

15       Q.   Did Hamid ever communicate to you that he had

16  made the decision to terminate your employment?

17       A.   No.

18       Q.   Did Ashwin Poojary make the decision to

19  terminate your employment?

20       A.   I don't know.

21       Q.   Did you ever tell Ashwin Poojary had you

22  cancer?

23       A.   I don't remember.

24       Q.   Did Ashwin Poojary make the decision to fire

25  you?

Page 191

```
 1                    THE WITNESS:  I cannot speculate about their
 2       reasons without knowing what they knew and what they --
 3       how they made that decision.
 4       BY MR. MECKLEY:
 5            Q.   Okay.
 6            A.   I can't speculate about that.
 7            Q.   So do you think the people who made the
 8       decision to fire you could fire you based on a
 9       disability that they were unaware of?
10                    MS. KATEBI:  Objection.  Form.
11                    THE WITNESS:  I don't know.
12       BY MR. MECKLEY:
13            Q.   During your employment with Twitter, did
14       anyone ever say anything to you that you believed was
15       negative or derogatory regarding people who had cancer?
16            A.   I do not recall any such occurrence.
17            Q.   And during your employment with Twitter, did
18       anyone ever say anything to you that you believed was
19       negative or derogatory regarding persons who had
20       disabilities?
21            A.   I don't recall it being directed at me.
22            Q.   When you say "it," what are you referring to?
23            A.   It, statements that could be derogatory
24       towards people with disabilities.
25            Q.   Were there any statements that you considered
```

Page 194

1    derogatory towards people with disabilities that were

2    made when you were employed at Twitter?

3              MS. KATEBI:  Objection.  Form.

4              THE WITNESS:  I don't recall.

5    BY MR. MECKLEY:

6         Q.   Okay.

7         A.   There may have been, especially if you really

8    stretch the definition of derogatory.

9         Q.   Well, when you say "there may have been" and

10   "stretching derogatory," is there something you're

11   referring to particularly?

12        A.   I don't know.  For example, if somebody uses a

13   word "limp."

14        Q.   Limp?

15        A.   Yeah.

16        Q.   Uh-huh.

17        A.   Like that could be, you know, accuse or it

18   could be derogatory depending on the context.  And

19   somebody may have used something like that in my

20   earshot.  I don't recall it, but it could happen.

21        Q.   So there's nothing that you recall was said

22   when you were at Twitter that was derogatory about

23   people with disabilities; is that fair?

24              MS. KATEBI:  Objection.  Form.

25              THE WITNESS:  Let me think.  I remember there

                                        Page 195

1          Q.   So after there was this announcement by

2     Mr. Musk, it didn't change the fact that you continued

3     to work at home; correct?

4          A.   It did not.

5               MR. MECKLEY:  Ready to keep going or do you

6     need a break?

7               THE WITNESS:  I think it would be nice just to

8     walk off my legs once more.

9               MR. MECKLEY:  Okay.

10              THE VIDEOGRAPHER:  Off the record?

11              MR. MECKLEY:  Yup.

12              THE VIDEOGRAPHER:  This marks the end of Media

13    Number 7 in the deposition of Dmitry Borodaenko.  The

14    time is 4:24 p.m.  We're off the record.

15              (Recess taken.)

16              THE VIDEOGRAPHER:  This marks the beginning of

17    Media Number 8 in the deposition of Dmitry Borodaenko.

18    The time is 4:39 p.m.  We are on the record.

19              (Exhibit 39 was marked for identification.)

20    BY MR. MECKLEY:

21         Q.   I'm showing you --

22         A.   Many pages.

23         Q.   I'm showing you Exhibit 39.  It's a document

24    stamped 1 through 54.  It's identified as the Twitter

25    Playbook.

                                        Page 217

1       A.    Uh-huh.

2       Q.    I'm not going to ask you about all of this.

3   Probably just maybe four pages.  So if you want to look

4   at it to familiarize yourself, you're welcome to you,

5   but I'm --

6       A.    Let's dive into it.  I really hope I don't

7   have to reread all of that.

8       Q.    You won't.

9           Okay.  So first off, do you understand that

10  the Playbook was the name of Twitter's employee handbook

11  essentially?

12      A.    Yes.

13      Q.    Okay.  And during your employment with Twitter

14  the Playbook applied to you as an employee; is that

15  correct?

16      A.    Yes.

17      Q.    And you understood that as an employee of

18  Twitter, you were required to comply with the policies

19  in the Playbook; is that right?

20      A.    Correct.

21      Q.    Okay.

22           If you could take a look at the page that's

23  stamped 2 at the bottom.

24      A.    Stamped 2, okay.

25      Q.    At the bottom of that page, it refers to our

Page 218

1    open door approach?

2         A.   Uh-huh.  Yes.

3         Q.   And it provides an email address for employee

4    relations and a way to contact an HRBP, human resources

5    business partner, to raise concerns.

6              Did you ever contact employee relations or

7    human resources with any concerns you had when you were

8    an employee at Twitter?

9         A.   Not that I recall.

10        Q.   All right.  Can you take a look at the next

11   page.

12        A.   Okay.

13        Q.   At the very -- at the very top, it says "The

14   ethics helpline is also available to hear employee

15   concerns."

16             Do you see that?

17        A.   Yes.

18        Q.   During your employment with Twitter, did you

19   ever contact the ethics helpline with any concerns you

20   had?

21        A.   Not that I recall.

22        Q.   All right.  Further down that page, exhibit --

23   page 3 of Exhibit 39, it refers to Twitter recognizing

24   protected characteristics throughout the United States.

25             Do you see that?

Page 219

1    A.   Yes.

2    Q.   And if you go to the next page, one of those

3    is disability, physical and mental.

4         Do you see that?

5    A.   Yes.

6    Q.   And you understood that it was Twitter's

7    policy to treat disability as a protected

8    characteristic; isn't that right?

9    A.   Yes.

10   Q.   And did you understand that Twitter's policy

11   was to prohibit discrimination based on disability?

12   A.   Yes.

13   Q.   Did anyone from Twitter tell you that was not

14   its policy?

15   A.   I do not recall anybody saying that.

16   Q.   All right.  Further down on the page, it says

17   "Twitter will provide reasonable accommodation job

18   modifications for each of the following circumstances

19   when the need is identified and reasonable accommodation

20   is possible."

21        Do you see that?

22   A.   Yes.

23   Q.   And one of those circumstances is based on a

24   disability?

25   A.   Yes.

Page  220

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1     Q.    Did you understand it was Twitter's policy to

2     provide reasonable accommodation for employees with

3     disabilities?

4          A.    At the time this Playbook was published, yes.

5          Q.    And at the time it was in effect; correct?

6               MS. KATEBI:   Objection.   Form.

7               THE WITNESS:   Are you asking when it was in

8     effect?

9     BY MR. MECKLEY:

10         Q.    No.   I'm saying it was your understanding that

11    during the time that this Playbook was in effect, you

12    understood Twitter's policy was to provide reasonable

13    accommodation to employees with disabilities; is that

14    true?

15              MS. KATEBI:   Objection.   Form.   Calls for

16    speculation.

17              THE WITNESS:   I assume so.

18    BY MR. MECKLEY:

19         Q.    All right.   If you could take a look at page 5

20    of Exhibit 39.

21              At the bottom, the title is "Modifications Due

22    to Disability."   And it states, quote, "Twitter will

23    make reasonable accommodations for known physical or

24    medical conditions of an otherwise qualified applicant

25    or employee with a disability consistent with applicable

Page  221

1    law."
2         Do you see that?
3    A.   I see that.
4    Q.   Did anyone from Twitter tell that you the
5    language I just quoted to you was not Twitter's policy?
6    A.   I don't recall hearing that at the time of my
7    employment at Twitter.
8    Q.   All right.  And please look at the next page,
9    Number 6.  It says at the top, "If you need a
10   modification in order to perform essentially job
11   functions, please email accommodation@twitter.com or
12   contact your HRBP.  Someone will work with you to
13   determine what, if any, modifications may be reasonable
14   or will propose alternatives."
15        Do you see that?
16   A.   I see that.
17   Q.   Did you ever email the
18   accommodation@twitter.com address to seek any type of
19   modification of job duties?
20   A.   No.
21   Q.   And did you ever contact a human resources
22   business partner to request any accommodation?
23   A.   No.
24   Q.   You can hold on to that.  There will be some
25   more questions, but I want to show you another document

Page 222

1    right now.

2              (Exhibit 40 was marked for identification.)

3    BY MR. MECKLEY:

4        Q.   Exhibit 40 is a one-page document stamped

5    BOR418.  And it says -- one of the columns is "Workday

6    Account."

7        A.   Sure.

8        Q.   The other column says "Entry Moment,

9    October 21, 2021."

10       A.   Okay.

11       Q.   And you'll see that there are modifications

12   listed here or new instances, et cetera.  Next to the

13   one for disability, it states, "I do not identify as

14   disabled/person with a disability."

15             Do you see that?

16       A.   Yup.

17       Q.   So you started your employment with Twitter in

18   June of 2021.

19             Isn't it true that you made modifications to

20   your Workday status in October of 2021?

21       A.   That doesn't look like modification because

22   there is an old value here, just new instance.  So looks

23   like some sort of new form.

24       Q.   Do you know what modification you were making

25   in October of 2021?

1        A.   No, I don't recall.

2        Q.   Okay.  And, again, had you saved any of your

3   information that was listed in Workday at the time your

4   employment terminated?

5        A.   Probably some.

6        Q.   Have you given those to your attorneys?

7        A.   Yes.

8        Q.   Okay.  Do you have any information regarding

9   what values were in the Workday system for you at

10  Twitter?

11       A.   I don't think anything I saved was related to

12  the data in this form.

13       Q.   All right.  If you could go back to

14  Exhibit 39, which is the Twitter Playbook.

15       A.   Sure.

16       Q.   And take a look at page 6.

17       A.   Looking at it.

18       Q.   There's a heading in the middle of the page

19  that talks about respect, demands, no abusive conduct or

20  harassment.  And below that there's a definition of

21  abusive conduct that means cruel mistreatment or

22  significant inappropriate unwelcome or unjustified acts.

23            Further below it states, quote, "Examples of

24  behaviors that can violate this policy are," and one of

25  the things listed is "mocking or ridiculing."

                                              Page  224

1              Do you see that?

2        A.   Yeah, found it.

3        Q.   And you understood that this policy applied to

4   you when you were employed; correct?

5        A.   Yes.

6        Q.   All right.  And wasn't your posting of the

7   meme of Steve Buscemi mocking of the requirement to

8   produce written pages of code?

9        A.   Hold on a second.

10            This document says about conduct towards

11   people with protected characteristics; right?

12            Unlawful discriminatory or harassment because

13   of persons -- so this is talking about persons; right?

14        Q.   Where does it say that?

15        A.   Immediately above the paragraph you quoted.

16        Q.   Can you show it to me or point it out?

17        A.   Yeah, this bit.

18        Q.   Uh-huh.

19        A.    It says "Unlawful discriminatory harassment

20   because of a person's protected characteristics."

21        Q.   Right.

22            So you see, though, Mr. Borodaenko, above that

23   where it says "Abusive conduct means cruel mistreatment

24   or significant inappropriate, unwelcomed or justified

25   acts including," and then there are separate bullet

Page 225

```
 1    BY MR. MECKLEY:
 2         Q.   But you understood at that time, in November
 3    of 2022, Mr. Musk was, you know, the owner of Twitter
 4    and highest level person in the company; right?
 5         A.   Yes.
 6         Q.   And he was making decisions about large
 7    numbers of employees and their employment; correct?
 8              MS. KATEBI:  Objection.  Calls for
 9    speculation.
10              THE WITNESS:  I did mention I did not have
11    direct interactions with Elon Musk at the time.
12              MR. MECKLEY:  Can you read my question back,
13    please.
14              (Record read.)
15              THE WITNESS:  Yes.
16    BY MR. MECKLEY:
17         Q.   All right.
18              Can you look at page 23 of Exhibit 39.
19         A.   Okay.  Looking at it.
20         Q.   This page refers to flexible work.  It states,
21    "Twitter offers the possibility of flexible work where
22    feasible.  Flexible work arrangements are a privilege,
23    not a right, and must be evaluated based on business and
24    team needs."
25              Lower in the paragraph, "That is why employees
```

Page 228

1      and managers must get approval from the flexible work

2      program team for all of these arrangements."

3                  Do you see that?

4          A.    Yup.

5          Q.    Did you ever get approval from the flexible

6      work program team to work fully remotely at Twitter?

7          A.    Not that I recall.

8          Q.    You were not laid off on November 4th in that

9      reduction force; correct?

10         A.    Yes.

11         Q.    And after that, you were not laid off by

12     Twitter; correct?

13                MS. KATEBI:  Objection --

14                THE WITNESS:  Incorrect.

15                MS. KATEBI:  -- to the extent it calls for a

16     legal conclusion.

17     BY MR. MECKLEY:

18         Q.    Can you tell me all the reasons why you

19     believe you were laid off, as opposed to being fired, by

20     Twitter on November 15?

21                MS. KATEBI:  Objection.  Form.

22                THE WITNESS:  What do you mean, "all the

23     reasons"?  All the possible reasons or the actual

24     reasons or the reasons I assume are most likely?

25     / / /

Page 229

1    timing of my termination aligns a lot more with

2    return-to-office policy change than it does with

3    anything else I did before or after acquisition.

4         Q.   Do you know whether Hamid, your manager,

5    shared with anyone else at Twitter your statement that

6    you weren't going to come to work in the office?

7         A.   I don't know.

8         Q.   And do you know whether the people who made

9    the decision to fire you had any awareness that you told

10   your manager you weren't going to come to work at the

11   office?

12        A.   I don't know.

13        Q.   All right.  Any other reasons why you believe

14   you were not fired but actually laid off on November 15?

15        A.   Nothing comes to mind right now.

16        Q.   All right.  After your employment with Twitter

17   ended, when did you first start looking for other

18   employment?

19        A.   On the next day.

20        Q.   That would be November 16?

21        A.   Yes.

22        Q.   What did you do on November 16?

23        A.   I started looking for job openings and sending

24   out my resume.

25        Q.   So on November 16 you sent your resume to

Page 231

```
 1                      REPORTER'S CERTIFICATE

 2

 3           I, JENNIFER J. MATTEO, hereby certify that the

 4     witness in the foregoing deposition was by me sworn to tell

 5     the truth, the whole truth, and nothing but the truth in the

 6     within-entitled cause;

 7           That said deposition was taken in shorthand by me,

 8     a disinterested person, at the time and place therein stated,

 9     and that the testimony of the said witness was thereafter

10     reduced to typewriting, by computer, under my direction and

11     supervision;

12           That before completion of the deposition, review of

13     the transcript [ ] was [X ] was not requested.  If requested,

14     any changes made by the deponent (and provided to the

15     reporter) during the period allowed are appended hereto.

16           I further certify that I am not of counsel or

17     attorney for either or any of the parties to the said

18     deposition, nor in any way interested in the event of this

19     cause, and that I am not related to any of the parties

20     thereto.

21     Dated:  July 14, 2025

22

23           Jennifer Matteo

24           JENNIFER J. MATTEO, CSR, RPR, CRR

25               CSR License No. 12139

                                                     Page 261
```